JOSEPHINE BORCHARDT
GENEVIEVE BORCHARDT
FRANCESCA BORCHARDT
GABRIELA BORCHARDT
200 S. BARRINGTON AVE #491661
LA, CA 90049
IN PRO PERS

FILED
CLERK, U.S. DISTRICT COURT
MAR 23 2021
CENTRAL DISTRICT OF CALIFORNIA
BY [signature] DEPUTY

**UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

Case No.: 2:21cv02540-FMO-RAOx

| | |
|---|---|
| JOANNA ARDALAN<br>Plaintiff,<br>vs.<br><br>GABRIELA BORCHARDT;<br>JOSEPHINE BORCHARDT;<br>FRANCESCA BORCHARDT;<br>GENEVIEVE BORCHARDT<br>Defendants | Superior Court of the State of California<br>Case No.: 20STCV20169<br><br>**NOTICE OF REMOVAL TO FEDERAL COURT** |
| JOSEPHINE BORCHARDT;<br>GENEVIEVE BORCHARDT;<br>FRANCESCA BORCHARDT<br>Cross-Plaintiff<br>vs.<br>JOANNA ARDALAN; BACH ARDALAN<br>Cross-Defendant | |

**NOTICE OF REMOVAL**

Please take notice that Defendants, Josephine Borchardt, Francesca Borchardt, Genevieve Borchardt and Gabriela Borchardt, hereby removes the above-captioned action (Exhibit 1) to this Court from the Superior Court of the State of California, County of Los Angeles.

As set forth below, defendants have complied with the statutory requirements for removal under 28 U.S.C. § 1441(c)(1) and 28 U.S.C. § 1446(b)(3), and this Court has federal jurisdiction over this action pursuant to 28 U.S.C § 1331 and 42 U.S.C. § 1983.

The defendants have been deprived and violated by State Court of their right to due process under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment is crucial to the protection of the defendants as litigants in the matter.

**FEDERAL QUESTION JUSTIFICATION FOR REMOVAL PURSUANT TO 14TH AMENDMENT**

1) On March 10th, 2021, defendants were called to court, in which defendants asserted abuse of power by opposing counsel in the form of personal attacks and libel from opposing counsel. The state judge refused to hear the defendants as the matter had not been put into a motion before him, thus the complaints made by the defendants in their attempt to testify in court of opposing counsel's behavior, were not legitimately heard or acknowledged.

2) On March 15th, 2021, an emergency hearing was heard for a Motion for Protective Order brought by the defendants regarding opposing counsel's history of abuse upon the defendants and to protect aspects of requested discovery which were vital to keep confidential due to opposing counsel's history of behavior that was unlawful against the defendants.

3) Opposing counsel behaves unlawfully without regard to his legal license and does so as he is romantically involved with his client and has a personal stake in the case due to his active role involving the events prior to his representation that led to this court matter.

4) Opposing counsel often personally attacks and blatantly lies and misrepresents information to the courts in a malice attempt to harm the reputation of defendants and to mislead the court of the facts of the case, which is why the defendants officially brought a motion to be heard in court that day.

5) The defendants have attempted to make it known to the court that opposing counsel was actively involved while the defendants suffered the breaches among other damages therefore, this is motive for opposing counsel to misrepresent facts and intentionally mislead the court, but because of the bias against pro se litigants by the state judge, the state judge ignores the necessary facts of the case to make a fair ruling.

6) On March 15th, 2021, opposing counsel in the state matter gave the state judge's clerk a motion not filed in court, and not given to defendants prior to the day's proceedings. The clerk confirmed with opposing counsel that the document had not been filed electronically per local rules of the court and not served upon the defendants via email per stipulated order prior to the following proceeding. The state judge in the case accepted the documents given to him by opposing counsel which were documents not filed in court and not served onto the defendants, contrary to proper attorney and judicial practice and procedure. The judge then used those documents in his consideration of that day's decision and made a ruling based on those documents, without defendants ever seeing the documents. This is clearly a violation of ABA's Rule 2.9: Ex Parte Communications.

7) The defendants' motion heard on March 15th, 2021, was brought in good faith under legitimate circumstances and was brought as a due process action to be heard since the judge in previous hearings had refused to acknowledge or hear testimony of abuse exhibited by opposing counsel onto the defendants as the judge stated he had not received anything in writing regarding the assertions defendants made. Therefore, the defendants brought the motion in writing of opposing counsel's behavior to the judge's attention.

8) The judge then without justification, sanctioned defendants $500 collectively per the request of opposing counsel.

9)      The state judge has made affirmative statements against the defendants in support of the plaintiff's unverified allegations, and the judge has done so without a trial and without due process upon the defendants. The defendants have not been found liable or guilty or responsible for anything set forth by the plaintiff's unverified claims, but yet because the defendants are pro se litigants, the judge has made statements and assumptions, and confirmed the plaintiff's position on damages, that are biased against the defendants' position in the case.

10)     The judge's support of opposing counsel is biased as he completely ignores the defendants supported claims, their evidence, declarations, and testimony clearly showing abuse and lies. The judge does not allow the defendants to even state their position of the abuse from opposing counsel and plaintiff which is in the form of misrepresentation to the court, misleading the court, blatant lies, and a history of using fraudulent personnel with no regard to their professional licenses.

11)     The judge has rejected the opportunity for the defendants to even voice the bias and unconstitutionality of the proceedings as well as abuse from opposing counsel, taking away the defendants' right to due process equally among litigants in a civil action.

12)     The judge further allows this miscarriage of justice to be performed in his court, by saying, "counsel is counsel" and that we, the defendants, must act "ladylike", when the defendants were attempting to assert their rights of due

process and alerting and informing the court of misrepresentation and misleading and lies from opposing counsel, that could easily be proven. Defendants were ignored and not properly heard, instead continued to be told to "act ladylike", which has allowed for complete immunity for counsel's misrepresentation of facts and intentional malice and lies to the court to occur.

13) The defendants initially had faith with the court to be unbiased against their sex and pro se status, until those rights were deprived on March 15th, 2021, which is within 30 days of the removal action per 28 U.S.C. § 1446(b)(3).

14) The judge made the distinction that "counsel is counsel", and that the defendants are not pro se, but "ladies", and therefore must act as such. This is in direct violation of the defendants' right to due process as being treated as equal litigants in a civil action.

15) Defendants are being silenced by the state judge in that the state judge then threatens the defendants to dismiss their cross-complaint if the defendants continue to exercise their judicial due process rights, therefore allowing opposing counsel to outright lie, misrepresent facts, mislead the court, and then continue to abuse the defendants as if counsel has immunity to his reckless and meritless behavior.

16) Furthermore, the obstruction of due process against the defendants in the state court is that the defendants have demanded a jury trial in motions and

verbally to the court, and yet a jury trial is being highly discouraged by the state judge.

17)    On March 15th, 2021, the state judge not only verbally asserted his discouragement for a jury trial, but then the judge ordered mediation at a point of which the defendants had yet to have the court officially recognize the damages they asserted in their cross-complaint, and when defendants voiced their choice not to have mediation at this time due to their damages not yet being recognized, instead the defendants' rights were ignored.

18)    When the defendants attempted to assert their claims of damages to the state judge, as opposing counsel had stated their claims to the judge which were not only accepted by the state judge but also confirmed in the affirmative orally by the state judge, the defendants were verbally told by the state judge that their claims are for trial, but that the plaintiff's claims are for now in mediation.

19)    The defendants' right to fair and due process is being impeded and obstructed in the court, due to opposing counsel's misrepresentation and fabrication of irrelevant non-related occurrences, for the purpose of confusing and convoluting the court and also to maliciously harm the defendants; and ALSO due the court and judge's bias against pro se litigants, in the form of unequal treatment upon the defendants such as the lack of equal process and unequal protection in

civil action for all litigants and the acceptance of documents not filed or served onto defendants, and accepting and allowing the lies and misrepresentation from opposing counsel to continue to occur despite defendants attempts and pleas to inform the court of the malicious and unlawful behavior. This is causing an obstruction of justice and the true facts of the case to not be brought to light, and for due process and equal protection among litigants to not be fairly distributed in the state court.

20) Therefore, the above matter in the state court will result in a biased, one sided plaintiff's proceeding, with the other side (the defendants) restricted from delivering the true facts of the case and also will result in the collective four defendants continued to be deprived of their rights under the U.S. Constitution and Civil Rights.

Dated: March 23, 2021

By:

Josephine Borchardt, In Pro Per

Genevieve Borchardt, In Pro Per

Francesca Borchardt, In Pro Per

Gabriela Borchardt, In Pro Per

VERIFICATION

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a party to this action. I declare under penalty of perjury under the laws of the State of California and The United States of America that the foregoing answers are true and correct.

Executed on March 23rd, 2021 at Los Angeles, California.

//signed//

Josephine Borchardt, In Pro Per

//signed//

Genevieve Borchardt, In Pro Per

//signed//

Francesca Borchardt, In Pro Per

//signed//

Gabriela Borchardt, In Pro Per

PROOF OF SERVICE BY ELECTRONIC MAIL

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a party to this action, and I confirm the foregoing document was sent via email on March 23rd, 2021 to the following address:

David Quinto

davidwquinto@gmail.com

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 23rd, 2021 at Los Angeles, California.

//signed//

Josephine Borchardt, In Pro Per

# EXHIBIT 1

20STCV20169

SUM-100

# AMENDED SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
JOSEPHINE BORCHARDT, an individual; GENEVIEVE BORCHARDT, an individual; FRANCESCA BORCHARDT, an individual; GABRIELA BORCHARDT, an individual; and DOES 1-10, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
JOANNA ARDALAN, an individual,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡**AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Los Angeles County Superior Court
Stanley Mosk Courthouse
111 North Hill Street
Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
20STCV20169

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David W. Quinto SBN 106232 (213) 604-1777

3007 Franklin Canyon Drive Beverly Hills, CA 90210

DATE: 06/02/2020 Sherri R. Carter Executive Officer / Clerk of Court Clerk, by J. Lara, Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [X] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*:
3. [ ] on behalf of *(specify)*:
   under: [ ] CCP 416.10 (corporation) [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation) [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
   [ ] other *(specify)*:
4. [ ] by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

American LegalNet, Inc.
www.FormsWorkflow.com

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

County of Los Angeles on 05/28/2020 10:03 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez, Deputy Clerk 20STCV20169

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
JOSEPHINE BORCHARDT, an individual; GENEVIEVE BORCHARDT, an individual; FRANCESCA BORCHARDT, an individual; GABRIELA BORCAHRDT, an individual; and DOES 1-10, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
JOANNA ARDALAN, an individual,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡**AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (*www.sucorte.ca.gov*), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (*www.lawhelpcalifornia.org*), en el Centro de Ayuda de las Cortes de California, (*www.sucorte.ca.gov*) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Los Angeles County Superior Court
Stanley Mosk Courthouse
111 North Hill Street
Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*
20STCV20169

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David W. Quinto SBN 106232 (213) 604-1777
3007 Franklin Canyon Drive Beverly Hills, CA 90210

Sherri R. Carter Executive Officer / Clerk of Court

DATE: *(Fecha)* 05/28/2020 Clerk, by *(Secretario)* R. Perez, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

David Quinto (SBN 106232)
davidwquinto@gmail.com
3007 Franklin Canyon Drive
Beverly Hills, CA 90210
Telephone: (213) 604-1777

Attorney for Plaintiff
Joanna Ardalan

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

JOANNA ARDALAN, an individual,

Plaintiff,

v.

JOSEPHINE BORCHARDT, an individual; GENEVIEVE BORCHARDT, an individual; FRANCESCA BORCHARDT, an individual; GABRIELA BORCHARDT, an individual; and DOES 1-10, inclusive,

Defendants.

Case No. 20STCV20169

**COMPLAINT FOR:**

1) **BREACH OF CONTRACT**
2) **DECLARATORY RELIEF**
3) **NEGLIGENCE**
4) **UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

Joanna Ardalan ("Ardalan" or "Plaintiff"), by and through her attorney of record complains against Josephine Borchardt, Genevieve Borchardt, Francesca Borchardt, and Gabriela Borchardt (collectively the "Borchardts") and Does 1 through 10 (collectively, "Defendants") as follows:

**THE PARTIES**

1. Plaintiff is an individual residing in Los Angeles County, California.

2. Josephine Borchardt is an individual who resides in Los Angeles County, California.

3. Genevieve Borchardt is an individual who resides in Los Angeles County, California.

4. Francesca Borchardt is an individual who resides in Los Angeles County, California.

5. Gabriela Borchardt is an individual who resides in Los Angeles County, California.

6. Plaintiff is unaware of the true names and capacities of the defendants sued herein as DOES 1-10, inclusive, and therefore sues those defendants by such fictitious names. Plaintiff will amend the complaint to allege their true names and capacities when ascertained.

**VENUE AND JURISDICTION**

7. Jurisdiction and venue in Los Angeles County, California is proper. The Borchardts are individuals residing in Los Angeles County, California. In addition, the property at issue is in Los Angeles, California and the lease agreement at issue was entered into in Los Angeles County, California.

8. This is an action for damages in excess of $25,000, exclusive of interest and court costs.

///

///

///

## FACTUAL BACKGROUND

### *The Beginning of Defendants' Tenancy*

9. On or around October 19, 2019, Defendants Josephine Borchardt and Genevieve Borchardt, together with their teenage sister, Defendant Francesca Borchardt (collectively the "Borchardt Sisters") toured Ardalan's rental house located at 1628 N. Beverly Glen Drive, Los Angeles, California. Their mother, Gabriela Borchardt, was not present. At the time, the adjacent vacant lot had large bulldozers and other machinery present, making it apparent that construction was in process. Ardalan told the Borchardt Sisters that because of the construction, her asking price to lease the house was less than what she believed to be the market price, especially in light of the recent improvements she had made to the property. Those included taking out carpet, adding hard surface floors, and re-painting the interior.

10. After the tour, Josephine Borchardt and Genevieve Borchardt (the "Borchardt Lessees"), as the prospective lessees, gave Ardalan their application and accompanying financial documents. Ardalan asked a realtor she trusted, Stewart Fournier, to review the paperwork to determine whether it was satisfactory. The Borchardt Lessees' finances caused him concern because the Borchardt Lessees were unable to demonstrate the income they claimed on their application. The Borchardt Lessees claimed there really was no issue with their income and that they had afforded a similarly priced property during their preceding tenancy. Ultimately, Ardalan told Fournier that she really liked that the Borchardt Sisters were supporting each other, that they seemed very ambitious, and that she wanted to support their efforts by extending a lease to them. The lease agreement ("Lease Agreement") was then executed by the Borchardt Lessees and Ardalan. During the Lease Agreement approval process, Josephine Borchardt disclosed to Ardalan her intention to someday be elected as president of the United States. After learning that, Ardalan sent Josephine a constitutional law book written by Erwin Chemerinsky, a well-known legal scholar, to create good feelings and support Josephine's ambitions.

11. Ardalan's kind efforts did not stop there. She allowed the Borchardt Sisters to move in early after they told they were living in a hotel. Prophetically, they claimed they were forced to move out of their previous landlord's unit owing to "code violations." Ardalan also allowed Borchardts to break up their deposit into three payments, ending in January 2020, to ease their financial difficulty. *See* Exhibit A, which is a true and correct copy of the lease agreement. Even with this courtesy, the first deposit check was "lost" in the mail and never arrived. The Borchardt Sisters ultimately made a one-week late deposit payment. Ardalan also allowed them to break up their monthly payments into two payments. The Borchardt Sister frequently took advantage of this and frequently paid the second part of the rent many days late. *See* Exhibit B is a true and correct copy of a screenshots of text messages showing money transferred to Ardalan's account via Zelle and showing that even the first month's rent was late, having been paid in part on November 6 and in part on November 7. The third part of the deposit was due on January 2, 2020 but was paid on February 27, 2020. *See* Exhibit C, a true and correct screenshot of text messages showing money transferred to Ardalan's account via Zelle. The Borchardt Sisters often paid their rent after the 5th of the month. That entitled Ardalan to a 5% late charge, but Ardalan never demanded it. Prior to April 2020, Ardalan never complained about any of the late payments, and, at most, sent "friendly-reminders" about the overdue rent.

12. During the first few months of the tenancy there were minimal issues between Defendants and Ardalan. There were repairs or replacements that came up from time to time, but the Borchardt Sisters allowed Ardalan's handyman to fix each problem. In at least one instance where Josephine complained of a problem that turned out to be "user error," she required a handyman to visit twice at Ardalan's expense. The one exception to expeditious repair is that the Borchardt Sisters complained that the oven was cooking unevenly. The handyman investigated the claim and expressed displeasure at replacing the oven because, he said, it was cooking just slightly unevenly, and did not warrant replacement. He recommended to Ardalan

that she not replace the oven. Ardalan told the handyman that we should replace it or fix it anyway because she wanted the tenant to be happy. Due to the Borchardts' history of reporting non-existent problems, Ardalan thought they had realized it was a non-issue.

13. On March 16, Josephine complained about the oven once more and, for the first time, complained about the refrigerator. She said the refrigerator had too much condensation. Ardalan scheduled the handyman to return on March 18 and to purchase a new oven. On March 19, she told Josephine that the handyman had ordered a new oven.

14. Ardalan was surprised that the refrigerator was having problems as it was only a few years old, having been manufactured in November 2016. Even though it was ***expressly excluded*** from Ardalan's maintenance obligations under the Lease Agreement, Ardalan called GE and booked the first available appointment convenient for the Borchardts and ***even paid for the visit***. The appointment with GE was scheduled on March 25 between 1 and 5 p.m. and was confirmed with Josephine. At 1:51 p.m. on March 25, Josephine texted Ardalan to complain that "the GE tech never came" and that the stove "still has not been addressed." *See* Exhibit D. She demanded that all appliances be fixed or replaced immediately and gave an April 1 deadline. Ardalan reminded Josephine that GE was scheduled to visit between 1 p.m. and 5 p.m., and that she was free to call them and confirm. Unbeknownst to Ardalan, GE had texted Josephine directly that they would be at the house between 11:40 a.m. and 1:40 p.m. When Josephine forwarded the text to Ardalan, Ardalan pointed out that remainder of the GE confirmation text said "estimated arrival times are subject to change, click the link to check …" Ardalan suggested that Josephine click the link to get an update. Of course, GE came, and Josephine confirmed they arrived and by 4 p.m., the technician had adjusted the gasket. Ardalan paid for the service (even though she did not have to under the lease).

15.     On March 30, 2020 Josephine called to complain that the caulking on the toilet was separating.  In less than 10 minutes, Ardalan replied that she would set up an appointment with the handyman. *See* Exhibit E. Within half an hour of Josephine's complaint, the handyman confirmed that he was on his way to the house to fix it. *Id.* Josephine responded that "today does not work for us," and told the handyman to come the following day after 10 a.m. The handyman went the following day and fixed the toilet. After the fix, the handyman called Ardalan to confirm it was fixed. He expressed some concern though, that the damage ***had not resulted from ordinary wear and tear.*** On April 16, Josephine also claimed a cabinet fell in the bathroom. At Ardalan's request, the handyman fixed it on April 17. *See* Exhibit E-1 which consists of true and correct copies of screenshot of text messages. While there, he confirmed with Josephine that the toilet was working properly and the work he had performed previously was fine. *Id.*

16.     On April 10, 2020, at 11:40 PM, Josephine sent Ardalan pictures and a video along with a message saying that she had "seen a few mouse droppings lately, and we were not sure if this was maybe a one off but now we are positive it is not as was an in the kitchen and here it gnawing." *See* Exhibit F, which are true and correct screenshots of text messages. The following day, Ardalan ordered rodent traps for the house. *Id.* When the traps arrived, on April 14, the Borchardt Sisters refused to use them insisting that an exterminator come. *See* Exhibit G, which is a true and correct screenshot of a text message. That same day, Ardalan called Orkin and booked the next available appointment, for Thursday April 14, 2020. *See* Exhibit H, which consists of true and correct screenshots of text messages. When Ardalan scheduled the appointment, she told Orkin that she wanted to make sure that the technician would call her directly with any recommendations for follow-up. Orkin did not call Ardalan following the visit so Ardalan assumed all was well. The next day, Friday, April 17 at 9:31 p.m., Josephine sent a picture of a rat hole. *See* Exhibit I, which consists of true and correct copies of screenshots of text messages. Ardalan responded at 9:51 p.m.,

asking whether the exterminator had come the previous day. *Id.* In response, Josephine admonished Ardalan for not calling the technician herself to get an update and told Ardalan that Orkin put out poison and traps and fixed the holes she had called out to its attention the day before. This hole, however, was one she had not disclosed to Orkin. Josephine also said that she had made a follow-up appointment on Monday, April 20, but that she wanted Orkin to come sooner. *Id.* Ardalan called Orkin the following morning, a Saturday, but Orkin was double-booked all day and does not perform the needed service on Sundays. *Id.* Ardalan reconfirmed the appointment for Monday and, again, reiterated to Orkin that they had made a mistake by not following up with her directly. She again asked Orkin to please call her, not the Borchardts, if any more follow-up was required. Ardalan reiterated that she would do whatever they recommended but that they need to speak with her directly if there was an issue. On April 20, Orkin performed its follow-up services. Exhibit J is a true and correct copy of the report provided by Orkin. The report demonstrates that remediation services were performed.

***The Borchardt Begin Making Allegations and Obstructing Repairs***

17. At about 9:01 p.m. on April 20, Ardalan received a "notice to cure" letter from the Borchardts. A true and correct copy is attached as Exhibit K. The letter made numerous allegations, including that Ardalan had not taken the "Rodent Exclusive Service" recommended by Orkin (even though this was the first time Ardalan had heard of the recommendation), that the handywork on the toilet was "shoddy" (even though it was apparently fine the week before when the handyman visited to fix the cabinet), that Ardalan should fix the refrigerator again (even though its maintenance is excluded under the lease), that the brand new oven was of a "lesser quality" and that Ardalan misrepresented the construction noise levels of the adjacent property during the tour of the home, notwithstanding that Ardalan expressly said that the rent was reduced owing to the nearby construction and notwithstanding that the Borchardt Lessees executed the Lease Agreement acknowledging that they had

inspected the neighborhood and were satisfied with the conditions, including any nearby construction. *See* Exhibit A. The Borchardt Lessees also demanded that a property manager take over management.

18. On April 21, 2020, Ardalan called Orkin to explain that by giving the recommendation to purchase an additional plan to Josephine, and not to her, Orkin put Ardalan in a position where the tenant had information about their recommendations that she did not have and that the tenant was trying to say that Ardalan had done something wrong by not acting on a recommendation she never received. Orkin was extremely apologetic and wanted to make it up to Ardalan for the mix-up. On information and belief, Orkin confused Plaintiff with Josephine and called the wrong person. As such, the manager of the branch, who had special rodent training, offered to inspect the house for free with specialized equipment, and to propose a game plan to take care of the rodent issue. He advised that the plan would require multiple follow-up visits over 30-60 days, but that the issue could and would be remedied. Ardalan asked that he schedule a time convenient for the Borchardts. Orkin communicated with Josephine directly and scheduled an appointment for Friday, April 24, 2020. Ardalan followed-up with Orkin to ensure the appointment was made with Josephine and Orkin confirmed by text message that it was. Exhibit L is a true and correct redacted copy of text messages between Ardalan and Orkin regarding confirmation of the appointment time. The phone numbers are redacted to protect the privacy of third parties.

19. Also, on April 21, the day after she received the notice to cure, Ardalan's attorney, David Quinto, responded to Josephine via email. A true and correct copy of his correspondence is attached as Exhibit M. Quinto stated that he "represent[s] your landlord, Joanna Ardalan, in connection with your demands and the defense of your prospective legal claims. I am writing in response to your April 20, 2020 message to her." Quinto explained why the Borchardt Sister's position was meritless. He also informed them that "going forward Stewart Fournier will serve as

the property manager" and provided his email address and telephone number. Quinto requested that the Borchardts "communicate directly with him regarding any further real or perceived concerns." He also asked for a copy of the Borchardts' renter's insurance policy, which the lease agreement required them to have. *See* Exhibit A. In addition, Quinto offered that if the Borchardts wanted to get out of their lease, Ardalan would be willing to discuss that with them. Exhibit M.

20. The next day, on April 22 at 7:58 p.m., the Borchardt Lessees sent a second notice to cure letter, for the first time informing Ardalan that "mold and termites are present throughout the home." No photographs or descriptions were included. A true and correct copy of the letter is attached as Exhibit N. The letter was sent to Ardalan only, and not Quinto or Fournier.

21. On April 23, Ardalan called Orkin to request that they add a termite inspection and treatment to their already planned visit. Exhibit O is a true and correct copy of screenshots between Ardalan and Orkin. Orkin explained that it required another specialist as the licensing requirements are different for termites but agreed to schedule the specialist for the same time slot. *Id.*

22. On April 23, Quinto e-mailed the Borchardts Lessees again asking them to contact him directly and inquiring why they would not reach out to Fournier, but only to Ardalan, about the purported problems. Exhibit P is a true and correct copy of the letter. Quinto also asked where in the house the termites and mold were located and asked for photographs. Quinto explained that Orkin would visit for the third time to treat rodents, and now, termites. He also promised that following receipt of more information regarding the mold, he would arrange for an inspection. He again asked for a copy of the renter's insurance policy. *Id.*

23. On April 23, Josephine emailed Ardalan, without cc'ing Quinto or Fournier claiming that Ardalan "failed to communicate" with her, although acknowledging receipt of Quinto's messages. A true and correct copy of the email is attached as Exhibit Q. At this point, Ardalan wanted all communications to be

between her counsel or property manager and Josephine directly. By then it became apparent that Josephine was attempting to manufacture a claim against Ardalan. At the same time, Ardalan learned that Josephine had been arrested for assault and fired for stealing from her employer before unsuccessfully suing the employer for wrongful termination. Ardalan therefore wanted to create distance between herself and Josephine.

24. On April 24, two rodent specialists with Orkin, one of whom was Orkin's Los Angeles branch manager, arrived as scheduled for the inspection. Josephine and one of her sisters refused to allow Orkin onto the property. According to Orkin, Josephine and/or one of her sisters told Orkin that the owner never told them that the inspection would happen. The Orkin specialist said words to the effect of "I made the appointment with ***you*** directly and ***you*** said this was a good time." Josephine and/or her sister began filming the Orkin personnel, despite their repeated requests not to do so. They explained that they were here to help, but Josephine and her sister's histrionics forced them to leave. Afterwards, the Orkin manager notified Ardalan that Orkin could not allow its specialists to suffer such harassment. A true and correct copy of the service report showing that the Borchardt Lessees refused entry is attached as Exhibit R. Exhibit R-1 is a redacted email message from Orkin explaining what happened. After several calls from Ardalan, Orkin subsequently agreed to return to the property to treat rodents and termites, but only if Defendants were not present at the time. As a practical matter, the termite treatment requires that Defendants vacate for a short period of time anyway.

25. On April 24, Quinto sent Josephine a third letter, with both Ardalan and Fournier cc'ed. He explained that "yesterday I advised you that your landlord had arranged to have Orkin Pest Control visit your property for the third time this month. [] Orkin communicated directly with you to schedule a termite and follow-up rodent inspection and arrived as scheduled." A true and correct copy is attached as Exhibit S. The letter then confirmed that they had denied Orkin admission notwithstanding that

they had scheduled the visit. Quinto also explained that the "landlord cannot determine whether your claims that your property has both terminates and mold is simply baseless or whether you prefer to live in these alleged infestations." He also expressed concern that the same or similar harassment would happen to a mold inspector and asked that they confirm their cooperation. In addition, Quinto again asked Defendants to communicate with him or Fournier directly. Quinto explained that he had asked Fournier to inspect the home and reminded the Borchardts of their legal obligation to allow the owner (or her agents) to inspect the home. Quinto renewed his request for a copy of the renter's insurance policy. *Id.*

26. On Saturday, April 25, Fournier emailed Josephine, with both Ardalan and Quinto cc'ed, to request an initial inspection given the Borchardts' concerns. Josephine did not respond to this email message. Exhibit T is a true and correct copy of the email message.

27. On April 26, Josephine emailed Ardalan, without cc'ing Quinto or Fournier, claiming that Ardalan had "refused to communicate" while also acknowledging that she received three letters from Quinto and an e-mail message from Fournier. Josephine claimed that Ardalan was "in full breach of contract" and could not be relieved of her duties under the lease agreement because, after all no other name was on the lease agreement. Exhibit U is a true and correct copy of the e-mail message.

28. On April 26, Fournier e-mailed Josephine, cc'ing Ardalan and Quinto, stating that "you requested that Ms. Ardalan engage a property manager to oversee the home []; She has done as you asked." He reiterated that Quinto had advised her to direct any complaints to him. He further assured her that she would not have to speak with him as he inspected the house for signs of damage and advised her that in any event it would be best if she were not in the house owing to COVID concerns. He asked for a time within the next three days for an inspection. Exhibit V is true and correct copy of the e-mail message. Josephine did not respond.

29.     On April 30, Josephine emailed Ardalan, without Quinto or Fournier cc'ed, with lab reports from Terminix and a mold report. The report showed that there were termites in four places and the mold report showed some mold in a closet. Significantly, the report did not suggest that the tenants needed to move out the property owing to the mold, but that one bedroom may need to be vacated for a short period of time during the repair process. Exhibit W is a true and correct copy of the e-mail message and reports. Josephine further claimed that "Since April 20th, you have not communicated. You have abandoned your duties as our landlord. You are in breach of our contract. You have not complied with California Civil Codes. Our health has been adversely affected because of your neglect. We are suffering."

30.     At this point, Ardalan was fed up with Josephine's refusal to respond to the numerous requests for inspection, documentation, and information made by Quinto and Fournier, and, as such, she responded:

"David Quinto and Stewart Fournier have contacted you numerous times attempting to set up inspections and repairs, but you haven't responded. They are trying to help you and me, because to the extent there are issues with a home I love, I want them taken care of.

"Thank you for sharing the lab report.  As you know, I was trying to get them done but you refused to communicate with us. It is impossible to investigate problems unless you cooperate with us, and I ask that you communicate with Mr. Quinto directly. He repeatedly asked you for convenient times to inspect the property and for photographs of the mold and termites but heard nothing. Mr. Fournier also asked for times to conduct inspections and likewise received no response. I am legally entitled to have agents to respond on my behalf. A response from them is like a response from me. Just as you are entitled to have a lawyer act on your behalf, I am too.

"I wish you had cooperated with us because, as you know, Orkin was at the property to conduct a full investigation and to report its recommendations. I had already told Orkin that I would most likely accept its recommendations because I wanted any

problems fixed. But despite having confirmed their appointment with them, you refused to admit them when they arrived. Because you denied them entry, there is now a delay in undertaking corrective measures.

"The bottom line is, of course, I want to get any repairs done, but doing so depends on your willingness to let the repair people into the house. Also, I ask you to treat the vendors with respect. If they do not consent to being filmed, please do not do so. They are just trying to investigate or fix the issues you reported.

"Please communicate with Mr. Quinto directly. He will make sure, on my behalf, to take care of any problem provided that you allow access to the property. Orkin said they will not come to the property unless you agree to not film or otherwise harass them. Please allow them to treat the termites and please allow another vendor to remediate the mold or any other issue that may arise. We try to schedule them at a time convenient for you once you confirm that you will cooperate in permitting repairs. Please send us times that work for you. We will try to accommodate them.

"I understand that Mr. Quinto has asked you for your renter's insurance policy several times. Please provide that to him promptly.

A true and correct copy of the email message is attached as Exhibit X.

31.    On May 1 at 12:20 p.m., Ardalan emailed Josephine again, stating:

"We would like to have a mold specialist inspect and recommend repairs on Monday morning. The specialist needs a two-hour arrival window, 9-11, 10-12, etc., and will be happy to accommodate your schedule.

"We also want to have Orkin return to treat the termites and to follow-up on rodents. They can come either Monday 10-12 or Tuesday 10-12. They will come, however, only if you will allow them to work without obstructing their efforts by photographing them or otherwise harassing them. Please confirm that you will allow them to do their jobs without interference.

"Please let Mr. Quinto know whether and when the problems you have called to our attention may be corrected. I very much want to prevent further damage to the house."

A true and correct copy of the email message is attached as Exhibit Y.

32. Shortly after Ardalan's May 1 e-mail messages, Josephine responded to Ardalan's first message. A true and correct copy is attached as Exhibit Z. She thanked Ardalan from complying with Civil Code 1962, which requires that an owner of a property provide the name and contact information of anyone managing the unit. (Josephine ignored that an agent of the owner can indicate his agency as directed by the owner, which is what happened here again and again.) She provided available times, which were the following day which was a Saturday, as well as Sunday, and Thursday, and Friday, but declined to say whether she would allow the specialists to do their work without antics. Without getting that assurance, at least, Orkin would refuse to visit the property and rodents and termites would go untreated. Josephine ended her message by asserting that Quinto and Fournier had to abide by the parameters of Civil Code 1954 regarding notice to the tenant, which, of course, they have always done. This gave no clarity as to whether she would allow the specialists in under Section 1954, or would require a 24-hour notice with an owner/manager present, also as provided by Section 1954 (and which would *de facto* make a Saturday appointment impossible). Ardalan followed up within 20 minutes, asking if Josephine would cooperate. A true and correct copy is attached as Exhibit AA.

33. On May 1 at 12:55, Quinto wrote to Josephine once again asking whether she would allow the mold specialist and Orkin to treat the property without harassment and noting that the report from ***her own*** vendors require that they leave the premises temporarily. A true and correct copy of the letter is attached as Exhibit AB. In response, Josephine claimed that they were on quarantine and that there is "no need for Orkin to come into the home" and said that if Orkin came they would not leave the premises (although the purported presence of rodents continues to be one of

Josephine's complaints with respect to the habitability of the home). A true and correct copy is attached as Exhibit AC. Four minutes later, Ardalan sent an e-mail message saying that "subject to Mr. Quinto's email the mold specialist can come on Thursday May 7 between 12 and 3pm. Please confirm receipt and consent." Josephine did not confirm her consent to the repairs, but said if the specialist came, she would demand his business card. *See* Exhibit AC. Ardalan still did not know whether the Borchardts would require her or Quinto's presence. (Around this time, Fournier terminated his role as manager and Quinto informed the Borchardts that he would take over the management role.)

34. On May 2, Quinto sent another letter. A true and correct copy is attached as Exhibit AD. He noted that Ardalan had a contract with Orkin and relayed, again, that it was available to come on Tuesday, May 5, but required the Borchardts to be off property because of their history of harassment and because the termite treatment generally required tenants to vacate temporarily. Again, Quinto asked that Josephine confirm that she would vacate and permit Orkin to work in peace. *Id.* Quinto also advised Josephine that a mold specialist could provide service on May 7 between noon and 3 p.m. if she confirmed that she will allow the mold company to perform its work. Quinto also asked for the current lockbox code. Finally, ***Quinto advised them that the Ardalan would allow them to break their lease at no extra expense to resolve an unhappy situation.*** *Id.* A true and correct copy of Josephine's non-responsive response is attached as Exhibit AF.

35. On May 3, the Borchardt Lessees announced they would terminate the lease under Civil Code 1942, which provides that if a home is uninhabitable, "the tenant may vacate the premises, in which case the tenant shall be discharged from further payment of rent, or performance of other conditions as of the date of vacating the premises." In the same letter the Borchardts announced that they would not move out until June 30 because of COVID restrictions, but also seemed to say they would

not pay rent. A true and correct copy of that correspondence is attached as Exhibit AG.

36. Mr. Quinto explained that Civil Code 1942 does not allow them to terminate a lease but not leave—they must leave, or they must pay rent. He also explained that the offer to terminate the lease was not an admission that the property was uninhabitable, but rather a concession made because the owner found the tenants insufferable. Mr. Quinto formally requested mediation as Ardalan believed that a neutral third party might be better positioned to explain to Defendants that they, not Ardalan, were in breach of contract. A true and correct copy of the letter is attached as Exhibit AH.

37. On May 4, Josephine responded claiming Quinto's letters were "inaccurate" but failed to provide any explanation for the same and declined the offer for mediation. Josephine re-stated that "our Notice to Terminate the Lease Agreement stands." A true and correct copy is attached as Exhibit AI.

***The Borchardts Use Humiliation Tactics to Further Obstruct Repairs***

38. Despite numerous requests, there was no clarity as to whether Ardalan or her agents would have to provide a 24-hour notice and be present for the mold specialist's visit or whether the Borchardt Lessees would allow the specialist in. To avoid further potential delay, on May 5, Ardalan played it safe by serving the Borchardt Lessees with a 24-hour notice of entry. Ardalan went to the home and taped the notice on a door. Later that day, Josephine sent an email alleging that Ardalan was spying on them and had looked through the downstairs bedroom window and into their car. A true and correct copy is attached as Exhibit AJ. But from the presence of a car in the driveway it was apparent that the Borchardts were home at a time they had said they would be unavailable for repairs. A true and correct copy of the 24-hour notice that was affixed to the door is attached as Exhibit AK.

39. The Borchardt Lessees ended up paying $2,700 in rent for May, which is $1,150 less than they owed. The portion of the rent was paid by Genevieve

Borchardt and so Ardalan speculated that possibly Genevieve was defying Josephine and recognized that the ridiculous positions she had taken may affect Genevieve as a signing party on the lease. As such, Quinto called Genevieve and when he was not sure his voicemail went through, he sent a text message asking for a call back.

40.     On May 5, Josephine sent an email insisting that all communications go through her. A true and correct copy is attached as Exhibit AJ. Quinto responded stating that he could not understand Josephine's cryptic messages and hoped that she would allow the termite specialist and handyman to work in peace without requiring that Ardalan or Quinto be present. He also reminded her that they could not schedule Orkin until the Borchardts agreed to absent themselves from the property. A true and correct copy is attached as Exhibit AL. Josephine did not respond.

41.     Because there was no clarity concerning whether the Borchardt Lessees would allow the mold specialist in, Quinto and Ardalan believed that one of them needed to be present at the property to prevent the Borchardts from later claiming that under the Civil Code, an owner or manager must be present while workers are working.

42.     On May 7, Ardalan had a work obligation, so Quinto, in his gardening clothes, visited the property when he understood the mold specialist would arrive. He stood on the street waiting to make sure the Borchardt Lessees would allow the mold specialist in. As he stood there, the Borchardt Sisters' mother, Gabriela Borchardt and Josephine came out to yell at him and told him he could not come into the house. Quinto explained he did not want to come into the house, he just wanted to make sure the mold specialist would be allowed in. He also asked about whether they would allow Orkin to work. Gabriela and Josephine started to film Quinto and, while yelling at him, made fun of his clothes, saying that he "couldn't be a very successful lawyer with holes in his shoes." They also said, again, that he would not be allowed in the house. Quinto explained, again, that he was not asking to go in. They then accused Quinto of being a "potential rapist" and told him again he could not come in. Gabriela

then asked Francesca to call the police. When the police appeared, Quinto was chatting with the owner of an adjacent property. The police asked for Quinto by name. Quinto explained the situation, and fortunately, the adjacent property owner confirmed to the policemen that Quinto had done nothing threatening. The Borchardts later claimed to not know who Quinto was, which was why they called the police. Of course, this is untrue inasmuch as Josephine had previously met Quinto and the police asked for him by name. The policeman spoke with Defendants and did not follow-up further with Quinto.

43. On May 8, a handyman was scheduled to arrive; the 24-hour notice stated the same. There was a scheduling problem with that handyman and so Ardalan found another handyman who had repaired the property several times before to come during the same timeslot. Josephine refused to allow the second handyman in because he was not the one named in the notice. A true and correct copy of that correspondence is attached as Exhibit AM.

44. At this point it was apparent that Ardalan and Quinto were going to suffer extreme harassment for attempting to make repairs, while Ardalan was also going to get accused of breaching the warranty of habitability as Borchardts had repeatedly alleged. As such, on May 8, Ardalan called numerous property managers to find a professional expert at handling difficult tenants.

***New Management Suffers the Same Games***

45. Ardalan communicated with property manager Daniel Glaser over the weekend of May 9 and 10. Mr. Glaser exhibited the hallmarks of professionalism, patience, and empathy for the situation and had substantial experience dealing with difficult tenants. On Monday, May 11, Ardalan retained Mr. Glaser, and, later that day, he gave notice to the Borchardts that he was taking over as the property manager by putting a notice on their door and sending a confirming email. A true and correct copy is attached as Exhibit AN.

46. On May 15, Josephine emailed Quinto and Ardalan complaining that "there is someone posing as the property manager for the home." Ignoring that Quinto had repeatedly told her that Fournier was no longer the manager, she asked that Quinto and Ardalan confirm that Fournier was the manager. Josephine claimed that, "You are furthering your breach of contract. The damages and injuries we have sustained are severe and have impacted our lives on so many levels. You have absolutely disrespected us as human beings and disregarded the value of our lives by committing gross negligence." A true and correct copy is attached as Exhibit AO.

47. On May 16, Quinto responded, confirming that due to their behavior, Ardalan hired a manager who specialized in difficult tenants. A true and correct copy is attached as Exhibit AP. He also memorialized the events of the previous week. Josephine replied that his recitation was "not factual" and was "dishonest" without further explanation. A true and correct copy of Josephine's email is attached as Exhibit AQ. Quinto responded to Josephine by letter, again challenging her on her position that his correspondence was "not factual." Exhibit AQ2.

48. Fortunately, after serving another 24-hour notice, Glaser was able to schedule preliminary testing required as a precursor to the mold remediation, for May 21.

49. On May 20, Borchardts questioned whether the remediation itself might cause them health problems and that they would have to talk to their doctors. Exhibit AQ3, AQ4.

***The "Tale" that Wags the Dog: The Borchardts Confirm that Their True Motive Is to Build a Claim, Not to Improve Their Living Conditions***

50. Knowing now that the Borchardts are going to claim health problems whether they eventually permit the repair work or not, on May 21, Ardalan, through Glaser, proposed an eminently reasonably offer:

"As the Borchardts have terminated the lease and have given notice that they will leave on June 30, 2020, ***Ardalan will pay them one month's rent, $3850, to vacate the property on May 31, 2020."*** Payment was conditioned on leaving their key and the

lockbox code, which Ardalan still did not have. A true and correct copy of the email correspondence is attached as Exhibit AR. Had the offer been accepted, Ardalan would have been able to make repairs necessary to protect her property and the Borchardts purported concern that their health was at risk would have been at an end. And while the Borchardts would be inconvenienced for leaving thirty days early, they would have cash to pay for another place to stay. For anyone with a legitimate health concern, this offer should have been a no brainer.

51. On May 22, Josephine responded: "***Due to the short notice, our offer to move by the end of the day on May 31st, 2020, is for $60,000, via cashier's check payment received on the morning of May 31st, 2020.***" A true and correct copy is attached as Exhibit AS. That revealed the reason for defendants' obstruction, harassment, and headache: to lay the foundation for an attempt at civil extortion.

52. On May 26, Ardalan received an "Official Inspection Report" from the City of Los Angeles requiring that she repair the mold and remediate rodents. On information and belief, the Borchardts sought this inspection to manufacture a claim, all the while failing to disclose to the City that it is they who have obstructed the necessary repairs that Ardalan has been trying to complete.

53. Adding insult to injury, Ardalan now has reasons to believe that Gabriela Borchardt has been living in the house all along, causing the house to suffer additional wear and tear (at best) and causing Ardalan, who pays the utility bills, to pay for an additional person. LexisNexis records confirm she has had no other address since November 2019. Moreover, a handyman confirmed that that he saw Gabriela Borchardt at the house on numerous occasions during his visits.

**FIRST CAUSE OF ACTION**

**(Breach of Written Contract Against Josephine and Genevieve Borchardt)**

54. Plaintiff incorporates by reference each and every allegation in Paragraphs 1-53 above, as though set forth fully herein.

55.     The Lease Agreement, Exhibit A, is a valid and binding contract between Ardalan and Josephine and Genevieve Borchardt.

56.     As detailed *supra*, Josephine and Genevieve Borchardt have breached the Agreement, including the implied duty of good faith and fair dealing by, among other things:

    a.   Obstructing efforts to make repairs.

    b.   Obstructing efforts to remediate the purported rodent, termite, and mold infestations claimed by the tenants.

    c.   Damaging the property and its fixtures.

    d.   Refusing to allow Ardalan or her agents to inspect the home.

    e.   Refusing to provide the lockbox code to Ardalan, preventing her from entering if necessary, in an emergency situation.

    f.    Harassing vendors and others who attempt to make repairs.

    g.   Making late and/or partial payment of rent.

    h.   Permitting Gabriela Borchardt to live in the home while expressly prohibited from doing so by the Lease.

    i.    Making false claims to government inspectors.

    j.    Refusing to buy renter's insurance as required by the Lease.

57.     Plaintiff has complied fully with all her obligations under the Agreement, other than those that were prevented, delayed, waived, or excused by Josephine and Genevieve Borchardt's failure to perform under the Agreement.

58.     The damage to the property continues as Josephine and Genevieve Borchardt refuse to cooperate in allowing repairs and remediation to proceed. Plaintiff therefore requests a temporary restraining order and a preliminary injunction requiring Defendants to allow her to make repairs and remediate ongoing problems while keeping the rest of the property as is until Defendants vacate.

59. As a direct and proximate result of Josephine and Genevieve Borchardt's breach of the Agreement, Plaintiff has incurred, and will continue to incur, damages in an amount to be proven at trial.

60. Taken together, Plaintiff's damages as a direct and proximate result of Josephine and Genevieve Borchardt's breach of contract are well in excess of $25,000.

**SECOND CAUSE OF ACTION**

**(Declaratory Judgment Against All Defendants)**

61. Plaintiff incorporates by reference each and every allegation in Paragraphs 1-60 above, as though set forth fully herein.

62. Defendants contend and Ardalan denies, that she in breach of the warranty of habitability. Defendants have engaged in a concerted pattern of obstructing repairs and remediation work. Accordingly, if the property has become uninhabitable it is defendants who caused and continue to cause that condition.

63. An actual controversy exists of sufficient immediacy exists between the Parties as to whether Ardalan breached the warranty of habitability.

**THIRD CAUSE OF ACTION**

**(Negligence Against All Defendants)**

64. Plaintiff incorporates by reference each and every allegation in Paragraphs 1-63 above, as though set forth fully herein.

65. Defendants owe a legal duty of care to Ardalan to avoid injuring the Property.

66. Defendants breached that duty of care by engaging in the acts as described *supra*.

67. As a direct and proximate result of Defendants' breach of their duty of care and the Agreement, Plaintiff has incurred, and will continue to incur, damages in an amount to be proven at trial.

68. Taken together, Plaintiff's damages as a direct and proximate result of Defendants' breach of contract are well in excess of $25,000.

**FOURTH CAUSE OF ACTION**

**(Unjust Enrichment Against Gabriela Borchardt)**

69. Plaintiff incorporates by reference each and every allegation in Paragraphs 1-68 above, as though set forth fully herein.

70. By living in the Property without Plaintiff's consent and in violation of the express terms of the lease agreement, Gabriela Borchardt has benefited from unlawfully obtaining free housing, while causing additional damage, wear-and-tear, and utility bills for Ardalan.

71. As a direct and proximate result of Gabriela Borchardt's breach of the Agreement, Plaintiff has incurred, and will continue to incur, damages in an amount to be proven at trial.

72. Plaintiff is entitled to recover the damages she suffered, and the gain Defendant Gabriela Borchardt made as a direct and proximate result of her unjust enrichment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendant, as follows:

1. For judgment against Defendants, in favor of Ardalan, for:
   a. Damages for breach of the Lease Agreement as to Josephine and Genevieve Borchardt;
   b. Declaratory relief as to all Defendants that Ardalan has not breached the implied warranty of habitability;
   c. Negligence as to all Defendants;
   d. Unjust Enrichment, with respect to Gabriela Borchardt; and
   e. For actual and compensatory damages as to all Defendants in an amount to be proven at trial;

2. For a mandatory temporary restraining order and Preliminary Injunction requiring all Defendants to permit the necessary repairs to be made without interference or harassment and requiring that Defendants otherwise maintain the property in its current condition;

3. For the costs of suit incurred herein;

4. For pre-judgment and post-judgment interest; and

5. For such other and further relief as the Court deems just and proper.

Dated: May 28, 2020

By: /s/ David Quinto
David Quinto

Attorney for Plaintiff
Joanna Ardalan

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

Dated: May 28, 2020

By: /s/ David W. Quinto
David Quinto

Attorney for Plaintiff
Joanna Ardalan

# Exhibit A

CALIFORNIA ASSOCIATION OF REALTORS®

# RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT

(C.A.R. Form LR, Revised 6/18)

Date 10/24/2019, Joanna Ardalan ("Landlord") and Josephine Borchardt, Genevieve Borchardt ("Tenant") agree as follows ("Agreement"):

1. PROPERTY:
   A. Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: 1628 Beverly Glen Blvd., Los Angeles, CA 90077 ("Premises")
   B. The Premises are for the sole use as a personal residence by the following named person(s) only: Josephine Borchardt, Genevieve Borchardt, Francesca Borchardt
   C. The following personal property, maintained pursuant to paragraph 11, is included: Outdoor patio furniture, Washer Dryer, Refrigerator or ☐ (if checked) the personal property on the attached addendum is included.
   D. The Premises may be subject to a local rent control ordinance
2. TERM: The term begins on (date) November 1, 2019 ("Commencement Date"). If Tenant has not paid all amounts then due: (i) Tenant has no right to possession or keys to the premises and; (ii) this Agreement is voidable at the option of Landlord, 2 calendar days after giving Tenant a Notice to Pay (C.A.R. Form PPN). Notice may be delivered to Tenant (i) in person; (ii) by mail to Tenant's last known address; or (iii) by email, if provided in Tenant's application or previously used by Tenant to communicate with Landlord or agent for Owner. If Landlord elects to void the lease, Landlord shall refund to Tenant all rent and security deposit paid. **(Check A or B):**
   ☐ A. **Month-to-Month:** This Agreement continues from the commencement date as a month-to-month tenancy. Tenant may terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Tenant shall be responsible for paying rent through the termination date even if moving out early. Landlord may terminate the tenancy by giving written notice as provided by law. Such notices may be given on any date.
   ☒ B. **Lease:** This Agreement shall terminate on (date) October 31, 2020 at 12:00 ☐ AM/ ☒ PM. Tenant shall vacate the Premises upon termination of the Agreement, unless: **(i)** Landlord and Tenant have extended this Agreement in writing or signed a new agreement; **(ii)** mandated by local rent control law; or **(iii)** Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.
3. RENT: "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of the Agreement, except security deposit.
   A. Tenant agrees to pay $3,850.00 per month for the term of the Agreement.
   B. Rent is payable in advance on the **1st (or ☐ ____) day** of each calendar month, and is delinquent on the next day.
   C. If Commencement Date falls on any day other than the day Rent is payable under paragraph 3B, and Tenant has paid one full month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated and Tenant shall pay 1/30th of the monthly rent per day for each day remaining in the prorated second month.
   D. PAYMENT: **(1)** Rent shall be paid by ☐ personal check, ☐ money order, ☐ cashier's check, made payable to Joanna Ardalan, ☒ wire/electronic transfer, or ☐ other ____
   **(2)** Rent shall be delivered to (name) Joanna Ardalan, (whose phone number is) (323)309-9215 at (address) 9301 Wilshire blvd. Penthouse, Beverly Hills 90210, (or at any other location subsequently specified by Landlord in writing to Tenant) (and ☐ if checked, rent may be paid personally, between the hours of ____ and ____ on the following days ____)
   **(3)** If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then, after that: (i) Landlord may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by ☐ money order, or ☐ cashier's check.
   E. Rent payments received by Landlord shall be applied to the earliest amount(s) due or past due.
4. SECURITY DEPOSIT:
   A. Tenant agrees to pay $5,000.00 as a security deposit. Security deposit will be ☒ transferred to and held by the Owner of the Premises, or ☐ held in Owner's Broker's trust account.
   B. All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest, invitee or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property or appurtenances. **SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT.** If all or any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within five days after written notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Landlord shall: **(1)** furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by California Civil Code § 1950.5(g); and **(2)** return any remaining portion of the security deposit to Tenant.
   C. **Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.**
   D. No interest will be paid on security deposit unless required by local law.
   E. If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in Owner's Broker's trust account, and Broker's authority is terminated before expiration of this Agreement, and security deposit is released to someone other than Tenant, then Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.

Tenant's Initials (JB) (GB)    Landlord's Initials (____) (____)

© 2018, California Association of REALTORS®, Inc.

Compass, 9454 Wilshire Beverly Hills CA 90210 Phone: 3109661734 Fax: 3105463416 1628 Beverly Glen
Stewart Fournier Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

Premises: *1628 Beverly Glen Blvd., Los Angeles, CA 90077* Date: *10/24/2019*

5. **MOVE-IN COSTS RECEIVED/DUE:** Move-in funds shall be paid by ☐ personal check ☐ money order, or ☐ cashier's check, ☐ wire/ electronic transfer

| Category | Total Due | Payment Received | Balance Due | Date Due | Payable To |
|---|---|---|---|---|---|
| Rent from *11/01/2019* to *12/01/2019* (date) | *$3,850.00* | | *$3,850.00* | *11/01/2019* | *Joanna Ardalan* |
| *Security Deposit | *$1,666.66* | | *$1,666.66* | *10/25/2019* | *Joanna Ardalan* |
| Other *Security Payment* | *$1,666.66* | | *$1,666.66* | *12/01/2019* | *Joanna Ardalan* |
| Other *Security Payment* | *$1,666.66* | | *$1,666.66* | *01/02/2020* | *Joanna Ardalan* |
| Total | *$8,849.98* | | *$8,849.98* | | *Joanna Ardalan* |

*The maximum amount of security deposit, however designated, cannot exceed two months' Rent for an unfurnished premises, or three months' Rent for a furnished premises.

6. **LATE CHARGE; RETURNED CHECKS:**
   A. Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Landlord to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within **5 (or ☐ ______ ) calendar days** after the date due, or if a check is returned, Tenant shall pay to Landlord, respectively, an additional sum of $ ______ or *5.000* % of the Rent due as a Late Charge and $25.00 as a NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.
   B. Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall neither be deemed an extension of the date Rent is due under paragraph 3 nor prevent Landlord from exercising any other rights and remedies under this Agreement and as provided by law.

7. **PARKING: (Check A or B)**
   *X* A. Parking is permitted as follows: *No Garage Parking.*

   The right to parking *X* is ☐ is not included in the Rent charged pursuant to paragraph 3. If not included in the Rent, the parking rental fee shall be an additional $ ______ per month. Parking space(s) are to be used only for parking properly registered and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work, or storage of inoperable vehicles, or storage of any kind is not permitted in parking space(s) or elsewhere on the Premises except as specified in paragraph 8.

   OR ☐ B. Parking is not permitted on the real property of which the Premises is a part.

8. **STORAGE: (Check A or B)**
   ☐ A. Storage is permitted as follows: ______

   The right to separate storage space ☐ is, ☐ is not, included in the Rent charged pursuant to paragraph 3. If not included in the Rent, storage space fee shall be an additional $ ______ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.

   OR *X* B. Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

9. **UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: ______ except *water/trash*, which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Landlord. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Landlord is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.
   ☐ A. **Water Submeters:** Water use on the Premises is measured by a submeter and Tenant will be separately billed for water usage based on the submeter. See attached Water Submeter Addendum (C.A.R. Form WSM) for additional terms.
   ☐ B. **Gas Meter:** The Premises does not have a separate gas meter.
   ☐ C. **Electric Meter:** The Premises does not have a separate electrical meter.

10. **CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke alarm(s) and carbon monoxide detector(s).
   **(Check all that apply:)**
   ☐ A. Tenant acknowledges these items are clean and in operable condition, with the following exceptions: ______
   ☐ B. Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MIMO).
   *X* C. (i) Landlord will Deliver to Tenant a statement of condition (C.A.R. Form MIMO) ☐ within **3 days** after execution of this Agreement; ☐ prior to the Commencement Date; *X* within **3 days** after the Commencement Date.
   (ii) Tenant shall complete and return the MIMO to Landlord within **3 (or *X* ____ ) days** after Delivery. Tenant's failure to return the MIMO within that time shall conclusively be deemed Tenant's Acknowledgement of the condition as stated in the MIMO.

Tenant's Initials ( JB ) ( AB ) Landlord's Initials ( [signature] ) ( ______ )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen

X D. Tenant will provide Landlord a list of items that are damaged or not in operable condition within 3 (or ___ ) days after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgement of the condition of the Premises.

☐ E. Other: ______

11. **MAINTENANCE USE AND REPORTING:**

A. Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, carbon monoxide detector(s) and smoke alarms, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for checking and maintaining all carbon monoxide detectors and any additional phone lines beyond the one line and jack that Landlord shall provide and maintain. Tenant shall replace any burned out or malfunctioning light bulbs. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage with any item including carbon monoxide detector(s) and smoke alarms on the property. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.

B. ☐ Landlord X Tenant shall water the garden, landscaping, trees and shrubs, except: ______

C. X Landlord ☐ Tenant shall maintain the garden, landscaping, trees and shrubs, except: ***Landlord will pay for gardener twice a month for landscape maintenance only.***

D. ☐ Landlord ☐ Tenant shall maintain ______

E. Landlord and Tenant agree that State or local water use restrictions shall supersede any obligation of Landlord or Tenant to water or maintain any garden, landscaping, trees or shrubs pursuant to 11B, 11C, and 11D.

F. Tenant's failure to maintain any item for which Tenant is responsible shall give Landlord the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.

G. The following items of personal property are included in the Premises without warranty and Landlord will not maintain, repair or replace them: ***Washer, Dryer, Dishwasher, Refrigerator, Patio Furniture***

H. Tenant understands that if Premises is located in a Common Interest Development, Landlord may not have authority or control over certain parts of the Premises such as roof, electrical, gas or plumbing features inside certain walls, and common areas such as shared parking structure or garage.

I. Tenant shall not use the premises to plant, grow, cultivate or sell marijuana.

12. **NEIGHBORHOOD CONDITIONS:** Tenant is advised to satisfy himself or herself as to neighborhood or area conditions, including but not limited to, schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

13. **PETS:** Unless otherwise provided in California Civil Code §54.2, or other law, no animal or pet shall be kept on or about the Premises without Landlord's prior written consent, X except as agreed to in the attached Pet Addendum (C.A.R. Form PET).

14. **SMOKING:**

A. (i) Tenant is responsible for all damage caused by smoking including, but not limited to stains, burns, odors and removal of debris; (ii) Tenant acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire premises regardless of when these items were last cleaned, replaced or repainted. Such actions and other necessary steps will impact the return of any security deposit.

B. The Premises or common areas may be subject to a local non-smoking ordinance.

C. NO SMOKING of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, (i) Tenant is in material breach of this Agreement, (ii) Tenant, guests, and all others may be required to leave the Premises. ☐ Smoking of the following substances only is allowed: ______

15. **RULES/REGULATIONS:**

A. Tenant agrees to comply with all Landlord rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests, invitees, and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, under federal, state, or local law including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.

B. **(If applicable, check one)**

☐ 1. Landlord shall provide Tenant with a copy of the rules and regulations within ______ days or ______

OR ☐ 2. Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

Tenant's Initials ( JB ) ( GB ) Landlord's Initials ( [signature] ) ( ______ )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen

16. ☐ (If checked) **CONDOMINIUM; PLANNED UNIT DEVELOPMENT:**

**A.** The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is ______ Tenant agrees to comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Tenant shall reimburse Landlord for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant or Landlord shall have the right to deduct such amounts from the security deposit.

**B.** If applicable, Tenant is required to pay a fee to the HOA to gain access to certain areas within the development such as but not necessarily including or limited to the front gate, pool, and recreational facilities. If not specified in paragraph 5, Tenant is solely responsible for payment and satisfying any HOA requirements prior to or upon or after the Commencement Date.

**C. (Check one)**

☐ **1.** Landlord shall provide Tenant with a copy of the HOA Rules within ______ days or ______

**OR** ☐ **2.** Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.

17. **ALTERATIONS; REPAIRS:** Unless otherwise specified by law or paragraph 25C, without Landlord's prior written consent, **(i)** Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; **(ii)** Landlord shall not be responsible for the costs of alterations or repairs made by Tenant; **(iii)** Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and **(iv)** any deduction made by Tenant shall be considered unpaid Rent.

18. **KEYS; LOCKS:**

**A.** Tenant acknowledges receipt of (or Tenant will receive ☐ prior to the Commencement Date, or ☐ ______):

☒ 2 3 key(s) to Premises,
☐ ______ remote control device(s) for garage door/gate opener(s),
☐ ______ key(s) to mailbox,
☐ ______
☐ ______ key(s) to common area(s),
☐ ______

**B.** Tenant acknowledges that locks to the Premises ☐ have, ☐ have not, been re-keyed.

**C.** If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.

19. **ENTRY:**

**A.** Tenant shall make Premises available to Landlord or Landlord's representative for the purpose of entering to make necessary or agreed repairs (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters, or repairing dilapidation relating to the presence of mold); providing decorations, alterations, or improvements, or supplying necessary or agreed services; or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, contractors and others (collectively "Interested Persons"). Tenant agrees that Landlord, Broker and Interested Persons may take photos of the Premises.

**B.** Landlord and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows. (1) 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice. (2) If Landlord has in writing informed Tenant that the Premises are for sale and that Tenant will be notified orally to show the premises (C.A.R. Form NSE), then, for the next 120 days following the delivery of the NSE, notice may be given orally to show the Premises to actual or prospective purchasers. (3) No written notice is required if Landlord and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement. (4) No notice is required: (i) to enter in case of an emergency; (ii) if the Tenant is present and consents at the time of entry; or (iii) if the Tenant has abandoned or surrendered the Premises.

**C.** ☒ (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).

20. **PHOTOGRAPHS AND INTERNET ADVERTISING:**

**A.** In order to effectively market the Premises for sale or rental it is often necessary to provide photographs, virtual tours and other media to Interested Persons. Tenant agrees that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Premises ("Images") for static and/or virtual tours of the Premises by Interested Persons for use on Broker's website, the MLS, and other marketing materials and sites. Tenant acknowledges that once Images are placed on the Internet neither Broker nor Landlord has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet.

**B.** Tenant acknowledges that prospective Interested Persons coming onto the Premises may take photographs, videos or other images of the Premises. Tenant understands that Broker does not have the ability to control or block the taking and use of images by any such persons. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Landlord has control over who views such Images nor what use viewers may make of the Images.

21. **SIGNS:** Tenant authorizes Landlord to place FOR SALE/LEASE signs on the Premises.

22. **ASSIGNMENT; SUBLETTING: A.** Tenant shall not sublet all or any part of Premises, or parking or storage spaces, or assign or transfer this Agreement or any interest in it, without Landlord's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement. **B.** This prohibition also applies (☐ does not apply) to short term, vacation, and transient rentals such as, but not limited to, those arranged through AirBnB, VRBO, HomeAway or other short term rental services. **C.** Any violation of this prohibition is a non-curable, material breach of this Agreement.

Tenant's Initials ( JB ) ( AB ) Landlord's Initials ( ______ ) ( ______ )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

23. **JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

24. **POSSESSION:**

A. (1) Tenant is not in possession of the Premises. If Landlord is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to the date on which possession is made available to Tenant. If Landlord is unable to deliver possession within 5 (or ______ ) **calendar days** after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid

**or** (2) Possession is deemed terminated when Tenant has returned all keys to the Premises to Landlord.

B. ☐ Tenant is already in possession of the Premises.

25. **TENANT'S OBLIGATIONS UPON VACATING PREMISES:**

A. Upon termination of this Agreement, Tenant shall: **(i)** give Landlord all copies of all keys and any opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Landlord, empty of all persons; and personal property belonging to Tenant **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in paragraph C below, to Landlord in the same condition as referenced in paragraph 10; **(v)** remove all debris; **(vi)** give written notice to Landlord of Tenant's forwarding address; and **(vii)** ______________________

B. All alterations/improvements made by or caused to be made by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.

C. **Right to Pre-Move-Out Inspection and Repairs:** (i) After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the expiration of this Agreement, Tenant has the right to request that an inspection of the Premises take place prior to termination of the lease or rental (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Landlord. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: **(a)** obtain receipts for Repairs performed by others; **(b)** prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and **(c)** provide copies of receipts and statements to Landlord prior to termination. Paragraph 25C does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3), or (4).

26. **BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by paragraph 25, in the event of termination by Tenant prior to completion of the original term of the Agreement, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Landlord may withhold any such amounts from Tenant's security deposit.

27. **TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.

28. **DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Landlord or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Landlord shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in Rent shall be made.

29. **INSURANCE: A.** Tenant's guest's, invitees or licensee's personal property and vehicles are not insured by Landlord, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage. B.** Tenant shall comply with any requirement imposed on Tenant by Landlord's insurer to avoid: (i) an increase in Landlord's insurance premium (or Tenant shall pay for the increase in premium); or (ii) loss of insurance. C. ☒ Tenant shall obtain liability insurance, in an amount not less than $*100,000.00* ______________, naming Landlord and, if applicable, Property Manager as additional insured for injury or damage to, or upon, the Premises during the term of this agreement or any extension. Tenant shall provide Landlord a copy of the insurance policy before commencement of this Agreement, and a rider prior to any renewal.

30. **WATERBEDS/PORTABLE WASHERS:** Tenant shall not use or have waterbeds on the Premises unless: (i) Tenant obtains a valid waterbed insurance policy; (ii) Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and (iii) the bed conforms to the floor load capacity of Premises. Tenant shall not use on the Premises: ☐ Portable Dishwasher ☐ Portable Washing Machine

31. **WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

Tenant's Initials ( ) ( ) Landlord's Initials ( ) ( )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen



Premises *1628 Beverly Glen Blvd., Los Angeles, CA 90077* Date *10/24/2019*

32. **NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:

Landlord: *Joanna Ardalan*
*9301 Wilshire Blvd. Penthouse, Beverly Hills, CA 90210*

Tenant: *Josephine Borchardt*
*Genevieve Borchardt*
*1628 Beverly Blvd. LA 90077*

33. **TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within **3 days** after its receipt (C.A.R. Form TEC). Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

34. **REPRESENTATION**

A. **TENANT REPRESENTATION; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Landlord requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Landlord when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Agreement. Landlord may cancel this Agreement: (i) before occupancy begins; upon disapproval of the credit report(s), or upon discovering that information in Tenant's application is false; (ii) After commencement date, upon disapproval of an updated credit report or upon discovering that information in Tenant's application is no longer true. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.

B. **LANDLORD REPRESENTATIONS:** Landlord warrants that, unless otherwise specified in writing, Landlord is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

35. **MEDIATION:**

A. Consistent with paragraphs B and C below, Landlord and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.

B. The following matters are excluded from mediation: (i) an unlawful detainer action; (ii) the filing or enforcement of a mechanic's lien; and (iii) any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.

C. Landlord and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

36. **ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs, collectively not to exceed $1,000 (or *$3,000.00*), except as provided in paragraph 35A.

37. **C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

38. **STATUTORY DISCLOSURES:**

A. [X] **LEAD-BASED PAINT (If checked):** Premises were constructed prior to 1978. In accordance with federal law, Landlord gives and Tenant acknowledges receipt of the disclosures on the attached form (C.A.R. Form FLD) and a federally approved lead pamphlet.

B. **PERIODIC PEST CONTROL (CHECK IF EITHER APPLIES):**

1. [ ] Landlord has entered into a contract for periodic pest control treatment of the Premises and shall give Tenant a copy of the notice originally given to Landlord by the pest control company.
2. [ ] Premises is a house. Tenant is responsible for periodic pest control treatment.

C. [ ] **METHAMPHETAMINE CONTAMINATION:** Prior to signing this Agreement, Landlord has given Tenant a notice that a health official has issued an order prohibiting occupancy of the property because of methamphetamine contamination. A copy of the notice and order are attached.

D. **BED BUGS:** Landlord has no knowledge of any infestation in the Premises by bed bugs. See attached Bed Bug Disclosure (C.A.R. Form BBD) for further information. Tenant shall report suspected bed bug infestation to Landlord or, if applicable, property manager and cooperate with any inspection for and treatment of bed bugs. Landlord will notify tenants of any units infested by bed bugs.

E. **MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Landlord nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)

F. [X] **RESIDENTIAL ENVIRONMENTAL HAZARDS BOOKLET:** Tenant acknowledges receipt of the residential environmental hazards booklet.

G. [ ] **MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises are located within one mile of an area once used for military training, and may contain potentially explosive munitions.

H. **FLOOD HAZARD DISCLOSURE:** Flooding has the potential to cause significant damage to personal property owned by Tenant. See attached Tenant Flood Hazard Disclosure (C.A.R. Form TFHD) for additional information.

Tenant's Initials ( JB ) ( GB ) Landlord's Initials ( ) ( )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen

Premises: 1628 Beverly Glen Blvd., Los Angeles, CA 90077 Date 10/24/2019

39. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California landlord-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

40. **AGENCY:**

A. **CONFIRMATION:** The following agency relationship(s) are hereby confirmed for this transaction:
Listing Agent: (Print firm name) ____
is the agent of (check one): ☐ the Landlord exclusively; or ☐ both the Landlord and Tenant.
Leasing Agent: (Print firm name) ____
(if not same as Listing Agent) is the agent of (check one): ☐ the Tenant exclusively; or ☐ the Landlord exclusively; or ☐ both the Tenant and Landlord.

B. **DISCLOSURE:** ☐ (If checked): The term of this Agreement exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) has been provided to Landlord and Tenant, who each acknowledge its receipt.

41. ☐ **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.

42. **NOTICE OF RIGHT TO RECEIVE FOREIGN LANGUAGE TRANSLATION OF LEASE/RENTAL AGREEMENTS:** California Civil Code requires a landlord or property manager to provide a tenant with a foreign language translation copy of a lease or rental agreement if the agreement was negotiated primarily in Spanish, Chinese, Korean, Tagalog or Vietnamese. If applicable, every term of the lease/rental needs to be translated except for, among others, names, dollar amounts and dates written as numerals, and words with no generally accepted non-English translation.

43. **OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LL or LCA).

44. **RECEIPT:** If specified in paragraph 5, Landlord or Broker, acknowledges receipt of move-in funds.

45. **OTHER TERMS AND CONDITIONS;** If checked, the following ATTACHED documents are incorporated in this Agreement:
☒ Keysafe/Lockbox Addendum (C.A.R. Form KLA); ☒ Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD);
☐ Lease/Rental Mold and Ventilation Addendum (C.A.R. Form LRM); ☐ Landlord in Default Addendum (C.A.R. Form LID)
☒ Bed Bug Disclosure (C.A.R. Form BBD); ☒ Tenant Flood Hazard Disclosure (C.A.R. Form TFHD)
Other: ____

46. **REPRESENTATIVE CAPACITY:** If one or more Parties is signing this Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 49 or 50 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity (i) represents that the entity for which that party is acting already exists and (ii) shall Deliver to the other Party and Escrow Holder, within 3 Days After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

Landlord and Tenant acknowledge and agree Brokers: **(a)** do not guarantee the condition of the Premises; **(b)** cannot verify representations made by others; **(c)** cannot provide legal or tax advice; **(d)** will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers: **(e)** do not decide what rental rate a Tenant should pay or Landlord should accept; and **(f)** do not decide upon the length or other terms of this Agreement. Landlord and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

47. ☐ **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: ____. Landlord and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).

48. The Premises is being managed by Owner, (or if checked):
☐ Listing firm in box below ☐ Leasing firm in box below ☐ Property Management firm immediately below

Real Estate Broker (Property Manager) ____ DRE Lic # ____
By (Agent) ____ DRE Lic # ____
Address ____ Telephone # ____

Tenant's Initials ( JB ) ( AYB ) Landlord's Initials ( [signature] ) ( ____ )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen

Premises *1628 Beverly Glen Blvd., Los Angeles, CA 90077* Date *10/24/2019*

**49. Tenant agrees to rent the Premises on the above terms and conditions.**

☐ One or more Tenants is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Tenant Representative) (C.A.R. Form RCSD-T) for additional terms.

Tenant [signature] Date 10/25/19

Print Name ***Josephine Borchardt***

Address ______ City ______ State ______ Zip ______

Telephone 480 321 9994 Fax ______ E-mail JBORCHARDT@email.arizona.EDU

Tenant ______ Date 10/25/19

Print Name ***Genevieve Borchardt***

Address ______ City ______ State ______ Zip ______

Telephone (310) 023-0460 Fax ______ E-mail genibortchardt@gmail.com

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

☐ **GUARANTEE:** In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: (i) guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and **(iii)** waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) ______

Guarantor ______ Date ______

Address ______ City ______ State ______ Zip ______

Telephone ______ Fax ______ E-mail ______

**50. Landlord (owner or ☐ agent for owner) agrees to rent the Premises on the above terms and conditions.**

☐ One or more Landlords is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Landlord Representative) (C.A.R. Form RCSD-LL) for additional terms.

Landlord [signature] Date ______ Landlord ______ Date ______

***Joanna Ardalan***

Address ______

Telephone ______ Fax ______ E-mail ______

**REAL ESTATE BROKERS:**

A. Real estate brokers who are not also Landlord under this Agreement are not parties to the Agreement between Landlord and Tenant.

B. Agency relationships are confirmed in paragraph 40.

C. **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or lease or a reciprocal MLS; or (ii) ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Real Estate Broker (Leasing Firm) ______ DRE Lic. # ______

By (Agent) ______ DRE Lic. # ______ Date ______

Address ______ City ______ State ______ Zip ______

Telephone ______ Fax ______ E-mail ______

Real Estate Broker (Listing Firm) ______ DRE Lic. # ______

By (Agent) ______ DRE Lic. # ______ Date ______

Address ______ City ______ State ______ Zip ______

Telephone ______ Fax ______ E-mail ______

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen



# BED BUG DISCLOSURE

(C.A.R. Form BBD, Revised 12/18)
(California Civil Code §1954.603)

The following terms and conditions are hereby incorporated in and made a part of the: Residential Lease or Month-to-Month Rental Agreement, ("Agreement"), dated *October 24, 2019*, on property known as *1628 Beverly Glen Blvd. , Los Angeles, CA 90077*
in which *Josephine Borchardt, Genevieve Borchardt* is referred to as ("Tenant")
and *Joanna Ardalan* is referred to as ("Landlord").

**INFORMATION ABOUT BED BUGS:**

1. Bed Bug Appearance. Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find and identify because they are tiny and try to stay hidden.
2. Life Cycle and Reproduction. An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days.
3. Bed bugs can survive for months without feeding.
4. Bed Bug Bites: Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all.
5. Common signs and symptoms of a possible bed bug infestation:
   - Small red to reddish brown fecal spots on mattresses, box springs, bed frames, mattresses, linens, upholstery, or walls.
   - Molted bed bug skins, white, sticky eggs, or empty eggshells.
   - Very heavily infested areas may have a characteristically sweet odor.
   - Red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. However, some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.
6. For more information, see the Internet Web sites of the United States Environmental Protection Agency and the National Pest Management Association.
7. **Tenant shall report suspected infestations by bed bugs to the Landlord or Property Manager** at the mailing, or email address or phone number provided in the Agreement and cooperate with any inspection for and treatment of bed bugs.
8. Landlord will notify tenants of any units inspected by a pest control operator of the findings by such an operator within 2 business days of the receipt of the findings. All Tenants will be notified of confirmed infestations within common areas.

Tenant agrees to release, indemnify, hold harmless and forever discharge Landlord and Landlord's employees, agents, successors and assigns from any and all claims, liabilities or causes of action of any kind that Tenant, members of Tenant's household or Tenant's guests or invitees may have at any time against Landlord or Landlord's agents resulting from the presence of bedbugs due to Tenant's failure to comply with this Bed Bug Disclosure.

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date 10-25-19 Date

Tenant [signature] *Josephine Borchardt* Landlord [signature] *Joanna Ardalan*

Tenant [signature] *Genevieve Borchardt* Landlord

© 2018, California Association of REALTORS® Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Compass 9454 Wilshire Beverly Hills CA 90210 Phone: 3109681730 Fax: 3105463416 1628 Beverly Glen
Stewart Foerster Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com



# TENANT FLOOD HAZARD DISCLOSURE

(C.A.R. Form TFHD, Revised 12/18)

The following terms and conditions are hereby incorporated in and made a part of the: Residential Lease or Month-to-Month Rental Agreement, ("Agreement"), [X] Residential Lease After Sale, [ ] Other ______________, dated *October 24, 2019* on property known as *1628 Beverly Glen Blvd., Los Angeles, CA 90077* in which *Josephine Borchardt, Genevieve Borchardt* is referred to as ("Tenant") and *Joanna Ardalan* is referred to as ("Landlord").

**INFORMATION ABOUT FLOOD HAZARDS: Tenant is informed of the following:**

1. **The Property is not located in a special flood hazard area or an area of potential flooding.**

OR

[ ] The Property is located in a special flood hazard area or an area of potential flooding.
Property is deemed to be in a special flood hazard area or area of potentially flooding if any of the following scenarios apply:

A. The owner has actual knowledge of that fact.
B. The owner has received written notice from any public agency stating that the Property is located in a special flood hazard area or an area of potential flooding.
C. The Property is located in an area in which the owner's mortgage holder requires the owner to carry flood insurance.
D. The owner currently carries flood insurance.

2. The tenant may obtain information about hazards, including flood hazards, that may affect the Property from the Internet Web site of the Office of Emergency Services, My Hazards Tool (http://myhazards.caloes.ca.gov).

3. The owner's insurance does not cover the loss of the tenant's personal possessions and it is recommended that the tenant consider purchasing renter's insurance and flood insurance to insure his or her possessions from loss due to fire, flood, or other risk of loss.

4. The owner is not required to provide additional information concerning the flood hazards to the Property and that the information provided pursuant to this section (California Government Code section 8589.45) is deemed to inform the tenant.

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date 10/25/19

Tenant [signature]
*Josephine Borchardt*

Tenant [signature]
*Genevieve Borchardt*

Date ______

Landlord [signature]
*Joanna Ardalan*

Landlord ______

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Compass, 9454 Wilshire Beverly Hills CA 90210 Phone: 3109661730 Fax: 3105463416 1628 Beverly Glen
Stewart Fournier Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com



CALIFORNIA
ASSOCIATION
OF REALTORS®

# PET ADDENDUM

(C.A.R. Form PET, 11/13)

The following terms and conditions are hereby incorporated in and made a part of the [X] Residential Lease or Month-to-Month Rental Agreement, [ ] other ______, dated *10/24/2019*, on property located at (Street Address) *1628 Beverly Glen Blvd.* (Unit/Apartment) ______ (City) *Los Angeles* (State) *CA* (Zip Code) *90077* ("Premises"), in which *Josephine Borchardt, Genevieve Borchardt* is referred to as "Tenant" and *Joanna Ardalan* is referred to as "Landlord" (the term "Landlord" includes Owner and agent).

**PET ADDENDUM AND AGREEMENT:**

Notwithstanding any other term in the Agreement, Landlord herewith grants permission for Tenant to have the following pet(s) only on the Premises: *1 dog* subject to the following terms and conditions:

1. Tenant is not allowed to have any other pets on the Premises other than those designated above, including any pets that are "just visiting."
2. Tenant represents to Landlord that the pet(s) is housebroken, has no vicious tendencies or history of threatening or causing harm to persons by biting, scratching, chewing or otherwise.
3. Tenant agrees that the pet(s) will be properly licensed and vaccinated pursuant to applicable laws and Tenant further agrees to provide proof of licensing and vaccination upon Landlord's or agent's request.
4. Tenant is responsible for compliance with all local laws and regulations relating to the pets.
5. Tenant agrees to clean up after their pet(s) and properly dispose of all waste.
6. Tenant agrees to keep Premises free from pet odor and stain.
7. Tenant agrees to take action to avoid pest infestations (fleas, etc.) in the Premises.
8. If the Premises is part of a residential complex, pets are not allowed in pool areas, clubhouses, business office, laundry rooms, business center or fitness centers. Pets may not be bathed or groomed in the laundry room sinks, pools, or pool area.
9. Permission to have a pet may be revoked at any time with three days notice for cause, or for month to month tenancies with thirty days notice without cause. Tenant's failure to remove the pet(s) after permission has been revoked shall be deemed a breach of the lease or rental agreement.
10. Tenant is responsible for and will be charged for any damage to the Premises caused by their pet(s), whether listed above or "just visiting." Damages include, but are not limited to, damages to floors, carpets, drapes, screens, landscaping, fencing, including odors due to the presence of pets.
11. Tenant agrees to indemnify and hold Landlord and Landlord's agents harmless from all liability, claims, demands, damages and costs for injuries to persons or property in connection with Tenant's pet(s).
12. [X] Tenant agrees to carry renter's insurance which includes coverage for pet ownership.
13. ______

**By signing below, Tenant acknowledges that they have read, understand, accept, and have received a copy of this addendum.**

Tenant (Signature): ______ Date: ______
(Print Name) *Josephine Borchardt* Date: ______
Tenant (Signature): ______ Date: ______
(Print Name) *Genevieve Borchardt* Date: ______
Landlord (Signature): ______ Date: ______
(Print Name) *Joanna Ardalan* Date: ______

© 2013, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



CALIFORNIA
ASSOCIATION
OF REALTORS®

# TENANT FLOOD HAZARD DISCLOSURE

(C.A.R. Form TFHD, Revised 12/18)

The following terms and conditions are hereby incorporated in and made a part of the: Residential Lease or Month-to-Month Rental Agreement, ("Agreement"), [X] Residential Lease After Sale, [ ] Other ____________, dated *October 24, 2019*, on property known as *1628 Beverly Glen Blvd., Los Angeles, CA 90077*, in which *Josephine Borchardt, Genevieve Borchardt* is referred to as ("Tenant") and *Joanna Ardalan* is referred to as ("Landlord").

**INFORMATION ABOUT FLOOD HAZARDS: Tenant is informed of the following:**

1. **The Property is not located in a special flood hazard area or an area of potential flooding.**

**OR**

[ ] The Property is located in a special flood hazard area or an area of potential flooding.
Property is deemed to be in a special flood hazard area or area of potentially flooding if any of the following scenarios apply:

A. The owner has actual knowledge of that fact.
B. The owner has received written notice from any public agency stating that the Property is located in a special flood hazard area or an area of potential flooding.
C. The Property is located in an area in which the owner's mortgage holder requires the owner to carry flood insurance.
D. The owner currently carries flood insurance.

2. The tenant may obtain information about hazards, including flood hazards, that may affect the Property from the Internet Web site of the Office of Emergency Services, My Hazards Tool (http://myhazards.caloes.ca.gov).

3. The owner's insurance does not cover the loss of the tenant's personal possessions and it is recommended that the tenant consider purchasing renter's insurance and flood insurance to insure his or her possessions from loss due to fire, flood, or other risk of loss.

4. The owner is not required to provide additional information concerning the flood hazards to the Property and that the information provided pursuant to this section (California Government Code section 8589.45) is deemed to inform the tenant.

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date ____________________ Date ____________________

Tenant ____________________ Landlord ____________________
*Josephine Borchardt* *Joanna Ardalan*

Tenant ____________________ Landlord ____________________
*Genevieve Borchardt*

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



CALIFORNIA
ASSOCIATION
OF REALTORS®

# BED BUG DISCLOSURE

**(C.A.R. Form BBD, Revised 12/18)**
**(California Civil Code §1954.603)**

The following terms and conditions are hereby incorporated in and made a part of the: Residential Lease or Month-to-Month Rental Agreement, ("Agreement"), dated *October 24, 2019*, on property known as *1628 Beverly Glen Blvd. , Los Angeles, CA 90077*
in which *Josephine Borchardt, Genevieve Borchardt* is referred to as ("Tenant")
and *Joanna Ardalan* is referred to as ("Landlord").

**INFORMATION ABOUT BED BUGS:**

1. Bed Bug Appearance: Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find and identify because they are tiny and try to stay hidden.
2. Life Cycle and Reproduction: An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days.
3. Bed bugs can survive for months without feeding.
4. Bed Bug Bites: Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all.
5. Common signs and symptoms of a possible bed bug infestation:
   - Small red to reddish brown fecal spots on mattresses, box springs, bed frames, mattresses, linens, upholstery, or walls.
   - Molted bed bug skins, white, sticky eggs, or empty eggshells.
   - Very heavily infested areas may have a characteristically sweet odor.
   - Red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. However, some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.
6. For more information, see the Internet Web sites of the United States Environmental Protection Agency and the National Pest Management Association.
7. **Tenant shall report suspected infestations by bed bugs to the Landlord or Property Manager** at the mailing, or email address or phone number provided in the Agreement and cooperate with any inspection for and treatment of bed bugs.
8. Landlord will notify tenants of any units inspected by a pest control operator of the findings by such an operator within 2 business days of the receipt of the findings. All Tenants will be notified of confirmed infestations within common areas.

Tenant agrees to release, indemnify, hold harmless and forever discharge Landlord and Landlord's employees, agents, successors and assigns from any and all claims, liabilities or causes of action of any kind that Tenant, members of Tenant's household or Tenant's guests or invitees may have at any time against Landlord or Landlord's agents resulting from the presence of bedbugs due to Tenant's failure to comply with this Bed Bug Disclosure.

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date ____________________ Date ____________________

Tenant ____________________ Landlord ____________________
*Josephine Borchardt* *Joanna Ardalan*

Tenant ____________________ Landlord ____________________
*Genevieve Borchardt*

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Compass, 9454 Wilshire Beverly Hills CA 90210 Phone: 3109681730 Fax: 3105463416 1628 Beverly Glen
Stewart Fournier Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com



CALIFORNIA
ASSOCIATION
OF REALTORS®

# MOVE IN / MOVE OUT INSPECTION

(C.A.R. Form MIMO, Revised 11/07)

Property Address *1628 Beverly Glen Blvd. , Los Angeles, CA 90077* Unit No. ______

Inspection: Move In *November 1, 2019* (Date) Move Out *October 31, 2020* (Date)

Tenant(s) *Josephine Borchardt, Genevieve Borchardt*

**When completing this form, check the Premises carefully and be specific in all items noted. Check the appropriate box:**
**N - NEW S - SATISFACTORY/CLEAN O - OTHER D - DEPOSIT DEDUCTION**

| | MOVE IN N | S | O | Comments | MOVE OUT S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| **Front Yard/Exterior** | | | | | | | | |
| Landscaping | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Fences/Gates | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Sprinklers/Timers | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walks/Driveway | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Porches/Stairs | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Mailbox | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Building Exterior | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Entry** | | | | | | | | |
| Security/Screen Doors | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Living Room** | | | | | | | | |
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Fireplace Equipment | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Dining Room** | | | | | | | | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

Tenant's Initials (______) (______) Tenant's Initials (______) (______)

Landlord's Initials (______) (______) Landlord's Initials (______) (______)

© 1982-2007, California Association of REALTORS®, Inc.

Compass, 9454 Wilshire Beverly Hills CA 90210 Phone: 3109681730 Fax: 3105463416 1628 Beverly Glen
Stewart Fournier Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

Property Address: *1628 Beverly Glen Blvd. , Los Angeles, CA 90077* Date: *10/20/2019*

| Other Room | MOVE IN N | S | O | Comments | MOVE OUT S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

| Bedroom # ____ | N | S | O | Comments | S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Closets/Doors/Tracks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

| Bedroom # ____ | N | S | O | Comments | S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Closets/Doors/Tracks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

| Bedroom # ____ | N | S | O | Comments | S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Closets/Doors/Tracks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

| Bedroom # ____ | N | S | O | Comments | S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures/Fans | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Closets/Doors/Tracks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

Tenant's Initials ( ) ( ) Tenant's Initials ( ) ( )

Landlord's Initials ( ) ( ) Landlord's Initials ( ) ( )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

Property Address: *1628 Beverly Glen Blvd. , Los Angeles, CA 90077* Date: *10/20/2019*

**Bath #** ____

| Item | MOVE IN N | S | O | Comments | MOVE OUT S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Toilet | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Tub/Shower | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Shower Door/Rail/Curtain | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Sink/Faucets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Plumbing/Drains | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Exhaust Fan | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Towel Rack(s) | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Toilet Paper Holder | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Cabinets/Counters | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

**Bath #** ____

| Item | MOVE IN N | S | O | Comments | MOVE OUT S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Toilet | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Tub/Shower | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Shower Door/Rail/Curtain | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Sink/Faucets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Plumbing/Drains | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Exhaust Fan | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Towel Rack(s) | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Toilet Paper Holder | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Cabinets/Counters | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

**Bath #** ____

| Item | MOVE IN N | S | O | Comments | MOVE OUT S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| Doors/Knobs/Locks | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Toilet | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Tub/Shower | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Shower Door/Rail/Curtain | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Sink/Faucets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Plumbing/Drains | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Exhaust Fan | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Towel Rack(s) | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Toilet Paper Holder | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Cabinets/Counters | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

Tenant's Initials (______) (______) Tenant's Initials (______) (______)

Landlord's Initials (______) (______) Landlord's Initials (______) (______)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen

EQUAL HOUSING OPPORTUNITY

Property Address: *1628 Beverly Glen Blvd. , Los Angeles, CA 90077* Date: *10/20/2019*

| | MOVE IN N | S | O | Comments | MOVE OUT S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| **Kitchen** | | | | | | | | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window Coverings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Windows/Locks/Screens | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Range/Fan/Hood | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Oven(s)/Microwave | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Refrigerator | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Dishwasher | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Sink/Disposal | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Faucet(s)/Plumbing | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Cabinets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Counters | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Hall/Stairs** | | | | | | | | |
| Flooring/Baseboards | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Walls/Ceilings | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Closets/Cabinets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Railings/Banisters | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Laundry** | | | | | | | | |
| Faucets/Valves | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Plumbing/Drains | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Cabinets/Counters | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Systems** | | | | | | | | |
| Furnace/Thermostat | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Air Conditioning | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Water Heater | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Water Softener | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

**Other** ____________

Tenant's Initials ( ) ( ) Tenant's Initials ( ) ( )

Landlord's Initials ( ) ( ) Landlord's Initials ( ) ( )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1628 Beverly Glen

EQUAL HOUSING OPPORTUNITY

Property Address: *1628 Beverly Glen Blvd. , Los Angeles, CA 90077* Date: *10/20/2019*

| | MOVE IN N | S | O | Comments | MOVE OUT S | O | D | Comments |
|---|---|---|---|---|---|---|---|---|
| **Garage/Parking** | | | | | | | | |
| Garage Door | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Other Door(s) | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Driveway/Floor | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Cabinets/Counters | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Light Fixtures | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Switches/Outlets | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Electrical/Exposed Wiring | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Window(s) | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Other Storage/Shelving | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Back/Side/Yard** | | | | | | | | |
| Patio/Deck/Balcony | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Patio Cover(s) | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Landscaping | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Sprinklers/Timers | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Pool/Heater/Equipment | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Spa/Cover/Equipment | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Fences/Gates | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| **Safety/Security** | | | | | | | | |
| Smoke/CO Detector(s) | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Security System | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |
| Security Window Bars | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | |

**Personal Property**

**Keys/Remotes/Devices**

Keys

Remotes/Devices

☐ **Attached Supplement(s)**

**THIS SECTION TO BE COMPLETED AT MOVE IN:** Receipt of a copy of this form is acknowledged by:

Tenant ______ *Josephine Borchardt* Date ______

Tenant ______ *Genevieve Borchardt* Date ______

New Phone Service Established? ☐ Yes ☐ No New Phone Number ______

Landlord (Owner or Agent) ______ Date ______

Landlord *Joanna Ardalan*
(Print Name)

**THIS SECTION TO BE COMPLETED AT MOVE OUT:** Receipt of a copy of this form is acknowledged by:

Tenant ______ *Josephine Borchardt* Date ______

Tenant ______ *Genevieve Borchardt* Date ______

Tenant Forwarding Address ______

Landlord (Owner or Agent) ______ Date ______

Landlord *Joanna Ardalan*
(Print Name)

© 1982-2007, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



CALIFORNIA
ASSOCIATION
OF REALTORS®

# LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS DISCLOSURE, ACKNOWLEDGMENT AND ADDENDUM
## For Pre-1978 Housing Sales, Leases, or Rentals
(C.A.R. Form FLD, Revised 11/10)

The following terms and conditions are hereby incorporated in and made a part of the: ☐ California Residential Purchase Agreement, ☒ Residential Lease or Month-to-Month Rental Agreement, or ☐ Other: ______________________, dated *October 24, 2019*, on property known as: *1628 Beverly Glen Blvd., Los Angeles, CA 90077* ("Property") in which *Josephine Borchardt, Genevieve Borchardt* is referred to as Buyer or Tenant and *Joanna Ardalan* is referred to as Seller or Landlord.

**LEAD WARNING STATEMENT (SALE OR PURCHASE)** Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligent quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**LEAD WARNING STATEMENT (LEASE OR RENTAL)** Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive federally approved pamphlet on lead poisoning prevention.

**EPA'S LEAD-BASED PAINT RENOVATION, REPAIR AND PAINTING RULE:** The new rule requires that contractors and maintenance professionals working in pre-1978 housing, child care facilities, and schools with lead-based paint be certified; that their employees be trained; and that they follow protective work practice standards. The rule applies to renovation, repair, or painting activities affecting more than six square feet of lead-based paint in a room or more than 20 square feet of lead-based paint on the exterior. Enforcement of the rule begins October 1, 2010. See the EPA website at www.epa.gov/lead for more information.

**1. SELLER'S OR LANDLORD'S DISCLOSURE**

I (we) have no knowledge of lead-based paint and/or lead-based paint hazards in the housing other than the following:

______________________________________________

I (we) have no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing other than the following, which, previously or as an attachment to this addendum, have been provided to Buyer or Tenant:

______________________________________________

I (we), previously or as an attachment to this addendum, have provided Buyer or Tenant with the pamphlet *"Protect Your Family From Lead In Your Home"* or an equivalent pamphlet approved for use in the State such as *"The Homeowner's Guide to Environmental Hazards and Earthquake Safety."*

For Sales Transactions Only: Buyer has 10 days, unless otherwise agreed in the real estate purchase contract, to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**I (we) have reviewed the information above and certify, to the best of my (our) knowledge, that the information provided is true and correct.**

Seller or Landlord *Joanna Ardalan* ______________ Date ______

Seller or Landlord ______________ Date ______

© 1996-2010, California Association of REALTORS®, Inc.

Buyer's Initials (_______) (_______)

Property Address: *1628 Beverly Glen Blvd., Los Angeles, CA 90077* Date *October 20, 2019*

## 2. LISTING AGENT'S ACKNOWLEDGMENT

Agent has informed Seller or Landlord of Seller's or Landlord's obligations under §42 U.S.C. 4852d and is aware of Agent's responsibility to ensure compliance.

**I have reviewed the information above and certify, to the best of my knowledge, that the information provided is true and correct.**

(Please Print) Agent (Broker representing Seller or Landlord) By Associate-Licensee or Broker Signature Date

## 3. BUYER'S OR TENANT'S ACKNOWLEDGMENT

I (we) have received copies of all information listed, if any, in 1 above and the pamphlet "*Protect Your Family From Lead In Your Home*" or an equivalent pamphlet approved for use in the State such as "*The Homeowner's Guide to Environmental Hazards and Earthquake Safety.*" **If delivery of any of the disclosures or pamphlet referenced in paragraph 1 above occurs after Acceptance of an offer to purchase, Buyer has a right to cancel pursuant to the purchase contract. If you wish to cancel, you must act within the prescribed period.**

For Sales Transactions Only: Buyer acknowledges the right for 10 days, unless otherwise agreed in the real estate purchase contract, to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; OR, (if checked) ☐ Buyer waives the right to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**I (we) have reviewed the information above and certify, to the best of my (our) knowledge, that the information provided is true and correct.**

Josephine Borchardt 10/25/19

Buyer or Tenant Date Buyer or Tenant Date

***Josephine Borchardt*** ***Genevieve Borchardt***

## 4. COOPERATING AGENT'S ACKNOWLEDGMENT

Agent has informed Seller or Landlord, through the Listing Agent if the property is listed, of Seller's or Landlord's obligations under §42 U.S.C. 4852d and is aware of Agent's responsibility to ensure compliance.

**I have reviewed the information above and certify, to the best of my knowledge, that the information provided is true and correct.**

Agent (Broker obtaining the Offer) By Associate-Licensee or Broker Signature Date

© 1996-2010, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

# Exhibit B

 

538-49

Wed, Nov 6, 11:46 AM

BofA: JOSEPHINE BORCHARDT sent you $2,000.00. Your account will be credited. Conf# 289503580

Thu, Nov 7, 12:16 PM

BofA: JOSEPHINE BORCHARDT sent you $1,850.00. Your account will be credited. Conf# 289859588

Sun, Dec 1, 10:24 AM

BofA: GENEVIEVE BORCHARDT sent you $2,000.00. Your account will be credited. Conf# 6904ac9b0.

Mon, Dec 2, 12:37 PM

BofA: GENEVIEVE BORCHARDT sent you $1,778.00. Your account will be credited. Conf# f9ae85fba.

Fri, Jan 3, 8:45 AM

BofA: GENEVIEVE BORCHARDT sent you $2,000.00. Your account will be credited. Conf# 0abdb6c01.

Sat, Jan 4, 4:38 PM

BofA: GENEVIEVE BORCHARDT sent you $1,850.00. Your account

      

# Exhibit C

538-49

sent you $1,850.00. Your account will be credited. Conf# GxrscnLld.

Thu, Feb 27, 12:29 AM

BofA: GENEVIEVE BORCHARDT sent you $1,666.00. Your account will be credited. Conf# t1yfzlvoW.

Mon, Mar 2, 3:30 PM

BofA: GENEVIEVE BORCHARDT sent you $2,000.00. Your account will be credited. Conf# IMAl9jBzS.

Thu, Mar 5, 4:20 PM

BofA: GENEVIEVE BORCHARDT sent you $1,850.00. Your account will be credited. Conf# d9d7babb1.

Thu, Apr 2, 6:08 PM

Cha-ching! Your BofA balance just grew. Genevieve Borchardt sent you $1,925.00 with Zelle for "April Rent"

Mon, Apr 6, 4:30 PM

Cha-ching! Your BofA balance just grew. Genevieve Borchardt sent you $1,925.00 with Zelle for "April rent"

Mon, May 4, 7:11 PM

   

      

# Exhibit D



Wed, Mar 25, 4:51 PM

Hi Jo,

The GE tech never came.

Our fridge has 1/4 inch of water floating at the bottom. Excessive condensation. And our food is spoiling by the minute.

Additionally, we have not had a properly working oven since Thanksgiving. If you remember, our Turkey was raw on the inside burned on the outside. Any time we have tried to cook anything it does not cook properly.
We made you aware in early December.

Your handyman- Hamo, inspected the appliance and assured us that it would be replaced. He said he would speak to you about it, and you confirmed that it would be taken care of.

It is now almost April, and still has not been addressed.

Please fix or replace the appliances

  

       

 

Josephine

taken care of.

It is now almost April, and still has not been addressed.

Please fix or replace the appliances immediately, before the 1st of April.

Thank you,
Josephine

Josephine - Ge is supposed to come today between 1 and 5-

That is what I texted you earlier

You are free to call them and confirm

I gave you the confirmation number

I received confirmation from them it was between 11:40-1:40

Oh I never got that

They only texted you that

Ok maybe they are running late

Text Message
Yesterday 7:01 PM

    

      





Josephine

Text Message
Yesterday 7:01 PM

GE Appliances Factory Service: Your service appointment on 03/25/2020 has been assigned to Ed. The technician should arrive between 11:40 AM - 01:40 PM. Estimated arrival times are subject to change, click the link to check for

Hamo said Home Depot had the wrong one and is short on trucks - he hopes to have it by Monday ...

Can we talk? I just called you

Isn't there something on the text you received that says "estimated arrival times are subject to change, click the link to check for .... " when you click it what does it say?

He sounds very unreliable









 

Josephine

He sounds very unreliable considering it has taken him 4 full months to get our appliances addressed and just now he found out they don't have the right one. Additionally, he does not communicate effectively.

I would suggest he check with Costco, Lowe's, or manufacture websites to secure an appliance.

Or you might want to use another handyman for this, because "hopes" does not secure a resolution. And continues to leave this issue unresolved, especially during this time of quarantine.

Can you please find out if the appointment changed?
Thank you

Josephine- I am sorry you feel this way... Hamo has done work for my partner for many years and we like him a lot - if you don't want to work with him I will find someone else for the next issue if another issues comes up... he didn't tell me that you reached out to him since nov. did you? When he told me about the

   

      

# Exhibit E

2:51

211

J

Josephine

CONSUMER SERVICE: PLEASE VISIT OUR
WEBSITE AT WWW.GEAPPLIANCES.COM
FOR CALIFORNIA RESIDENTS: AN ESTIMATE
AS REQUIRED (SECTION 9844 OR THE

Mon, Mar 30, 10:54 AM

Good morning,
Can you please give an update on the oven?
Thank you

Also-
The top bathroom door looks like the wood is falling apart on the hinges. And the caulking in the top bathroom is separating and we are starting to smell sewage.
When Hamo comes for the oven, can he please look at this as well?

Yes of course

Sat, Apr 4, 9:12 PM

Good evening,
You will receive the second portion of the rent on Monday.
Thank you!

Sun, Apr 5, 12:59 PM

Ok thanks

Pay



 

2 People >

Mon, Mar 30, 10:54 AM

Hi Hamo- do you have an update on the oven?

Hamo- there is another problem in the bathroom Josephine would like you to check out

Hamo

I'm going to Home Depot pick up the stove

Ok- can we schedule a time for you to go to Josephine's ? We have to be careful about scheuelinf a good time because she and her sisters have classes and work meetings and we don't want to interrupt

Josephine

Thank you Jo

Hamo

Hi Joe can you send me the address

1628 n Beverly Glen blvd 90077

What time do you think you can come?

Hamo

      

      



211
H J
2 People
What time do you think you can come?
Hamo
They make a delivery Thursday morning
Ok
Can you go to the house to look at the bathroom? There is something wrong -I'm don't know the details but there is a bad smell
Hamo
OK
Thank you very much??
Oops I meant !!!
When is a good time? I appreciate it Hamo!!!
Hamo
Right now
Josephine
Unfortunately today does not work for us. Tomorrow after 10am works. Thank you!
Message
Pay

# Exhibit E-1

6:47

2 People

Thu, Apr 16, 7:25 PM

Hi Hamo- the shelf in the bathroom has fallen. Can you go there and fix it and make sure it is very secure?

Can you let us know when is a good time for you? Thanks

Hamo

The Belair building ?



     

      



211
H J
2 People
Can you let us know when is a good time for you? Thanks
Hamo
The Belair building ?
Yes 1628 n Beverly Glen
Hamo
OK tomorrow morning
Thanks Hamo- can you give an approximate time?
Hamo
10 am
Josephine- can you confirm that works for you?
Josephine
Yes, perfect!
Thanks all!
Pay

# Exhibit F

Fri, Apr 10, 11:40 PM

J
Josephine

Pay





Hi Jo,
We have seen a few mouse droppings lately, and we were not sure if this was maybe a one off but now we are positive it is not as we are in the kitchen and hear it in the cabinet gnawing.

Can you please have someone come out tomorrow?
Thank you.

Hi Josephine,
Sorry to hear about this. I can't

 

Josephine

sure if this was maybe a one off but now we are positive it is not as we are in the kitchen and hear it in the cabinet gnawing.

Can you please have someone come out tomorrow?
Thank you.

Sat, Apr 11, 12:13 PM

Hi Josephine,
Sorry to hear about this. I can't come because of lock down but I'll send you rat poison via amazon and that should take care of it

It should be there Wednesday

Can you call an exterminator?

Sat, Apr 11 6:45 PM

Let's see if poison works- it's usually very effective

Sun, Apr 12, 6:00 PM

Hello,
The fridge still has issues with abnormal condensation and it's ruining our food. Can GE come out again to fix it?

   

      

# Exhibit G

 

Josephine

Good morning Jo,
We received the TomCat mouse killer.
My mom is here and she is asking where we are to place the block bait as we have seen and heard mice throughout the home.

We don't know where the point of entry is.

This is why we asked for the problem to be dealt with professionally as they would know the exact point of entry and would be able to pin point the best location to place the poison as oppose to us guessing.





iMessage

     

# Exhibit H



211
J
Josephine
they said
Confirmation 061149350
Great! Thank you
Is that appointment for the oven as well?
Is that appointment for the oven as well?
Thanks!
Orkin is coming on Thursday between 8 and 12
Great

# Exhibit I





Josephine

Fri, Apr 17, 5:31 PM

Hi Jo,
We found this huge rat hole in the kitchen.
Can it be repaired ASAP?



 

Josephine



Didn't the exterminator come yesterday?

Where is this in the kitchen

The exterminator was supposed to look for this

Didn't the exterminator come yesterday? Yes Jo, you know the exterminator came.
And he found the entry point

   

      

3:08

Josephine

look for this

Didn't the exterminator come yesterday? Yes Jo, you know the exterminator came.
And he found the entry point outside leading into the house.
And confirmed that they are rats.
We found this hole inside the kitchen today.

He was supposed to tell me if there was an entry point and I did t hear from him

I'm not qustioning you I just didn't hear from him and I would have expected it fixed yesterday

Not sure why they would make two trips out of it

Did you call Orkin to get an update on this problem?

They were supposed to call me if there was an entry problem -

I'll call them tomorrow and tell them to come back and fix it

Let me update you, the technician

   

      

 

Josephine

Let me update you, the technician did a thorough job around the perimeter of the home and pointed out the entry points.
He himself said that it looked like the rats dug their way into the home.
He pointed out the droppings in the different areas and signs of rat infestation.
He laid out poison where needed for the time-being and expressed that the follow up visit would be this upcoming Monday 4/20.
Jo, this is not a one day repair fix. This is a very in-depth serious problem that is affecting us severely.

I'm glad he is coming for a followup. Did he address fixing the holes? Why didn't he fix them yesterday?

My preference is for orkin to fix the holes as they are experts on this type of thing

He found the holes yesterday outside. We found this hole today just now.

   

      



My preference is for orkin to fix the holes as they are experts on this type of thing

He found the holes yesterday outside. We found this hole today just now.

Did they discuss fixing the holes outside in Monday

Please call Orkin first thing in the morning and see if they can come out sooner than Monday to followup given we found more holes.

Yes, he patched the holes outside.

Ok I'll call

Thank you.

Sat, Apr 18, 10:31 AM

Hi- orkin is double booked today and they don't work Sunday's. They are coming first thing in Monday 8-10 am

I reiterated to them that they should 

      





Josephine

given we found more holes.

Yes, he patched the holes outside.

Ok I'll call

Thank you.

Sat, Apr 18, 10:31 AM

Hi- orkin is double booked today and they don't work Sunday's. They are coming first thing in Monday 8-10 am

I reiterated to them that they should call me after the appt. if there is any issue please remind the tech

Delivered

Good morning,
Thank you

Mon, Apr 20, 9:02 PM

Good evening Jo,
We sent you an email.

Wed, Apr 22, 8:__ PM

Good evening Jo,
We sent you an email.















# Exhibit J



PEST CONTROL DOWN TO A SCIENCE.®

JOANNA ARDALAN
1628 N BEVERLY GLEN BLVD
LOS ANGELES, CA 90077-2708
408-321-9994 Cell
949-337-0707 Other

Orkin, 811-W. LOS ANGELES, CA
1053 CRENSHAW BLVD
LOS ANGELES, CA 90019-1940
(866) 640-4371
License # PR 40332

| | |
|---|---|
| Invoice/Service Ticket #: | 200254359 |
| Account #: | 31046196 |
| Balance: | $0.00 |
| Current Svc: | $0.00 |
| Tax: | $0.00 |
| Total Amt Due: | $0.00 |

**Date of Service** 04/20/2020 **Customer Since:** 2017
**Time In** 04/20/2020 09:45 AM **Time Out** 04/20/2020 10:33 AM
**PC Standard - EOM 7** , Follow Up

**Previous Services**
04/16/2020 Callback
03/13/2020 PC Standard
01/10/2020 PC Standard

**Pesticide Product Labels Are Available Upon Request**

Cesar Marroquin Rt# 811-16 Cesar
License #

| | |
|---|---|
| Amt Collected: | $0.00 |
| Auto Pay Exp | Aug 2023 |

## Services Provided

Inspected All Area, THANK YOU FOR YOUR BUSINESS.

## General Comments

I picked up 3/ dead rats, and I set two traps in the crawlspace and one in the Water H. Are.

## Observation Information

| | | Status | Responsibility | Date Entered | Location |
|---|---|---|---|---|---|
| Observation: | Activity - Dead | Resolved | Technician | 04/20/2020 | Crawl Space, Water Heater Area |
| Recommendation: | Treatment Rendered | Pest Type: | Rats | | |
| Observation: | Debris Present | Pending | Customer | 01/10/2020 | |
| Recommendation: | Clean Area | Pest Type: | | | |
| Observation: | Preventative | Pending | Technician | 03/03/2017 | |
| Recommendation: | Treatment Rendered | Pest Type: | | | |
| Observation: | Activity - Dead | Pending | Technician | 02/18/2017 | |
| Recommendation: | Treatment Rendered | Pest Type: | Ants, Spiders | | |

Printed 04/20/2020 10:33 AM National Poison Control Center: 1-800-222-1222

CO - Commercial applicators are licensed by the Colorado Department of Agriculture

AZ - Warning - Pesticides can be harmful. Keep children and pets away from pesticide applications until dry, dissipated, or aerated. For more information, contact Orkin Pest Control - C40298CD at 1-800-346-7546

For additional information, a copy of the Label and/or MSDS may be requested from your local branch or from http://www.orkin.com. Item # SVPC1026IOS rev. 05.13



ORKIN
PEST CONTROL DOWN TO A SCIENCE.™

JOANNA ARDALAN
1628 N BEVERLY GLEN BLVD
LOS ANGELES, CA 90077-2708
408-321-9994 Cell
949-337-0707 Other

Orkin, 811-W. LOS ANGELES, CA
1053 CRENSHAW BLVD
LOS ANGELES, CA 90019-1940
(866) 640-4371
License # PR 40332

**Invoice/Service Ticket #:**200254359
**Account #** 31046196
**Date of Service:** 04/20/2020
**Time In:** 04/20/2020 09:45 AM
**Time Out:** 04/20/2020 10:33 AM

**Product Application Details (Consumer post application precautionary statements on back)**

| | | | | Active Ingredient | App Method | App Equip | Target Pest(s) | Location |
|---|---|---|---|---|---|---|---|---|
| **Product:** | Rat Size Snap Trap 1.55 per unit (case) | **QTY:** | 3 EACH | | Inspection Only | No Equipment used | Rats | Crawl Space, Water Heater Area |
| **Formulation:** | | **EPA #:** | N/A | | | | | |
| **App Rate:** | | **LOT #:** | | | | | | |

Customer Signature: **Signature Not Entered**

CUSTOMER NAME:
CUSTOMER EMAIL:

Verbal Service Ticket: 04/20/2020 10:33 AM; ; Mrs at home everything is ok.

* This work has been performed to my satisfaction.

**If you experience pest issues between scheduled visits, we will come back and address the problem at no additional charge.**

**Remit To:** **Orkin, 811-W. LOS ANGELES, CA**
**P O BOX 7161**
**PASADENA, CA 91109-7161**

National Poison Control Center: 1-800-222-1222

CO - Commercial applicators are licensed by the Colorado Department of Agriculture

AZ - Warning - Pesticides can be harmful. Keep children and pets away from pesticide applications until dry, dissipated, or aerated. For more information, contact Orkin Pest Control - C4029BCD at 1-800-346-7546

For additional information, a copy of the Label and/or MSDS may be requested from your local branch or from http://www.orkin.com. Item # SVPC1026iOS rev. 05.13

## CONSUMER NOTIFICATION(S) / POST APPLICATION STATEMENTS

**Treated Area(s)** - Do not allow unprotected person(s), children, or pets to touch, enter or replace items or bedding, to contact or enter treated area(s) until dry.
**Ventilation/Reoccupying** - Vacate and keep area(s) closed up to 30 minutes after treatment, then ventilate area(s) well for up to 2 hours before reoccupying.
**Equipment/Processing/Food** - Thoroughly wash dishes, utensils, food preparation/processing equipment and surfaces with an effective cleaning compound and rinse with clean water if not removed or covered during treatment. This area should be odor free before food products are placed in the area.
**Exterior Applications (baits)** - Do not allow grazing of feed, lawn or sod clippings to livestock after bait applications.
**Granular Application(s)** - Do not water to the point of run off.
**Do not burn** treated fire wood for one month after treatment.

National Poison Control Center: 1-800-222-1222

# Exhibit K

April 20, 2020,

**Letter to Cure and Remedy**

Re:     1628 N. Beverly Glen Blvd.
        Los Angeles, CA 90077

**Your tenants (Josephine, Genevieve, and Francesca Borchardt), are requesting that you immediately cure and remedy your breach of contract.**

**Under California Civil Code 1941.1 and Section 17920.3 of the Health and Safety Code, your duties as the landlord are to uphold a dwelling that does not lack the substandard characteristics of living.**

**You have failed to abide by the California Civil Code and Health and Safety Codes.**

Appliances:
On December 3, 2019, you were made aware by Josephine Borchardt via text message that the stove/oven was not in proper working order.
You did not cure or remedy this problem for 4 months, despite tenant inquiries and your false assurances that the oven/ stove would be replaced.
On April 2, 2020, a new oven of lesser quality was installed.
The old oven was left on the driveway entrance from April 2, 2020, until April 5, 2020.

On March 16, 2020, you were made aware by Josephine Borchardt via text message that the refrigerator was not in proper working order.
You were made aware that the refrigerator has an excessive condensation problem and food is spoiling.
As of April 20, 2020, the issue pertaining to the refrigerator persists.

Rodent Infestation:
On April 10, 2020, Josephine Borchardt brought to your attention via text message that rodent activity was present in the home. Josephine sent videos and photos of rodent activity of gnawing, droppings, and a description of rodent noise in the home.
Josephine asked if you could please have someone come to exterminate the rodents.

On April 11, 2020, you responded via text message that the rodent infestation could not be addressed due to "lock down", but to use rodent poison which you were going to send via Amazon, to cure the issue.
On April 11, 2020, after your inept reply Josephine contacted Orkin via phone and email to see if they were available to come to treat the infestation. Orkin has a contract with the CDC, is an essential service, and was readily available.
On April 11, 2020, Josephine Borchardt asked you via text that the rodent infestation be handled professionally, to which you refused in your response.
On the morning of April 14, 2020, the poison arrived and Josephine asked you via text how to place the poison as she has no expertise in this matter, and that her mother was also inquiring and concerned. 5 hours later, you replied by stating you made the appointment for Orkin to come out on April 16, 2020.

On April 16, 2020, Orkin confirmed that the rodents infested in the home were in fact rats. 2 traps were placed in a crawl space and 1 was placed next to the water heater. A large hole was patched on the north side of the home and a follow-up appointment was made for April 20, 2020. You did not contact the Borchardt's or Orkin following the Orkin visit on April 16, 2020. A follow-up to your tenants which would be proper protocol is what you would expect from a

landlord who understands the gravity and severity of the problem, especially during a pandemic and a minor in the home.

On April 20, 2020, it was confirmed that 3 rats were caught in the 3 traps which Orkin placed on April 16, 2020. A very large hole was found on the north exterior of the home. This was unable to be patched as your Basic service does not warrant this to be done. On April 20, many other large holes leading to the foundation of the home were also found in the interior kitchen cabinets.

On April 20, 2020, Orkin confirmed to Josephine and Genevieve Borchardt that you have yet to upgrade your service from the Basic Bi-Monthly Service (every two months) to a Rodent Exclusion Service to fully exterminate the rats.

To properly cure and rectify the infestation, you must obtain the Orkin Rodent Exclusion Service.
This service encapsulates the sealant and patch of all points of entry regardless of size, collection of all dead rodents and the lay out of traps.
The Orkin technician also recommended the setting up of 6 Bait Station Blocks to be set up strategically along on the exterior of the home.
Orkin confirmed the poison you sent was not the correct method to treat the issue as it is amateur, not to be placed indoors, and they would have no responsibility if we or our food came into contact with the poison.

On April 20, 2020, Orkin confirmed they are not in the cabinetry business as you previously asserted they were via text April 17, 2020, and they are not at liberty to fix holes larger than 1 quarter or holes in cabinetry as they do not specialize in that service.
The Basic service with Orkin in which you pay $108 every other month for is to lay basic traps and patch holes that are less than 1 quarter in size along the exterior of the home.
You were made aware of the large scale of the holes, larger than 1 quarter on April 17, 2020, via text message images from Josephine.

You must have the kitchen cabinets which have been gnawed through from the rat infestation replaced by a cabinet professional.
They are not in repair order as they have been completely gnawed through in multiple areas of the kitchen in which the foundation of the home is clearly visible.

Handywork:
As for other issues that have been brought to your attention but not fully addressed, they must be addressed immediately.

The bathroom toilets must be re-caulked. The work which Hamo performed is cracking and sewage is seeping from underneath due to the shoddy work performed.
We have made you aware of his miscommunication, his lack of respect for our time, the trash and debris he has left every time which we then have to clean and dispose of, and the amateur work he performs.

On March 25, 2020, you insisted to speak with Josephine Borchardt via phone. During the call, you said, “If you don’t raise it with me, I promise you I’m not gonna focus on it” this is in regards to raising concerns to you, in which Josephine always promptly did. You also said, “If it’s not a priority for you its not gonna be a priority for me”. Josephine made you aware the first week of December 2019, that the oven/stove was not in working order.

Due to this, if you cannot maintain your home, you should obtain a property manager who is able to immediately cure issues relating to appliance and habitability so your tenants do not suffer.

Additionally, during this call, you proceeded to assert that because Josephine was inquiring on the appliances to be replaced and your lack of follow-through, that you felt "attacked". Contrary, the attack in which the Borchardt's have suffered is through your gross negligence in allowing the uninhabitable conditions to continue to dwell, addressing them with negligence, all while the country is in a state of quarantine.

The Borchardt's have made you aware that their food in the fridge is spoiling, that they are continuously having to throw away food that has become drenched in water from the fridge. They have made you aware that they have had to discard dry food in the pantry and cabinets due to the rodent infestation. The amount of time and effort in cleaning out the cabinets and home due to the rodent infestation and the expenses the Borchardt's have had to endure due to the repurchase of food items and small kitchen appliances after they have become saturated in water from the fridge or contaminated by rodents is insurmountable; and yet despite the Borchardt's pleasant communication and pleas to you asking for the issues to be rectified, you continue to address the issues brought to your attention with no sense of urgency and a defensive "laissez-faire" hands-off attitude.

We are requesting that you immediately cure the issues before they become further damaging.


Additionally, we are making you aware that you misrepresented the level of disruption that we were to receive from the ongoing construction next door. The level of machinery noise and the invasion of privacy is almost constant. In addition, the concrete debris that settles onto the patio is a chore of 1 hour every single day, only to have it refill the next day. We understand that this is not something that you can address or is in your control, but it was misrepresented as if it were to be a minor inconvenience or an occasional disruption, not to the reality. We only wish you had been forthcoming. We have supporting video of the magnitude of this problem.


This letter has been sent via email to jo.ardalan@gmail.com


Very Respectfully,

//Signed//

Josephine Borchardt
Genevieve Borchardt
Francesca Borchardt

1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

# Exhibit L

2 People

iMessage
Thu, Apr 23 1:26 PM

Hi Andy and Christian, this is jo Ardalan, the owner of 1628 n Beverly Glen. I spoke with Andy on Tuesday and received a call from Christian yesterday so I'm cc'ing you both here so our texts don't cross paths. I want to say thank you for offering to inspect the property for rats gratis after the phone number mix up with the tenant. Please let me know if there are additional charges for repairs and if there is anything else you recommend that I do to take care of the problem. Christian mentioned yesterday that he was going to reach out to the tenant to see if friday is a convenient time for the inspection. If there is any problem getting a hold of her, please let me know. I appreciate it! Please let me know that it is on schedule at it will give me some peace of mind. Many thanks jo Ardalan

+1 (626) [redacted]

It is all set for tomorrow.

Thanks much 

      

# Exhibit M

Gmail

Jo Ardalan <jo.ardalan@gmail.com>

## 1628 N. Beverly Glen Blvd.

1 message

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Tue, Apr 21, 2020 at 7:18 PM
To: jborchardt@email.arizona.edu
Cc: Jo Ardalan <jo.ardalan@gmail.com>, "Stewart L. Fournier" <stewart@fournierandfournierhomes.com>

Dear Ms. Borchardt:

Please see attached letter.

Thanks,

David Quinto

**letter to Borchardt 2020-04-21_191257.pdf**
1228K

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

April 21, 2020

Dear Ms. Borchardt:

I represent your landlord, Joanna Ardalan, in connection with your demands and the defense of your prospective legal claims. I am writing in response to your April 20, 2020 message to her.

As a preliminary matter, I see that your message was ghost written by someone else. If you will provide me with the name and contact information for your attorney, I will be pleased to communicate directly with him or her and spare you any unpleasantness going forward.

I have reviewed your lease agreement, the property maintenance records for 1628 N. Beverly Glen Blvd., and your correspondence with Ms. Ardalan. The records reflect that Ms. Ardalan has been consistently responsive to your questions and concerns. Most recently you advised her on Friday, April 10, 2020, at 11:40 PM, that after inhabiting the hillside canyon property for six months, you detected the presence of rats. Ms. Ardalan ordered traps the next day.

When you refused to use them, Ms. Ardalan immediately arranged to have an Orkin exterminator to take care of the rodent problem at the earliest available

time, on April 16. The exterminator searched the building for possible points of entry and applied materials and traps to kill any rodents inside the structure.

Although you were apparently present throughout the exterminator's visit, you waited until the next evening—a Friday night—to complain that the exterminator had not fixed a hole in your kitchen that you never called to his attention. You demanded that he return the following morning, April 18—a Saturday—to repair it. Because Orkin's schedule was already double booked for Saturday, the exterminator returned on Monday, April 20, to correct that problem. Please be advised that Ms. Ardalan has further arranged for an Orkin rodent specialist to inspect your property to determine whether any further treatment or repair is warranted.

The property maintenance records also reflect that when you complained of a problem with your toilet a month ago, Ms. Ardalan's maintenance person offered to fix the problem the same day. You asked that he wait until the following day, which he did. When the maintenance person again visited your property this past Friday, April 17, he asked whether you had experienced any further problem with the toilet. You replied that the toilet was fine. Given that admission, the claim expressed in your message to Ms. Ardalan yesterday that the toilet is continuing to malfunction must be taken with a grain of salt. Regardless, you may ask Ms. Ardalan's new property manager, identified below, to schedule the maintenance person to return at a time convenient to you to examine the toilet and fix any new problem.

Your remaining contentions are meritless and obviously intended only to manufacture a baseless claim or support a demand for a reduction in your rent. In particular, the adjacent lot was a construction site with a bulldozer on it when you toured Ms. Ardalan's property before leasing it. You confirmed both orally and in writing that you did not view the noise from the on-going construction project as a problem.

Following your complaints that the stove heated "unevenly," Ms. Ardalan replaced it with a new one. It is clearly better than the older model stove with which you were dissatisfied.

Your last purported complaint, concerning the refrigerator, is misdirected because you are responsible for its maintenance.

The property records reflects that Ms. Ardalan has extended numerous courtesies to you, including permitting you to occupy the property a week early without charge, allowing you to move in even though your deposit check was "lost in the mail," allowing you to pay the security deposit over time, and waiving the additional contractually authorized charge whenever you have not timely tendered payment of your monthly rent, including this month.

Given your recent conduct and obvious intent to manufacture meritless claims, you will henceforth be required to adhere strictly to the terms of your lease, including making timely payment in full of your monthly rental payments. In that vein, Ms. Ardalan demands that you immediately provide proof of renter's insurance as required by your lease.

Going forward, Stewart Fournier will serve as the property manager. Please communicate directly with him regarding any further real or perceived concerns involving the property. His email address is stewart@fournierandfournierhomes.com and his telephone number is 310-968-1730. He will contact you to arrange an inspection of your property.

I am aware that you were caught stealing from the till while employed by Harkins Fashion Square and responded to your termination by unsuccessfully suing Harkins for alleged sexual harassment and retaliation. I am also aware that you chose to sue your previous landlord.

You may think that you that you might gain from the assertion of meritless claims against Ms. Ardalan but you would be wrong. As a trial lawyer who has done nothing wrong—and who has been a stellar landlord—Ms. Ardalan will not yield to such tactics. In any event, you should consider whether continuing to manufacture claims is in your interest given that a tenant who repeatedly sues others, including landlords, might find it increasingly difficult to persuade anyone to rent to her.

If you (or your attorney) wish to discuss terms pursuant to which you would be allowed to vacate the property and obtain a release of your executory obligations

under your lease, I will be happy to have such a discussion. In the meantime, please be assured that Ms. Ardalan will continue to honor all her contractual and statutory obligations to you.

Very truly yours,

David W. Quinto

Cc: Joanna Ardalan, Esq.
Stewart Fournier

# Exhibit N

 Jo Ardalan <jo.ardalan@gmail.com>

## Fwd:

**Josephine Borchardt** <jborchardt@email.arizona.edu>
To: Jo Ardalan <jo.ardalan@gmail.com>

Wed, Apr 22, 2020 at 7:58 PM

Good evening,

Please review the attached PDF.

Please confirm receipt of this email.

Very Respectfully,

Josephine Borchardt
[Quoted text hidden]

**Second Letter to Cure and Remedy .pdf**
25K

April 22, 2020

**Letter to Cure and Remedy**

Re: 1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

**Your tenants (Josephine, Genevieve, and Francesca Borchardt), are requesting that you immediately cure and remedy your breach of contract.**

**Under California Civil Code 1941.1 and Section 17920.3 of the Health and Safety Code, your duties as the landlord are to uphold a dwelling that does not lack the substandard characteristics of living.**

**You have failed to abide by the California Civil Code and Health and Safety Codes.**

In addition to the Letter to Cure and Remedy sent from the Borchardts on April 20, 2020, you are hereby informed that mold and termites are present throughout the home.

We are requesting that you immediately cure the issues before they become further damaging.

This letter has been sent via email to jo.ardalan@gmail.com

Very Respectfully,

//Signed//

Josephine Borchardt
Genevieve Borchardt
Francesca Borchardt

1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

# Exhibit O

 

2 People

+1 (626) 283-3102

It is all set for tomorrow.

Thanks much

One more thing- yesterday she said for the first time that there are termites - if you see any indication of those will you let me know ? And also your recommendations for the same? Thanks

+1 (626) 283-3102

For termites, we would need to have a different inspector check for that, it requires a different license for that in the state of California, with your permission can I try to set up an inspection for that, same time?

Yes please thank you

Much appreciated

+1 (626) 283-3102

Termite Inspector will be giving you a call and it is set for tomorrow also 10-12

Perfect!!!

   

       

# Exhibit P

5/24/2020 Case 2:21-cv-02540-FMO-RAO Document 1 Filed 03/23/21 Page 114 of 289 Page ID #:114
Gmail - Your second set of complaints this week

Jo Ardalan <jo.ardalan@gmail.com>

## Your second set of complaints this week

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Thu, Apr 23, 2020 at 6:32 PM
To: jborchardt@email.arizona.edu
Cc: Jo Ardalan <jo.ardalan@gmail.com>, "Stewart L. Fournier" <stewart@fournierandfournierhomes.com>

Please see attached letter.

Thank you,

David Quinto

**2d letter to Bourchard.pdf**
334K

https://mail.google.com/mail/u/0?ik=518988e27e&view=pt&search=all&permmsgid=msg-f%3A1664815700945326023&simpl=msg-f%3A16648157009... 1/1

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

April 23, 2020

Dear Ms. Borchardt:

I am writing to address your latest complaints concerning your rental home.

As an initial matter, it is difficult to believe the asserted problems bother you at all or that they occurred within a span of two days. If there were a serious termite or mold issue, you would surely have mentioned them to the Orkin Pest Control agents who have already visited your property *twice* this month (the second time to fix a minor problem that you failed to mention during the first visit). Further, if you were bothered by mold or termites, surely you would have thought to mention them in the laundry list of alleged complaints you sent to Ms. Ardalan two days ago. And, if you were legitimately concerned, you would surely have sought speedy relief by notifying the property manager instead of deliberately refusing to notify him (or me). Finally, if there were a serious problem, you would have disclosed *where* the alleged problems are (and even sent a photograph showing them), as opposed to requiring that Ms. Ardalan play "Battleship" to find them.

That said, Ms. Ardalan is committed to fully discharging her obligations as a landlord and has arranged for Orkin to make a *third* visit this month to your rental home to inspect for termites. I assume that you will extend the courtesy of letting Orkin know where you believe there might be termites. If you reveal where you

think there is mold, the property manager will arrange an inspection and, if necessary, treatment.

When you rented a century-old hillside home, you could anticipate that settling cracks might have occurred over time and that the occasional entry of unwanted critters might occur. That said, the property manager has provided specifics concerning things he believes you did to cause the problems you have reported. Consistent with the evidence that you have caused many of the very problems you complain of, neither the immediately preceding owner of the property nor the immediately preceding tenant (who lived there for well over a year) reported anywhere near the number of problems you have purportedly encountered within a span of a few months.

Finally, this will serve as a reminder that you have not provided a copy of the renter's insurance policy you are obligated to maintain.

Very truly yours,

David W. Quinto

Cc: Joanna Ardalan, Esq.
    Stewart Fournier

# Exhibit Q

**Jo Ardalan <jo.ardalan@gmail.com>**

## Failure to Communicate

**Josephine Borchardt** <jborchardt@email.arizona.edu>
To: Jo Ardalan <jo.ardalan@gmail.com>

Thu, Apr 23, 2020 at 8:15 PM

Good evening Jo,

I emailed you a Letter to Cure and Remedy on April 20, 2020.
I confirmed via text message on April 20, 2020.
I have yet to receive a response from you.

I emailed you a second Letter to Cure and Remedy on April 22, 2020.
I confirmed via text message on April 22, 2020.
I still have yet to receive a response from you.

I have received two emails from a "David Quinto".
You have not instructed me to communicate with a "David Quinto".
You, Joanna Ardalan, are my landlord and you have obligations to uphold.

Very Respectfully,

Josephine Borchardt

# Exhibit R



ORKIN
PEST CONTROL DOWN TO A SCIENCE.

JOANNA ARDALAN
1628 N BEVERLY GLEN BLVD
LOS ANGELES, CA 90077-2708
(480) 321-9994 Cell
949-337-0707 Other

Orkin, 811-W. LOS ANGELES, CA
1053 CRENSHAW BLVD
LOS ANGELES, CA 90019-1940
(866) 640-4371
License # PR 40332

| | |
|---|---|
| Invoice/Service Ticket #: | 200333330 |
| Account #: | 31046196 |
| Balance: | $0.00 |
| Current Svc: | $0.00 |
| Tax: | $0.00 |
| Total Amt Due: | $0.00 |

**Date of Service** 04/24/2020 **Customer Since:** 2017
**Time In** 04/24/2020 10:16 AM **Time Out** 04/24/2020 10:49 AM
**PC Standard - EOM 7**, Callback

Cristian Navarro Rt# 811-41 Cristian
License # FR45741

| | |
|---|---|
| Amt Collected: | $0.00 |
| Auto Pay Exp | Aug 2023 |

**Previous Services**
04/20/2020 Follow Up
04/16/2020 Callback
03/13/2020 PC Standard

**Pesticide Product Labels Are Available Upon Request**

## Services Provided

THANK YOU FOR YOUR BUSINESS.

## General Comments

Tenant refused for BM Andy Hall and me to do service.

## Observation Information

| | | Status | Responsibility | Date Entered | Location |
|---|---|---|---|---|---|
| **Observation:** | Debris Present | Pending | Customer | 01/10/2020 | |
| **Recommendation:** | Clean Area | **Pest Type:** | | | |
| **Observation:** | Preventative | Pending | Technician | 03/03/2017 | |
| **Recommendation:** | Treatment Rendered | **Pest Type:** | | | |
| **Observation:** | Activity - Dead | Pending | Technician | 02/18/2017 | |
| **Recommendation:** | Treatment Rendered | **Pest Type:** | | | |

CO - Commercial applicators are licensed by the Colorado Department of Agriculture
AZ - Warning - Pesticides can be harmful. Keep children and pets away from pesticide applications until dry, dissipated, or aerated. For more information, contact Orkin Pest Control - C4029BCD at 1-800-346-7546

For additional information, a copy of the Label and/or MSDS may be requested from your local branch or from http://www.orkin.com. Item # SVPC1026IOS rev. 05.13



PEST CONTROL DOWN TO A SCIENCE™

JOANNA ARDALAN
1628 N BEVERLY GLEN BLVD
LOS ANGELES, CA 90077-2708
(480) 321-9994 Cell
949-337-0707 Other

Orkin, 811-W. LOS ANGELES, CA
1053 CRENSHAW BLVD
LOS ANGELES, CA 90019-1940
(866) 640-4371
License # PR 40332

Invoice/Service Ticket #:200333330
Account # 31046196
Date of Service: 04/24/2020
Time In: 04/24/2020 10:16 AM
Time Out: 04/24/2020 10:49 AM

Customer Signature: **Signature Not Entered**

CUSTOMER NAME:
CUSTOMER EMAIL:

**If you experience pest issues between scheduled visits, we will come back and address the problem at no additional charge.**

* This work has been performed to my satisfaction.

**Remit To:** **Orkin, 811-W. LOS ANGELES, CA**
**P O BOX 7161**
**PASADENA, CA 91109-7161**

Printed 04/24/2020 10:49 AM

National Poison Control Center: 1-800-222-1222

CO - Commercial applicators are licensed by the Colorado Department of Agriculture

AZ - Warning - Pesticides can be harmful. Keep children and pets away from pesticide applications until dry, dissipated, or aerated. For more information, contact Orkin Pest Control - C4029BCD at 1-800-346-7546

For additional information, a copy of the Label and/or MSDS may be requested from your local branch or from http://www.orkin.com. Item # SVPC1026IOS rev. 05.13

**CONSUMER NOTIFICATION(S) / POST APPLICATION STATEMENTS**

**Treated Area(s)** - Do not allow unprotected person(s), children, or pets to touch, enter or replace items or bedding, to contact or enter treated area(s) until dry.
**Ventilation/Reoccupying** - Vacate and keep area(s) closed up to 30 minutes after treatment, then ventilate area(s) well for up to 2 hours before reoccupying.
**Equipment/Processing/Food** - Thoroughly wash dishes, utensils, food preparation/processing equipment and surfaces with an effective cleaning compound and rinse with clean water if not removed or covered during treatment. This area should be odor free before food products are placed in the area.
**Exterior Applications (baits)** - Do not allow grazing of feed, lawn or sod clippings to livestock after bait applications.
**Granular Application(s)** - Do not water to the point of run off.
**Do not burn** treated fire wood for one month after treatment.

National Poison Control Center: 1-800-222-1222

# Exhibit R-1

 Jo Ardalan <jo.ardalan@gmail.com>

**Ref: Orkin account number: 31046196**

**Hall, Andrew** <█████@orkin.com> Fri, Apr 24, 2020 at 1:46 PM
To: "JO.ARDALAN@GMAIL.COM" <JO.ARDALAN@gmail.com>

Ref address: 1628 N Beverly Glen Blvd

Los Angele Ca 90077

Owner/Landlord requested an additional inspection of rodents in and around home so she could take care of her tenants

I spoke to the tenant on 4-22 at 5:12pm and confirmed an appointment to inspect home between 10-11am 04/24/20

This also was verified by text messaging with Cristian my Service Manager by the land lord, so the land lord was aware

I arrived with Service Manager Cristian Navarro at 10:30am

Two ladies at the door, immediately asked us our names and for our business cards. I gave them my card

The ladies at the door started asking why are we here, you already had tech here that suggested exclusion work

I explained that having the additional inspection was to assure we did not miss anything and that the Land Lord wanted to make sure they were taken care of

The two ladies then proceeded to say the Land Lords failed to contact them and did not react to take care of the rodents, I explained to them I contacted you and you stated and confirmed this time worked for you

I asked and explained several times I am here to help them, but they refused entry

Note: they also tried to record Cristian and I with their IPhone, I told them I do not authorize them record us

When we left, Cristian stated they recorded us walking away

We also scheduled a termite inspection, but due to the tenants not allowing us to even inspect, we canceled that appointment

Andrew Hall
Branch Manager

*Would you like to protect your customers and employees from mosquitos?*

Call (866) 580-1813

# Exhibit S

Gmail Jo Ardalan <jo.ardalan@gmail.com>

**Third Letter to Borchardt**
1 message

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Fri, Apr 24, 2020 at 8:34 PM
To: jborchardt@email.arizona.edu
Cc: Jo Ardalan <jo.ardalan@gmail.com>, "Stewart L. Fournier" <stewart@fournierandfournierhomes.com>

Ms. Borchardt,

Please see Ms. Ardalan's third letter to you attached.

Regards,

David Quinto

**Third Letter to Borchardt 4 24 20.pdf**
104K

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

April 24, 2020

Dear Ms. Borchardt:

Yesterday I advised you that your landlord had arranged to have Orkin Pest Control visit your property for the third time this month. She did so to follow up on your most recent complaints, which concerned purported mold and termite infestations.

Orkin communicated directly with you to schedule a termite and follow-up rodent inspection inspection and arrived as scheduled. Upon the arrival of the Orkin rodent and termite inspectors, you and your sister denied them admission and instead started photographing and harassing them. To no avail they reminded you that they had scheduled the inspection *with you* and were there *to help you*. Still you persisted.

At this juncture, the landlord cannot determine whether your claims that the property now has both termites and mold is simply baseless or whether you prefer to live with the alleged infestations. Given your treatment of the Orkin personnel and your continuing refusal to disclose where you think either the mold or the termites might be, the landlord will not now send a mold inspector unless and until you confirm that you will admit the inspector--as is your legal obligation.

You might be happy to share the property with mold and termites but the landlord is entitled to protect her investment. Accordingly, I am asking the property manager, Stewart Fournier, to inspect the property to determine

whether any type of remediation may be required, and, if so, where. Let me remind you of your legal obligation to permit such inspection.

Although you haven't communicated it to the property manager or me, I understand that you want to have a GE technician fix the refrigerator door that was somehow damaged. Provided that the repair is performed by a GE-approved technician at your expense, the repair is approved.

Finally, I am at a loss to understand why you refuse to communicate with me or Mr. Fornier and what you think you gain by antics such as today's. Doing so benefits you naught and merely contributes to the impression that you are untrustworthy. In that regard, I have already concluded as much with respect to your obligation to purchase renter's insurance. I hope to be proven wrong.


Very truly yours,

David W. Quinto

Cc: Joanna Ardalan, Esq.
    Stewart Fournier

# Exhibit T

Jo Ardalan <jo.ardalan@gmail.com>

**1628 Beverly Glen Blvd. Los Angeles CA 90071**

**Stewart Fournier** <stewart.fournier@compass.com> Sat, Apr 25, 2020 at 12:49 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: Jo Ardalan <jo.ardalan@gmail.com>, davidwquinto@gmail.com

Dear Ms. Borchardt:

As you know, I was in contact with you regarding the applicaon pr ocess for the rental of the 1628 N. Beverly Glen property. You and I had numerous communicaons r egarding your lease applicaon and supporng in formaon. I am contacng y ou today regarding the recent concerns the landlord has about the property.

As Mr. David Quinto has advised you, I have assumed representaon as the pr operty manager for the rental at this me. In f act, new management was one of your requests from your April 20 le er, so I suspect you will be pleased to know that I have taken over. Please note that from this point on all communicaon with r egard to the issues of management for the unit should be directed to me.

You have the opon t o be represented by a lawyer or real estate agent if feel the need and I would be happy to confer with that professional at any me.

Given your concerns about mold, termite and vermin infestaons I am oblig ed to invesg ate these concerns. Ms. Ardalan has requested I contact you for a me t o conduct an inial inspecon of the pr operty performed by me, followed by any other inspecons or tr eatments as needed. Please provide me with some appointment mes early next week so I can arrange for an inspecon of the abo ve-menoned issues.

Thank you for cooperaon in this mos t important ma er.

--
Stewart Fournier
m: 310.968.1730

9454 Wilshire Blvd. Ground Floor
Beverly Hills, CA 90212
DRE# 01280071

COMPASS

Aspen
Atlanta
Austin
Greater Boston
Chicago
Dallas
Denver
Greenwich, CT
The Hamptons
Houston
Los Angeles & Orange County
Miami & Fort Lauderdale
Naples
Nashville
New York City
Philadelphia
Santa Barbara & Montecito
San Francisco Bay Area
San Diego
Seattle
Washington, DC Area
Westchester, NY

compass.com

# Exhibit U

Gmail

Jo Ardalan <jo.ardalan@gmail.com>

**Refusal to Communicate**

**Josephine Borchardt** <jborchardt@email.arizona.edu> Sun, Apr 26, 2020 at 11:39 AM
To: Jo Ardalan <jo.ardalan@gmail.com>

Good morning Jo,

I emailed you a Letter to Cure and Remedy on April 20, 2020.
I confirmed via text message on April 20, 2020.
I have yet to receive a response from you.

I emailed you a second Letter to Cure and Remedy on April 22, 2020.
I confirmed via text message on April 22, 2020.
I still have yet to receive a response from you.

I emailed you on April 23, 2020, referencing your failure to communicate in response to our April 20th and April 22nd letters.
I still have yet to receive a response from you.

I emailed you on April 24, 2020, regarding the GE visit.
I still have yet to receive a response from you.

I have received three emails from a "David Quinto".
However, you have not instructed me to communicate with a "David Quinto".

I received an email from Stewart Fournier.
It is concerning that he is contacting me as you voiced your regret in using him to help facilitate in the online application process in October 2019.
It is also concerning due to the treatment we received from Stewart during the process.
When Genevieve and I met with you to sign the lease at your office, you said, "I am sorry for all the hassle. I told Stewart that's enough already; you guys have already proved your income but he was still concerned due to your age and the status of your family, but I told him I was fine with it." You continued, "I am really sorry, I felt obliged to use him as he is a friend of my fiance, but don't worry, you won't hear from him again".
Since the initial online application process, Stewart has not been involved with the property.

No other name, aside from your own and ours, is on the lease agreement.
You are not relieved of the contractual and legal duties of the agreement with us.
I do not understand your refusal to communicate.
You are in full breach of contract.

Very Respectfully,

Josephine Borchardt

# Exhibit V

 Jo Ardalan <jo.ardalan@gmail.com>

**1628 Beverly Glen Blvd. Los Angeles 90071**

**Stewart Fournier** <stewart.fournier@compass.com> Sun, Apr 26, 2020 at 6:38 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: Jo Ardalan <jo.ardalan@gmail.com>, davidwquinto@gmail.com

Dear Ms. Borchardt,

You requested that Ms. Ardalan engage a property manager to oversee the home you have leased. She has done as you asked. She hired Compass for that purpose. I am the Compass associate representative responsible for the property (1628 Beverly Glen Dr., LA 90077). As Ms. Ardalan's attorney David Quinto has instructed you, any complaints, concerns, or questions you have concerning the property should be directed to me.

Please note that any contact with Ms. Ardalan without my knowledge will be considered interference with regard to my relationship with my client. Further, any claim as to the accuracy of my representation is a serious matter. Please do not interfere with my relationship with my client. We have a professional relationship that dates serval years and your response to my last email in regards to your contact with my client, Ms. Ardalan, rather than to me, is deeply concerning.

I understand that you are upset with me for asking you to provide evidence of your ability to pay the rent before Ms. Ardalan approved your lease application. That said, you will not need to speak with me when I inspect the property for signs of the types of damage you have reported. Not only are you free to remain outside for the brief period the inspection should last, but doing so would be consistent with social distancing. At most, just one person should be in the house if you prefer to have someone present. Please let me know when during the next three days you will permit the inspection.

Best;

--
Stewart Fournier
m: 310.968.1730

9454 Wilshire Blvd. Ground Floor
Beverly Hills, CA 90212
DRE# 01280071

COMPASS

Aspen
Atlanta
Austin
Greater Boston
Chicago
Dallas
Denver
Greenwich, CT
The Hamptons
Houston
Los Angeles & Orange County
Miami & Fort Lauderdale
Naples
Nashville
New York City
Philadelphia
Santa Barbara & Montecito
San Francisco Bay Area
San Diego
Seattle
Washington, DC Area
Westchester, NY

compass.com

# Exhibit W

Gmail Jo Ardalan <jo.ardalan@gmail.com>

## Reports, Labs, and Inspection

**Josephine Borchardt** <jborchardt@email.arizona.edu> Thu, Apr 30, 2020 at 5:32 PM
To: Jo Ardalan <jo.ardalan@gmail.com>

Good evening Jo,

Since April 20th, you have not communicated.
You have abandoned your duties as our landlord.
You are in breach of our contract.

You have not complied with California Civil Codes.
Our health has been adversely affected because of your neglect.
We are suffering.

We have obtained additional professional evaluations pertaining to the complaints we made to you. These evaluations confirm and support the uninhabitable conditions that both we (your tenants) and Orkin revealed to you.

Below you will find an in-depth inspection from Terminix.
You will also find a conclusive report of the lab findings for the samples collected and tested from the home, performed by Mold Inspection and Testing Los Angeles.

Respectfully,

Josephine Borchardt

1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

**3 attachments**

**Lab Results.pdf**
1124K

**Terminix Inspection.pdf**
3817K

**Mold Inspection Report.pdf**
4377K



SEEML Reference Number: 200430031

**Southeast Environmental Microbiology Laboratories**
102 Edinburgh Court
Greenville, SC 29607
Phone: (864) 233-3770
FAX: (864) 233-6589

The information and data for **Environmental Testing Group/MIT** has been checked for thoroughness and accuracy. The following reports are contained within this document:

☒ Surface/Bulk Report
☒ Spore Trap Report
☐ Andersen Fungal Report
☐ Quantitative Fungal Report

Lab Manager Review: *Angel Gosnell* Date: 04/30/20

Thank you for using SEEML laboratories. We strive to provide superior quality and service.
SEEML laboratories are accredited through AIHA-LAP, LLC (EMLAP # 173667) for the analysis of Spore Traps and Surface/Bulk Samples.

The data within this report is reliable to three significant figures. The third significant figure is technically unjustified. In this instance, the third figure is reported as an estimate to facilitate the interpretation by the customer.

Confidentiality Notice:
The document(s) contained herein are confidential and privileged information, intended for the exclusive use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of the document(s) is strictly prohibited. If you have received this document in error, please immediately notify us by telephone to arrange for its return. Thank you.

Guidelines for Interpretation:
No accepted quantitative regulatory standards currently exist by which to assess the health risks related to mold and bacterial exposure. Molds and bacteria have been associated with a variety of health effects and sensitivity varies from person to person.
Several organizations, including: the American Conference of Government Industrial Hygienists (ACGIH); the American Industrial Hygiene Association (AIHA); the Indoor Air Quality Association (IAQA); the United States Environmental Protection Agency (USEPA); the Centers for Disease Control (CDC), as well as the California Department of Health Services (CADHS), have all published guidelines for assessment and interpretation of mold resulting from water intrusion in buildings.

Interpretation of the data and information within this document is left to the company, consultant, and/or persons who conducted the fieldwork.

**Spore Trap Report**

| | |
|---|---|
| | Date Sampled: 04/24/20 |
| Attn: Environmental Testing Group | Date Received: 04/30/20 |
| DBA / Mold Inspection Testing | Date Analyzed: 04/30/20 |
| 650 W. Grand Ave, Suite 302 | Date Reported: 04/30/20 |
| Elmhurst, IL 60126 | Date Revised: |
| | Project Name: Josephine Borchardt |
| | Project Address: 1628 N. Beverly Glen Blvd |
| | Project City, State, ZIP: Los Angeles, CA |
| | SEEML Reference #: 200430031 |

**TEST METHOD: DIRECT MICROSCOPY EXAMINATION SEEML SOP 7**

| Client Sample ID | 2533442 | | | 2533444 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Location | Outside | | | Bedroom | | | | | |
| Lab Sample ID | 200430031-089 | | | 200430031-090 | | | | | |
| Detection Limit (spores/m³) | 40 | | | 40 | | | | | |
| Hyphal Fragments | 6 | 240 | | 3 | 120 | | | | |
| Pollen | 4 | 160 | | | | | | | |
| Spore Trap Used | M5 | | | M5 | | | | | |
| | raw ct. | spores/m³ | % | raw ct. | spores/m³ | % | | | |
| Alternaria | | | | | | | | | |
| Ascospores | 13 | 520 | 13 | | | | | | |
| Basidiospores | 35 | 1400 | 35 | 4 | 160 | 25 | | | |
| Bipolaris/Drechslera | | | | | | | | | |
| Chaetomium | | | | | | | | | |
| Cladosporium | 49 | 1960 | 49 | 1 | 40 | 6 | | | |
| Curvularia | | | | | | | | | |
| Epicoccum | | | | | | | | | |
| Cercospora | | | | | | | | | |
| Fusarium | | | | | | | | | |
| Memnoniella | | | | | | | | | |
| Nigrospora | | | | | | | | | |
| Penicillium/Aspergillus | | | | 10 | 400 | 63 | | | |
| Polythrincium | | | | | | | | | |
| Rusts | | | | | | | | | |
| Smuts/Periconia/Myxomy | 2 | 80 | 2 | | | | | | |
| Spegazzinia | | | | | | | | | |
| Stachybotrys | | | | 1 | 40 | 6 | | | |
| Stemphylium | | | | | | | | | |
| Tetraploa | | | | | | | | | |
| Torula | | | | | | | | | |
| Ulocladium | | | | | | | | | |
| Colorless/Other Brown* | | | | | | | | | |
| Oidium | | | | | | | | | |
| Zygomycetes | | | | | | | | | |
| Pithomyces | | | | | | | | | |
| Background debris (1-5)** | 3 | | | 3 | | | | | |
| Sample Volume(liters) | 25 | | | 25 | | | | | |
| **TOTAL SPORES/M³** | 99 | **3960** | | 16 | **640** | | | | |

Revisions:

Spore types listed without a count or data entry were not detected during the course of the analysis for the respective sample, indicating a raw count of <1 spore.
The analytical sensitivity is the spores/m³ divided by the raw count, expressed in spores/m³. The limit of detection is the analytical sensitivity (in spores/m³) multiplied by the sample volume (in liters) divided by 1000 liters.
*Colorless,other Brown are spores without a distinctive morphology on spore traps and non-viable surface samples.
**Background debris is the amount of particulate matter present on the slide and is graded from 1-5 with 1 = very light, 2= Light, 3 = Medium, 4 = Heavy, 5 = Very Heavy. The higher the rating the more likelihood spores may be underestimated. A rating of 5 should be interpreted as minimal counts and may actually be higher than reported.

**Disclaimer**: The sample results are determined by the sample volume, which is privided by the customer. This report relates only to the samples tested as they were received.

*Angel Gosnell*

Angel Gosnell, Approved Laboratory Signatory

102 Edinburgh Court
Greenville, SC, 29607
Phone: (864) 233-3770

## Surface and Bulk Sample Report

| | | |
|---|---|---|
| | Date Sampled: | 04/24/20 |
| Attn: Environmental Testing Group | Date Received: | 04/30/20 |
| DBA / Mold Inspection Testing | Date Analyzed: | 04/30/20 |
| 650 W. Grand Ave, Suite 302 | Date Reported: | 04/30/20 |
| Elmhurst, IL 60126 | Date Revised: | |
| | Project Name: | Josephine Borchardt |
| | Project Address: | 1628 N. Beverly Glen Blvd |
| | Project City, State ZIP: | Los Angeles, CA |
| | SEEML Reference #: | 200430031 |

**TEST METHOD: Direct Microscopic Examination (SEEML SOP 18)**

| Client Sample ID | | | | |
|---|---|---|---|---|
| Location | Bedroom Closet Wall | | | |
| SEEML Sample ID | 200430031-091 | | | |
| Sample Type | Swab | | | |
| | Quantification* | | | |
| Hyphal Fragments | L | | | |
| Pollen | | | | |
| **General Impressions **** | FG | | | |
| **Fungal Spore:** | | | | |
| Alternaria | | | | |
| Acremonium | | | | |
| Ascospores | | | | |
| Basidiospores | | | | |
| Bipolaris/Drechslera | | | | |
| Cercospora | | | | |
| Chaetomium | | | | |
| Cladosporium | | | | |
| Curvularia | | | | |
| Epicoccum | | | | |
| Fusarium | | | | |
| Geotrichum sp. | | | | |
| Memnoniella | | | | |
| Myxomycetes | | | | |
| Nigrospora | | | | |
| Penicillium/Aspergillus | | | | |
| Pithomyces | | | | |
| Rusts/Smuts | | | | |
| Stachybotrys | M | | | |
| Torula | | | | |
| Ulocladium | | | | |

** General Impressions: NFG = No Fungal Growth, FG = Fungal Growth, MFG = Minimal Fungal Growth Or Growth in vicinity

Quantification of fungal growth is done by semi-quantitative grading using the following ranges:

Scattered Spores, 1-20 fungal spores

VL = 21-100 fungal spores L = 101-1,000 fungal spores M = 1,001-10,000 fungal spores H = >10,000 fungal spores

ND = No Fungal Spores Detected

Disclaimer: This report relates only to the samples tested

Respectfully submitted, SEEML

*Angel Gosnell*, Approved Laboratory Signatory

102 Edinburgh Court
Greenville, SC 29607
Phone: (864) 233-3770
Fax: (864) 233-6589

AIHA-LAP, LLC EMLAP # 173667
Texas License: LAB1016

# Fungal Descriptions

## Alternaria sp.

Aw - 0.89. Conidia dimensions: 18-83 x 7-18 microns. A very common allergen with an IgE mediated response. It is often found in carpets, textiles and on horizontal surfaces in building interiors. Often found on window frames. Outdoors it may be isolated from samples of soil, seeds and plants. It is commonly found in outdoor samples. The large spore size, 20 - 200 microns in length and 7 - 18 microns in sizes, suggests that the spores from these fungi will be deposited in the nose, mouth and upper respiratory tract. It may be related to bakers' asthma. It has been associated with hypersensitivity pneumonitis. The species *Alternaria alternata* can produce tenuazonic acid and other toxic metabolites that may be associated with disease in humans or animals. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include edema and bronchospasms; chronic cases may develop pulmonary emphysema.

## Ascospore

A spore borne in a special cell called an ascus. Spores of this type are reported to be allergenic. All ascomycetes, members of a group of fungi called Ascomycotina, have this type of spore. The minute black dots on rotting wood and leaves or the little cups on lichens are examples of ascomycetes; another is the "truffle" mushroom.

## Aspergillus/Penicillium

These are two of the most commonly found allergenic fungi in problem buildings. *Aspergillus* comes in many varieties (species). Many of the varieties produce toxic substances. It may be associated with symptoms such as sinusitis, allergic bronchopulmonary aspergillosis, and other allergic symptoms. *Penicillium* is a variety of mold that is very common indoors and is found in increased numbers in problem buildings. It also has many varieties, some of which produce toxic substances. The symptoms are allergic reactions, mucous membrane irritation, headaches, vomiting, and diarrhea. Due to the morphological similarity of *Aspergillus* and *Penicillium*, they are not differentiated by microscopic analysis and are reported together.

## Aspergillus sp.

Aw 0.75 - 0.82. Reported to be allergenic. Members of this genus are reported to cause ear infections. Many species produce mycotoxins that may be associated with disease in humans and other animals. Toxin production is dependent on the species or a strain within a species and on the food source for the fungus. Some of these toxins have been found to be carcinogenic in animal species. Several toxins are considered potential human carcinogens. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include edema and bronchospasms; chronic cases may develop pulmonary emphysema; may also be associated with sinusitis, allergic bronchopulmonary aspergillosis, and other allergic symptoms.

### Basidiospore

Spore from basidiomycetes. Many varieties are reported to be allergenic.

### Bipolaris sp.

A fungus with large spores that could be expected to be deposited in the upper respiratory tract. This fungus can produce the mycotoxin - sterigmatocystin, which has been shown to produce liver and kidney damage when ingested by laboratory animals.

### Botrytis sp.

Aw 0.93. Conidia dimensions: 7-14 x 5-9 microns. It is parasitic on plants and soft fruits. Found in soil and on house plants and vegetables, it is also known as "gray mold". It causes leaf rot on grapes, strawberries, lettuce, etc. It is a well-known allergen, producing asthma type symptoms in greenhouse workers and "wine grower's lung".

### Cercaspora

Common outdoors in agricultural areas, especially during harvest. Parasite of higher plants, causing leaf spot. Commonly found as parasites on higher plants.

### Chaetomium sp.

large ascomycetous fungus producing perithecia. It is found on a variety of substrates containing cellulose, including paper and plant compost. It has been found on paper in sheetrock. It can produce an *Acremonium*-like state on fungal media. Varieties are considered allergenic and have been associated with peritonitis, cutaneous lesions, and system mycosis.

### Cladosporium sp.

Aw 0.88; Aw 0.84. Most commonly identified outdoor fungus. The outdoor numbers are reduced in the winter. The numbers are often high in the summer. Often found indoors in numbers less than outdoor numbers. It is a common allergen. Indoor *Cladosporium* sp. may be different than the species identified outdoors. It is commonly found on the surface of fiberglass duct liners in the interior of supply ducts. A wide variety of plants are food sources for this fungus. It is found on dead plants, woody plants, food, straw, soil, paint, and textiles. Produces greater than 10 antigens. Antigens in commercial extracts are of variable quality and may degrade within weeks of preparation. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include skin lesions, eye ulceration, mycosis (including onychomycosis, an infection of the nails of the feet or hands) edema and bronchospasms; chronic cases may develop pulmonary emphysema.

## Curvularia sp.

Reported to be allergenic and has been associated with allergic fungal sinusitis. It may cause corneal infections, mycetoma, and infections in immune compromised hosts.

## Dreschlera sp.

Conidia dimensions: 40-120 x 17-28 microns. Found on grasses, grains and decaying food. It can occasionally cause a corneal infection of the eye.

## Epicoccum sp.

Conidia dimensions: 15-25 microns. A common allergen. It is found in plants, soil, grains, textiles and paper products.

## Fusarium sp.

Aw 0.90. A common soil fungus. It is found on a wide range of plants. It is often found in humidifiers. Several species in this genus can produce potent trichothecene toxins. The trichothecene (scirpene) toxin targets the following systems: circulatory, alimentary, skin, and nervous. Produces vomitoxin on grains during unusually damp growing conditions. Symptoms may occur either through ingestion of contaminated grains or possibly inhalation of spores. The genera can produce hemorrhagic syndrome in humans (alimentary toxic aleukia). This is characterized by nausea, vomiting, diarrhea, dermatitis, and extensive internal bleeding. Reported to be allergenic. Frequently involved in eye, skin, and nail infections.

## Myxomycetes

Members of a group of fungi that is included in the category of "slime molds". They're occasionally found indoors, but mainly reside in forested regions on decaying logs, stumps, and dead leaves. Myxomycetes display characteristics of fungi *and* protozoans. In favorable (wet) conditions they exhibit motile, amoeba-like cells, usually bounded only by a plasma membrane, that are variable in size and form. During dry spells, they form a resting body (sclerotium) with dry, airborne spores. These fungi are not known to produce toxins but can cause hay fever and asthma.

## Memnoniella

Contaminant found most often with *Stachybotrys* on wet cellulose. Forms in chains, but it are very similar to *Stachybotrys* and sometimes is considered to be in the *Stachybotrys* family. Certain species do produce toxins very similar to the ones produced by *Stachybotrys chartarum* and many consider the IAQ importance of *Memnoniella* to be on par with *Stachybotrys*. Allergenic and infectious properties are not well studied.

## Nigrospora sp.

Commonly found in warm climates, this mold may be responsible for allergic reactions such as hay fever and asthma. It is found on decaying plant material and in the soil. It is not often found indoors.

## Oidium sp.

The asexual phase of *Erysiphe* sp. It is a plant pathogen causing powdery mildews. It is very common on the leaf's stems, and flowers of plants. The health effects and allergenicity have not been studied. It does not grow on non-living surfaces such as wood or drywall.

## Penicillium sp.

Aw 0.78 - 0.88. A wide number of organisms have been placed in this genus. Identification to species is difficult. Often found in aerosol samples. Commonly found in soil, food, cellulose and grains. It is also found in paint and compost piles. It may cause hypersensitivity pneumonitis, allergic alveolitis in susceptible individuals. It is reported to be allergenic (skin). It is commonly found in carpet, wallpaper, and in interior fiberglass duct insulation. Some species can produce mycotoxins. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include edema and bronchospasms; chronic cases may develop pulmonary emphysema. It may also cause headaches, vomiting, and diarrhea.

## Periconia sp.

*Periconia sp.* are found in soil, blackened and dead herbaceous stems leaf spots, grasses, rushes, and sedges. Almost always associated with other fungi. Rarely found growing indoors. Reportedly associated with a rare case of mycotic keratitis.

## Pithomyces sp.

A common mold found on dead leaves, plants, soil and especially grasses. Causes facial eczema in ruminants. It exhibits distinctive multi-celled brown conidia. It is not known to be a human allergen or pathogen. It is rarely found indoors, although it can grow on paper.

## Rusts/Smuts

These fungi are associated with plant diseases. In the classification scheme of the fungi, the smuts have much in common with the rusts, and they are frequently discussed together. Both groups produce wind-borne, resistant teliospores that serve as the basis for their classification and their means of spread. Rusts usually attack vegetative regions (i.e., leaves and stems) of plants; smuts usually are associated with the reproductive structures (seeds). They can cause hay fever and asthma.

## Spegazzinia

*Spegazzinia* species comprise a very small proportion of the fungal biota. This genus is somewhat related to other lobed or ornamented genera such as *Candelabrum*. No information is available regarding health effects or toxicity. Allergenicity has not been studied. Usually identified on spore trap samples where it is seen every few weeks. (Spores have very distinctive morphology.) May also be found in air by culturable (Andersen) samples if a long enough incubation period is provided so that sporulation occurs. Our laboratory has never found this organism growing on indoor environmental surfaces. Natural habitat includes soil and many kinds of trees and plants.

## Stachybotrys sp.

Aw - 0.94, optimum Aw ->0.98. Several strains of this fungus (*S. atra. S. chartarum* and *S. alternans* are synonymous) may produce a trichothecene mycotoxin- Satratoxin H - which is poisonous by inhalation. The toxins are present on the fungal spores. This is a slow growing fungus on media. It does not compete well with other rapidly growing fungi. The dark colored fungus grows on building material with high cellulose content and low nitrogen content. Areas with a relative humidity above 55%, and are subject to temperature fluctuations, are ideal for toxin production. Individuals with chronic exposure to the toxin produced by this fungus reported cold and flu symptoms, sore throats, diarrhea, headaches, fatigue, dermatitis, intermittent local hair loss and generalized malaise. Other symptoms include coughs, rhinitis, nosebleed, a burning sensation in the nasal passages, throat, and lungs, and fever. The toxins produced by this fungus will suppress the immune system affecting the lymphoid tissue and the bone marrow. Animals injected with the toxin from this fungus exhibited the following symptoms: necrosis and hemorrhage within the brain, thymus, spleen, intestine, lung, heart, lymph node, liver, and kidney. Affects by absorption of the toxin in the human lung are known as pneumomycosis.

This organism is rarely found in outdoor samples. It is usually difficult to find in indoor air samples unless it is physically disturbed (or possibly -this is speculation- a drop in the relative humidity). The spores are in a gelatinous mass. Appropriate media for the growth of this organism will have high cellulose content and low nitrogen content. The spores will die readily after release. The dead spores are still allergenic and toxigenic. Percutaneous absorption has caused mild symptoms.

## Stemphylium sp.

Reported to be allergenic. Isolated from dead plants and cellulose materials.

## Torula sp.

Found outdoors in air, soil, on dead vegetation, wood, and grasses. Also found indoors on cellulose materials. Reported to be allergenic and may cause hay fever and asthma.

## Tetraploa

*Tetraploa* species comprise a very small proportion of the fungal biota. This genus is somewhat related to *Triposporium* and Diplocladiella. The only reported human infections are two cases of keratitis (1970, 1980) and one case of subcutaneous infection of the knee (1990). No information is available regarding other health effects or toxicity. Allergenicity has not been studied. Usually identified on spore trap samples where it is seen every few weeks. (Spores have very distinctive morphology.) Our laboratory has never found this organism growing on indoor environmental surfaces. Natural habitat includes leaf bases and stems just above the soil on many kinds of plants and trees.

## Ulocladium sp.

Aw 0.89. Isolated from dead plants and cellulose materials. Found on textiles.

## Zygomycetes

Zygomycetes are one of the four major groups of fungi, the others being the Oomycetes, the Ascomycetes, and the Basidiomycetes. Zygomycetes are common, fast growing, and often overgrow and/or inhibit other fungi nearby. Rhizopus and Mucor are two of the most common Zygomycetes seen in the indoor environment. However, others are seen as well, including *Syncephalastrum*, *Circinella*, *Mortierella*, *Mycotypha*, *Cunninghamella*, and *Choanephora*. For further information, please see descriptions of these individual genera.

**The following table lists mycotoxins that are produced by certain types of fungi:**

| Fungi | Mycotoxin |
|---|---|
| *Acremonium crotocinigenum* | Crotocin |
| *Aspergillus favus* | Alfatoxin B, cyclopiazonic acid |
| *Aspergillus fumigatus* | Fumagilin, gliotoxin |
| *Aspergillus carneus* | Critrinin |
| *Aspergillus clavatus* | Cytochalasin, patulin |
| *Aspergillus Parasiticus* | Alfatoxin B |
| *Aspergillus nomius* | Alfatoxin B |
| *Aspergillus niger* | Ochratoxin A, malformin, oxalicacid |
| *Acremonium crotocinigenum* | Crotocin |
| *Aspergillus nidulans* | Sterigmatocystin |
| *Aspergillus ochraceus* | Ochratoxin A, penicillic acid |
| *Aspergillus versicolor* | Sterigmatocystin, 5 ethoxysterigmatocystin |
| *Aspergillus ustus* | Ausdiol, austamide, austocystin,brevianamide |
| *Aspergillus terreus* | Citreoviridin |
| *Alternaria* | Alternariol, altertoxin, altenuene, altenusin, tenuazonic acid |
| *Arthrinium* | Nitropropionic acid |
| *Biploaris* | Cytochalasin, sporidesmin, sterigmatocystin |
| *Chaetomium* | Chaetoglobosin A,B,C. Sterigmatocystin |
| *Cladosporium* | Cladosporic acid |
| *Clavipes purpurea* | Ergotism |
| *Cylindrocorpon* | Trichothecene |
| *Diplodia* | Diplodiatoxin |
| *Fusarium* | Trichothecene, zearalenone |
| *Fusarium moniliforme* | Fumonisins |
| *Emericella nidulans* | Sterigmatocystin |
| *Gliocladium* | Gliotoxin |
| *Memnoniella* | Griseofulvin , dechlorogriseofulvin, epi-decholorgriseofulvin, trichodermin, trichodermol |
| *Myrothecium* | Trichothecene |
| *Paecilomyces* | Patulin, viriditoxin |
| *Penicillium aurantiocandidum* | Penicillic acid |
| *Penicillium aurantiogriseum* | Penicillic acid |
| *Penicillium brasilanum* | Penicillic acid |
| *Penicillium brevicompactum* | Mycophenolic acid |
| *Penicillium camemberti* | Cyclopiazonic acid |
| *Penicillium carneum* | Mycophenolic acid, Roquefortine C |
| *Penicillium crateriforme* | Rubratoxin |

| Fungi | Mycotoxin |
|---|---|
| *Penicillium citrinum* | Citrinin |
| *Penicillium commune* | Cyclopiazonic acid |
| *Penicillium crustosum* | Roquefortine C |
| *Penicillium chrysogenum* | Roquefortine C |
| *Penicillium discolor* | Chaetoglobosin C |
| *Penicillium expansum* | Citrinin, Roquefortine C |
| *Penicillium griseofulvum* | Roquefortine C, cyclopiazonic acid, griseofulvin |
| *Penicillium hirsutum* | Roquefortine C |
| *Penicillium hordei* | Roquefortine C |
| *Penicillium nordicum* | Ochratoxin A |
| *Penicillium paneum* | Roquefortine C |
| *Penicillium palitans* | Cyclopiazonic acid |
| *Penicillium polonicum* | Penicillic acid |
| *Penicillum roqueforti* | Roquefortine C, Mycophenolic acid |
| *Penicillium veridicatum* | Penicillic acid |
| *Penicillium verrucosum* | Citrinin, ochratoxin A |
| *Penicillium/ Aspergillus* | Patulin |
| *Penicillium/ Aspergillus/Alternaria* | Glitoxin |
| *Phomopsis* | Macrocyclic trichothecenes |
| *Phoma* | Brefeldin, cytochalasin, secalonic acid, tenuazonic acid |
| *Pithomyces* | Sporidesmin |
| *Rhizoctonia* | Slaframine |
| *Rhizopus* | Rhizonin |
| *Sclerotinia* | Furanocoumarins |
| *Stachybotrys chartarum* | Iso-satratoxin F, roridin E, L-2, satratoxin G & H, trichodermin, trichodermol, trichothecene |
| *Torula* | Cytotoxins |
| *Trichoderma* | Trichodermin, trichodermol, gliotoxin |
| *Trichothecium* | Trichothecene |
| *Wallemia* | Walleminol |
| *Zygosporium* | Cytochalasin |

## General terms

### Allergen

An allergen is a substance that elicits an IgE antibody response and is responsible for producing allergic reactions. Chemicals are released when IgE on certain cells contact an allergen. These chemicals can cause injury to surrounding tissue - the visible signs of an allergy. Only a few fungal allergens have been characterized but all fungi are thought to be potentially allergenic. Fungal allergens are proteins found in either the mycelium or spores

### "Black mold"

A poorly defined term. Black mold or toxic black mold has usually been associated with the mold *Stachybotrys chartarum*. While there are only a few molds that are truly black, there are many that can appear black. Not all molds that appear to be black are *Stachybotrys*.

### Fungi

Fungi are neither animals nor plants and are classified in a kingdom of their own. The Kingdom of Fungi. Fungi include a very large group of organisms, including molds, yeasts, mushrooms and puffballs. There are >100,000 accepted fungal species but current estimates range to 1.5 million species. Mycologists (people who study fungi) have grouped fungi into four large groups according to their method of reproduction.

### Hidden mold

This refers to visible mold growth on building structures that is not easily seen, including the areas above drop ceilings, within a wall cavity (the space between the inner and outer structure of a wall), inside air handlers, or within the ducting of a heating/ventilation system.

### Microbial Volatile Organic Compounds (MVOCs)

Fungi produce chemicals as a result of their metabolism. Some of these chemicals, MVOCs, are responsible for the characteristic moldy, musty, or earthy smell of fungi. whether mushrooms or molds. Some MVOCs are considered offensive or annoying. Specific MVOCs are thought to be characteristic of wood rot and mold growth on building materials. The human nose is very sensitive to mold odors and sometimes more so than current analytical instruments.

## Mold

Molds are a group of organisms that belong to the Kingdom of Fungi (see Fungi). Even though the terms mold and fungi had been commonly referred to interchangeably, all molds are fungi, but not all fungi are molds.

## Mycotoxin

Mycotoxins are compounds produced by some fungi that are toxic to humans or animals. By convention, the term? Mycotoxin. Excludes mushroom toxins. Fungi that produce mycotoxins are called "toxigenic fungi."

## Spore

General term for a reproductive structure in fungi, bacteria and some plants. In fungi, the spore is the structure which may be used for dissemination and may be resistant to adverse environmental conditions.

## Toxic mold

The term "toxic mold" has no scientific meaning since the mold itself is not toxic. The metabolic byproducts of some molds may be toxic (see mycotoxin).

## Hypha (plural, hyphae)

An individual fungal thread or filament of connected cells; the thread that represents the individual parts of the fungal body.

## WOOD DESTROYING PESTS AND ORGANISMS INSPECTION REPORT

| Building No. Street, City, Zip | Date of Inspection | Number of Pages |
|---|---|---|
| 1628 N BEVERLY GLEN BLVD, LOS ANGELES, 90077-2708 | 04/22/2020 | 6 |

TERMINIX INTERNATIONAL. BRANCH #2350
13722 HARVARD PL
GARDENA,CA 90249-2527
PH: 5626412220

Firm Registration No PR 0801
Report No.: 79982-042220222002-5641

| Ordered by: | Property Owner or Party of Interest: | Report sent to: |
|---|---|---|
| JOSEPHINE BORCHARDT<br>1628 N BEVERLY GLEN BLVD LOS ANGELES CA 90077-2708 | JOSEPHINE BORCHARDT<br>1628 N BEVERLY GLEN BLVD LOS ANGELES CA 90077-2708 | JOSEPHINE BORCHARDT<br>1628 N BEVERLY GLEN BLVD LOS ANGELES CA 90077-2708 |

COMPLETE REPORT ☐ LIMITED REPORT ☒ SUPPLEMENTAL REPORT ☐ REINSPECTION REPORT ☐

General Description:
1 Story(s),Single Family Dwelling,Attached Garage,Occupied and Furnished

Inspection Tag Posted: Garage
Other Tags Posted: No

An inspection has been made of the structure(s) shown on the diagram in accordance with the Structural Pest Control Act. Detached porches, detached steps, detached decks and any other structures not on the diagram were not inspected.

Subterranean Termites ☐ Drywood Termites ☒ Fungus / Dryrot ☐ Other Findings ☐ Further Inspection ☒

**If any of the above boxes are checked, it indicates that there were visible problems in accessible areas. Read the report for details on checked items.**

(PLEASE SEE THE GRAPH DIAGRAM ON THE FOLLOWING PAGE)

**Inspected by:** RICKS, SOLOMAN **State License No.** FR 52745 **Signature**

You are entitled to obtain copies of all reports and completion notices on this property reported to the Structural Pest Control Board during the preceding two years. To obtain copies contact: Structural Pest Control Board, 2005 Evergreen Street, Suite 1500, Sacramento, CA 95815
NOTE: Questions or problems concerning the above report should be directed to the manager of the company. Unresolved questions or problems with services performed may be directed to the Structural Pest Control Board at (916) 561-8708, (800) 737-8188 or www.pestboard.ca.gov. 43M-41 (REV. 04/2015)

**TERMINIX**

GARDENA

13722 HARVARD PL

GARDENA,CA 90249-2527

5626412220

Contract #: 79982-042220222002-5641

Inspection Date: 04/22/2020

Inspector: RICKS, SOLOMAN

Scale 1:1

This graph is a record of a visual, non-destructive inspection by Terminix of certain readily accessible areas of the identified property for visible termite infestation/damage. Terminix is not responsible for repairs to damages disclosed above. In addition, hidden damage may exist in concealed, obstructed or inaccessible areas. No attempt to remove siding, plastic or sheetrock insulation, carpeting, paneling, etc. to search for hidden damage was made. Terminix cannot guarantee that the damage disclosed by visual inspection of the premises shown above represents the entirety of the damage which may exist as of the date of the initial control application. Terminix shall not be responsible for repair of any existing damage including without limitation, any damage which existed in areas or in structural members which were not accessible for visual inspection as of the date of this graph.

TERMINIX

GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

**GENERAL NOTES:**
Please see general notes following the findings and recommendations for additional conditions governing this report.

**READ THIS DOCUMENT.** It explains the scope and limitations of a Structural Pest Control Inspection and Wood Destroying Pest and Organism Inspection Report.

A Wood Destroying Pest and Organism Inspection Report contains findings as to the presence or absence of evidence of wood destroying insects or organisms (fungi/rot) in visible and accessible areas on the date of inspection. It contains our recommendations for correcting any infestations, infections or conditions found. The contents of the Wood Destroying Pest and Organism Inspection Report are governed by the Structural Pest Control Act and the rules and regulations of the Structural Pest Control Board.

NOTE: THE FOLLOWING AREAS, WHEN THEY EXIST, ARE CONSIDERED INACCESSIBLE FOR INSPECTION: THE INTERIORS OF HOLLOW WALLS AND ALL ENCLOSED SPACES BETWEEN A FLOOR OR PORCH DECK AND THE CEILING OR SOFFIT BELOW; AREAS BETWEEN ABUTTING/ATTACHED ROW HOUSES, TOWNHOUSES, CONDOMINIUMS AND SIMILAR STRUCTURES; PORTIONS OF THE ATTIC CONCEALED OR MADE INACCESSIBLE BY INSULATION; PORTIONS OF THE ATTIC CONCEALED OR MADE INACCESSIBLE BY DUCTING, PORTIONS OF THE ATTIC OR ROOF CAVITY CONCEALED DUE TO AN INADEQUATE CRAWL SPACE; THE INTERIORS OF BOXED EAVES; EAVES CONCEALED BY PATIO COVERS OR OTHER ABUTMENTS; PORTIONS OF THE SUBAREA CONCEALED OR MADE INACCESSIBLE BY INSULATION; PORTE COCHERES; ENCLOSED BAY WINDOWS; AREAS BENEATH WOOD FLOORS OVER CONCRETE; AREAS CONCEALED BY BUILT-IN CABINET WORK; AREAS CONCEALED BY FLOOR COVERINGS, SUCH AS WALL-TO-WALL CARPETING, LINOLEUM, CERAMIC TILE, ETC.; AND AREAS CONCEALED BY BUILT-IN APPLIANCES.

NOTE: THE FOLLOWING AREAS, WHEN THEY EXIST, ARE CONSIDERED INACCESSIBLE FOR INSPECTION: AREAS CONCEALED BY INTERIOR FURNISHINGS; AREAS CONCEALED BY FLOOR COVERINGS, SUCH AS AREA RUGS, THROW RUGS, BATH AND KITCHEN MATS, ETC.; AREAS CONCEALED BY FREE STANDING APPLIANCES; AREAS CONCEALED BY STORAGE; AREAS CONCEALED BY HEAVY VEGETATION; AND AREAS WHERE LOCKS PREVENTED ACCESS. THESE AREAS WILL BE INSPECTED FOR A FEE, IF THEY ARE MADE ACCESSIBLE AT THE OWNER'S EXPENSE. A SUPPLEMENTAL REPORT WILL BE ISSUED AND ANY FINDINGS AND RECOMMENDATIONS WILL BE LISTED ALONG WITH ESTIMATES FOR REPAIR AND/OR TREATMENT, IF WITHIN THE SCOPE OF THIS COMPANY'S OPERATIONS. NO OPINION IS RENDERED CONCERNING CONDITIONS IN THE AREAS AT THIS TIME.

NOTE: INSPECTIONS ARE MADE AND REPORTS ARE ISSUED ON THE BASIS OF WHAT WAS VISIBLE AND ACCESSIBLE AT THE TIME OF THE INSPECTION. THE ABSENCE OF VISIBLE EVIDENCE OF WOOD DESTROYING ORGANISMS IN THE VISIBLE AND ACCESSIBLE PORTIONS OF THE STRUCTURE IS NO ASSURANCE THAT WOOD DESTROYING ORGANISMS ARE NOT PRESENT IN INACCESSIBLE AREAS NOR THAT FUTURE INFESTATIONS WILL NOT OCCUR. THEREFORE, WE DO NOT ASSUME ANY RESPONSIBILITY FOR THE PRESENCE OF WOOD DESTROYING ORGANISMS, OR DAMAGE DUE TO SUCH ORGANISMS, IN AREAS THAT WERE NOT VISIBLE AND ACCESSIBLE AT THE TIME OF THE INSPECTION OR THAT MAY OCCUR IN THE FUTURE.

**NOTICE: THIS COMPANY WILL REINSPECT REPAIRS DONE BY OTHERS WITHIN FOUR MONTHS OF THE ORIGINAL INSPECTION. A CHARGE, IF ANY, CAN BE NO GREATER THAN THE ORIGINAL INSPECTION FEE FOR EACH INSPECTION. THE REINSPECTION MUST BE DONE WITHIN TEN WORKING DAYS OF REQUEST. THE REINSPECTION IS A VISUAL INSPECTION AND IF INSPECTION OF CONCEALED AREAS IS DESIRED, INSPECTION OF WORK IN PROGRESS WILL BE NECESSARY. ANY GUARANTEES MUST BE RECEIVED FROM PARTIES PERFORMING THE REPAIRS.**

NOTE: A VISUAL INSPECTION WAS PERFORMED AND THE INSPECTOR DID NOT DEFACE NOR PROBE INTO FINISHED WINDOW OR DOOR FRAMES, TRIM WORK, FLOOR COVERINGS, WALLS, CEILINGS, OR OTHER FINISHED SURFACES.

NOTE: THE EXTERIOR AREAS OF THIS STRUCTURE WERE VISUALLY INSPECTED FROM THE GROUND LEVEL. AREAS OF THE EXTERIOR THAT EXHIBITED VISIBLE SIGNS OF INFESTATION, INFECTION, OR DAMAGE FROM SAME WILL BE DESCRIBED IN THE BODY OF THIS REPORT.

NOTE: IF ANY INFESTATION, INFECTION, OR DAMAGE IS DISCOVERED IN A CONCEALED AREA DURING THE COURSE OF PERFORMING ANY RECOMMENDATION IN THIS REPORT, THIS COMPANY WILL ISSUE A SUPPLEMENTAL REPORT. THIS COMPANY IS NOT RESPONSIBLE FOR CONTROLLING SUCH INFESTATIONS OR INFECTIONS OR FOR REPAIRING SUCH DAMAGE. IF THE ADDITIONAL WORK REQUIRED IS WITHIN THE SCOPE OF THIS COMPANY'S OPERATIONS, A COST ESTIMATE WILL BE PROVIDED WITH THE SUPPLEMENTAL REPORT.

NOTE: THE OWNER OF THIS PROPERTY HAS CERTAIN RESPONSIBILITIES REGARDING THE NORMAL MAINTENANCE THAT PERTAINS TO THE DETERRENCE OF WOOD DESTROYING ORGANISMS. THESE NORMAL MAINTENANCE PROCEDURES INCLUDE, BUT ARE NOT LIMITED TO: MAINTENANCE OF THE ROOF, GUTTERS, AND DOWNSPOUTS; CAULKING AROUND DOORS, WINDOWS, VENTS, TUB AND SHOWER ENCLOSURES; KEEPING SOIL LEVELS BELOW THE TOP OF THE FOUNDATIONS; KEEPING STORED ITEMS (INCLUDING FIREWOOD) AT LEAST TWELVE (12) INCHES AWAY FROM THE STRUCTURE; ADJUSTING SPRINKLERS SO THAT THEY DO NOT SPRAY ONTO THE STRUCTURE; PROHIBITING SOIL FROM CONTACTING THE WOOD COMPONENTS OF THE STRUCTURE; AND PREVENTING VEGETATION OR OTHER ITEMS FROM BLOCKING VENTS.
NOTE: Limited Report



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

NOTE: This is a limited inspection and report at the request of JOSEPHINE BORCHARDT, and is limited to the following areas(s): Exterior Only/ One Bedroom. In view of the fact that this is a limited inspection, it is recommended that this company be authorized to make a complete inspection of the structure and furnish a complete report.

## SEE BELOW FOR YOUR FINDINGS AND RECOMMENDATIONS:

### Drywood Termites

**Item 2A**

FINDING: No evidence of drywood termites was noted in visible and accessible areas at the time of this inspection. However, the absence of visible evidence is no assurance that future infestations will not occur or that current infestations do not already exist in areas that are not visible and inaccessible to inspection. Preventative service can be rendered according to the following recommendation.

RECOMMENDATION: Apply a preventative treatment to exposed wood surfaces and potential entry points on the exterior, in the attic as well as the subarea (if there is a subarea) with properly labeled an approved termiticide(s). The terms and conditions of this service are detailed in your program agreement. Annual inspection is required.

**Item 2B**

FINDING: Evidence of drywood termites was noted at/in Back Bedroom.

RECOMMENDATION: Remove or cover accessible drywood termite fecal pellets.

RECOMMENDATION: Utilize heat to treat the structure as an all encompassing method to eradicate drywood termites. It will be necessary to vacate the structure until release for reentry by this company. Additional treatment with an approved insecticide may be necessary.

**Item 2C**

FINDING: Drywood termites have damaged Wood Members at/in Back Bedroom.

RECOMMENDATION: Remove the damaged wood member(s). Replace the damaged wood with new material. See recommendations in this report for the control of drywood termites.

**Item 2D**

FINDING: Evidence of drywood termites was noted at/in Exterior Wall.

RECOMMENDATION: Remove or cover accessible drywood termite fecal pellets.

RECOMMENDATION: Fumigate the structure with an approved fumigant for the eradication of drywood termites.

**Item 2E**

FINDING: Drywood termites have damaged Wood Members at/in Exterior Wall.

RECOMMENDATION: Remove the damaged wood member(s). Replace the damaged wood with new material. See recommendations in this report for the control of drywood termites.

### Further Inspection

**Item 5A**

FINDING: Evidence of Drywood Termites was noted at/in Back Bedroom which appears to extend into inaccessible areas.

RECOMMENDATION: Open inaccessible areas for further inspection. Upon further inspection, a supplemental report will be issued and any findings and recommendations will be listed along with estimates for repair and/or treatment, if within the scope of this company's operations.

**Item 5B**

FINDING: Evidence of Drywood Termites was noted at/in Exterior Wall which appears to extend into inaccessible areas.

RECOMMENDATION: Open inaccessible areas for further inspection. Upon further inspection, a supplemental report will be issued and any findings and recommendations will be listed along with estimates for repair and/or treatment, if within the scope of this company's operations.



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

**GENERAL NOTES:**

**NOTE: THE EXTERIOR SURFACE OF THE ROOF HAS NOT BEEN INSPECTED. IF YOU WANT THE WATER TIGHTNESS OF THE ROOF DETERMINED, YOU SHOULD CONTACT A ROOFING CONTRACTOR WHO IS LICENSED BY THE CONTACTORS STATE LICENSE BOARD.**

**NOTICE: REPORTS ON THIS STRUCTURE PREPARED BY VARIOUS REGISTERED COMPANIES SHOULD LIST THE SAME FINDINGS (I.E. TERMITE INFESTATION, TERMITE DAMAGE, FUNGUS DAMAGE, ETC.). HOWEVER, RECOMMENDATIONS TO CORRECT THESE FINDINGS MAY VARY FROM COMPANY TO COMPANY. YOU HAVE A RIGHT TO SEEK A SECOND OPINION FROM ANOTHER COMPANY.**

**NOTICE TO OWNER:** UNDER THE CALIFORNIA MECHANICS LIEN LAW, ANY STRUCTURAL PEST CONTROL COMPANY WHICH CONTRACTS TO DO WORK FOR YOU, ANY CONTRACTOR, SUBCONTRACTOR, LABORER, SUPPLIER, OR OTHER PERSON WHO HELPS TO IMPROVE YOUR PROPERTY, BUT IS NOT PAID FOR HIS OR HER WORK OR SUPPLIES, HAS A RIGHT TO ENFORCE A CLAIM AGAINST YOUR PROPERTY, THIS MEANS THAT AFTER A COURT HEARING, YOUR PROPERTY COULD BE SOLD BY A COURT OFFICER AND THE PROCEEDS OF THE SALE USED TO SATISFY THE INDEBTEDNESS. THIS CAN HAPPEN EVEN IF YOU HAVE PAID YOUR STRUCTURAL PEST CONTROL COMPANY IN FULL IF THE SUBCONTRACTOR, LABORERS, OR SUPPLIERS REMAIN UNPAID.

TO PRESERVE THEIR RIGHT TO FILE A CLAIM OR LIEN AGAINST YOUR PROPERTY, CERTAIN CLAIMANTS SUCH AS SUBCONTRACTORS OR MATERIAL SUPPLIERS ARE REQUIRED TO PROVIDE YOU WITH A DOCUMENT ENTITLED PRELIMINARY NOTICE. PRIME CONTRACTORS AND LABORERS FOR WAGES DO NOT HAVE TO PROVIDE THIS NOTICE. A PRELIMINARY NOTICE IS NOT A LIEN AGAINST YOUR PROPERTY. ITS PURPOSE IS TO NOTIFY YOU OF PERSONS WHO MAY HAVE A RIGHT TO FILE A LIEN AGAINST YOUR PROPERTY IF THEY ARE NOT PAID.

NOTE: IF DURING THE COURSE OF PERFORMING ANY REPAIRS, ANY FIXTURE OR PLUMBING IS FOUND TO BE UNSERVICEABLE, DAMAGED, OR DEFECTIVE, THERE WILL BE AN ADDITIONAL CHARGE FOR REPAIR AND/OR REPLACEMENT, AS NECESSARY.

NOTE: IT IS RECOMMENDED THAT BUILDING PERMITS BE OBTAINED FOR ALL WORK REQUIRING PERMITS. PRIOR TO BEGINNING THE RECOMMENDED REPAIRS. FOR INFORMATION CONCERNING THE BUILDING DEPARTMENT AND PERMIT REQUIREMENTS, CONTACT THE LOCAL BUILDING DEPARTMENT. WORK PERFORMED AS REQUIRED UNDER PERMIT FROM THE BUILDING DEPARTMENT SHOULD BE APPROVED, ACCEPTED, AND SIGNED OFF BY THE DEPARTMENT PRIOR TO CONSIDERING SUCH WORK TO BE COMPLETED. THE BUILDING DEPARTMENT MAY REQUIRE INSTALLATION OF SMOKE/HEAT DETECTORS AS A CONDITION OF OBTAINING A BUILDING PERMIT.

Some structures may not comply with building code requirements or may have structural, plumbing, electrical, heating and air conditioning, or other defects that do not pertain to wood destroying organisms. A Wood Destroying Pest and Organism Inspection Report does not contain information about such defects as they are not within the scope of the license of the inspector or the company issuing this report. Nor does a Wood Destroying Pest and Organism Inspection Report contain information about asbestos or any other environmental or safety hazard. Should interested parties desire opinions regarding these items, it is recommended that the owner engage the services of a reputable whole house inspection company.

This property was not inspected for the presence or absence of health related molds or fungi. By California law, we are neither qualified, authorized, nor licensed to inspect for health related molds or fungi. If you desire information about the presence or absence of health related molds or fungi, you should contact an industrial hygienist.

**The Structural Pest Control Board Mold Policy Statement is as follows:**

"Molds, sometimes called mildew, are not wood-destroying organisms. Branch 3 licensees do not have a duty under the Structural Pest Control Act and related regulations to classify molds as harmful to human health or not harmful to human health. This does not modify the Structural Pest Control Act or related regulations."

This statement is being provided to you for informational purposes.

## NOTICE TO OWNER / TENANT

**State law requires that you be given the following information:**

CAUTION – PESTICIDES ARE TOXIC CHEMICALS. Structural Pest Control Operators are registered and regulated by the Structural Pest Control Board, and apply pesticides which are registered and approved for use by the California Department of Pesticide Regulation and the United States Environmental Protection Agency. Registration is granted when the state finds that based on existing scientific evidence there are no appreciable risks if proper use conditions are followed or that the risks are outweighed by the benefits. The degree of risk depends upon the degree of exposure, so exposure should be minimized.

If within 24 hours following application, you experience headache, dizziness, nausea, tearing, coughing, nose and throat irritation or develop shortness of breath, double vision, unusual drowsiness and weakness, or tremors, contact your physician or poison control center (see below) and your pest control operator immediately. If rodenticide ingestion occurs, you may experience symptoms of mild shock and/or bleeding.

For further information, contract any of the following:

| | |
|---|---|
| Terminix International | 1-800-TERMINIX |
| Poison Control Center | 1-800-876-4766 |
| Regulatory information - Structural Pest Control Board | 1-916-561-8700<br>2005 Evergreen St, Ste. 1500, Sacramento, CA 95815-3831 |

### HEALTH QUESTIONS - CALIFORNIA COUNTY AGRICULTURAL COMMISSIONERS

| | | | | | |
|---|---|---|---|---|---|
| Alameda | (510) 670-5232 | Marin | (415) 499-6700 | San Luis Obispo | (805) 781-5910 |
| Alpine | (see El Dorado) | Mariposa | (209) 966-2075 | San Mateo | (650) 363-4700 |
| Amador | (209) 223-6487 | Mendocino | (707) 463-4208 | Santa Barbara | (805) 681-5600 |
| Butte | (530) 538-7381 | Merced | (209) 385-7431 | Santa Clara | (408) 918-4600 |
| Calaveras | (209) 754-6504 | Modoc | (530) 233-6401 | Santa Cruz | (831) 763-8080 |
| Colusa | (530) 458-0580 | Mono | See Inyo County | Shasta | (530) 224-4949 |
| Contra Costa | (925) 646-5250 | Monterey | (831) 759-7325 | Sierra | See Plumas County |
| Del Norte | (707) 464-7235 | Napa | (707) 253-4357 | Siskiyou | (530) 841-4025 |
| El Dorado | (530) 621-5520 | Nevada | (530) 273-2648 | Solano | (707) 784-1310 |
| Fresno | (559) 456-7510 | Orange | (714) 447-7100 | Sonoma | (707) 565-2371 |
| Glenn | (530) 934-6501 | Placer | (530) 889-7372 | Stanislaus | (209) 525-4730 |
| Humboldt | (707) 445-7223 ext. 0 | Plumas | (530) 283-6365 | Sutter | (530) 822-7500 |
| Imperial | (760) 482-4314 | Riverside | (951) 955-3045 | Tehama | (530) 527-4504 |
| Inyo | (760) 873-7860 | Sacramento | (916) 875-6603 | Trinity | (530) 623-1356 |
| Kern | (661) 868-6300 | San Benito | (831) 637-5344 | Tulare | (559) 685-3323 |
| Kings | (559) 582-3211 #2831 | San Bernardino | (909) 387-2105 | Tuolumne | (209) 533-5691 |
| Lake | (707) 263-0217 | San Diego | (858) 694-2739 | Ventura | (805) 388-4222 |
| Lassen | (530) 251-8110 | San Francisco | (415) 252-3830 | Yolo | (530) 666-8140 |
| Los Angeles | (626) 575-5466 | San Joaquin | (209) 468-3300 | Yuba | (530) 749-5400 |
| Madera | (559) 675-7876 | | | | |

### APPLICATION INFORMATION - CALIFORNIA COUNTY HEALTH DEPARTMENTS

| | | | | | |
|---|---|---|---|---|---|
| Alameda | (510) 267-8000 | Madera | (559) 675-7893 | San Joaquin | (209) 468-3411 |
| Alpine | (530) 694-2146 | Marin | (415) 499-3696 | San Luis Obispo | (805) 781-5500 |
| Amador | (209) 223-6407 | Mariposa | (209) 966-3689 | San Mateo | (650) 573-2346 |
| Berkley City | (510) 981-5310 | Mendocino | (707) 472-2600 | Santa Barbara | (805) 681-5102 |
| Butte | (530) 538-7581 | Merced | (209) 381-1200 | Santa Clara | (408) 885-4214 |
| Calaveras | (209) 754-6450 | Modoc | (530) 233-6311 | Santa Cruz | (831) 454-4000 |
| Colusa | (530) 458-0380 | Mono | (760) 932-7485 | Shasta | (530) 225-5591 |
| Contra Costa | (925) 957-5400 | Monterey | (831) 755-4500 | Sierra | (530) 993-6701 |
| Del Norte | (707) 464-3191 | Napa | (707) 253-4231 | Siskiyou | (530) 841-4040 ext. 0 |
| El Dorado | (530) 621-6100 | Nevada | (530) 265-1450 | Solano | (707) 784-8600 |
| Fresno | (559) 445-0656 | Orange | (714) 834-8180 | Sonoma | (707) 565-4567 |
| Glenn | (530) 934-6588 | Pasadena | (626) 744-6004 | Stanislaus | (209) 558-5670 |
| Humboldt | (707) 445-6200 | Placer | (530) 889-7141 | Sutter | (530) 822-7215 |
| Imperial | (760) 482-4438 | Plumas | (530) 283-6337 | Tehama | (530) 527-6824 |
| Inyo | (760) 783-7868 | Riverside | (951) 782-2974 | Trinity | (530) 623-8209 |
| Kern | (661) 868-0302 | Sacramento | (916) 875-5881 | Tulare | (559) 737-4660 ext. 0 |
| Kings | (559) 584-1402 - Ask for "Nurse of the Day" | San Benito | (831) 637-5367 | Tuolumne | (209) 533-7400 |
| Lake | (707) 263-8929 | San Bernardino | (909) 387-6280 | Ventura | (805) 677-5200 |
| Lassen | (530) 251-8183 | San Diego | (619) 515-6555 | Yolo | (530) 666-8645 |
| Long Beach City | (562) 570-4000 | San Francisco | (415) 554-2500 | Yuba | (530) 741-6366 |
| Los Angeles | (213) 240-8117 | | | | |

One or more of the following chemicals may be applied to your property:

ADVANCE (Diflubenzuron) BOR-RAM (Disodium Octaborate Tetrahydrate) BORA-CARE (Disodium Octaborate Tetrahydrate) BORATHOR (Disodium Octaborate Tetrahydrate) CIMEXA (Silicon Dioxide) CY-KICK (Cyfluthrin) DRAGNET SFR(Permethrin) DRIONE INSECTICIDE DUST (Amor, Silica Aerogel, Pyrethrins, Piperonyl Butoxide) PHANTOM (Chlorfenapyr) PRELUDE (Permethrin) PREMISE 75 INSECTICIDE (Imidacloprid) PT TRI-DIE DUST (Amor, Silica Aerogel, Pyrethrins, Piperonyl Butoxide) RECRUIT HD (Noviflumuron) TAP INSULATION (Orthoboric Acid) TEMPO WP (Cyfluthrin) TEMPO SC ULTRA (Cyfluthrin) TIM-BOR (Disodium Octaborate Tetrahydrate) TERMIDOR (Fipronil) TTRELONA (Novaluron) VIKANE (Sulfuryl Fluoride) NOTE: Chloropicrin is use as a warning agent on all structural fumigations.

Thank you for calling Terminix. Should you have any questions regarding this report, please call 1-800-TERMINIX.





GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

Homeowner Name: JOSEPHINE BORCHARDT
Address: 1628 N BEVERLY GLEN BLVD
City State Zip: LOS ANGELES, CA,90077-2708
Home Phone: 4803219994
Work Phone:

# Ultimate Protection Home Pest Inspection

Please pay special attention to findings and comments below as these may indicate conditions that can lead to termite and pest problems.

## EXTERIOR INSPECTION

### PROPERTY DETAILS

| | | | | | |
|---|---|---|---|---|---|
| Linear Feet: | 90 | Built Pre 1985: | ☒ | Primary Use: | Single Family Dwelling |
| # of Stories: | 1 | Roof Type: | Shingle Roof | Foundation Type: | Concrete |
| Construction Type: | Accessible Crawlspace | Siding: | Stucco | Industry Type: | |
| Square Footage: | 1450 | Lot Size: | | # of Gas Meters: | 1 |
| Cubic Feet: | 31 | Eave Height: | 18 | Peak Height: | 22 |

**PROPERTY HAS A:**

| | | | | | |
|---|---|---|---|---|---|
| Cistern: | | French Drain: | | Well: | |
| Visible Pond, Lake, Stream, or Waterway: | | | | Sprinkler System Present: | |
| Exterior Slab (False Porch) Over Basement Area: | | | | Gas Meter Have 3' Clearance: | ☒ |

### CONDUCIVE CONDITIONS

| | | | |
|---|---|---|---|
| Indications of pests, rodents, termites, wildlife, or other wood-destroying pests? | ☒ | Live Subterranean Termites Found? | |
| Damage Found? | | Trees/shrubs on or against home? | |
| Conditions on or around foundation conducive to termite attack? | | Foundation slab/wall visible? | |
| Conditions allowing water to collect around structure? | | Openings large enough for pest/rodent/wildlife entry? | |
| Gutters and downspouts clear of debris and standing water? | | Siding Less Than 6" From Grade: | |
| Styrofoam Insulation or "DRI-VIT" Below Grade? | | Wood embedded in concrete? | |
| Breeding Sites: | | | |



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

## INTERIOR INSPECTION

**PROPERTY DETAILS**

Sump Pump:
A/C - Heat Ducts in or Below Slab:
Plenum A/C - Heat System:
Radiant Heat:

**CONDUCIVE CONDITIONS**

Indications Of Pests, Rodents, Termites, Wildlife, Or Other Wood-Destroying Pests? ☒
Live Subterranean Termites Found?
Damage Found?
Obvious Signs Of Leaks?
Musky Odors?
Bath Traps Installed Where Applicable?
Wall Separation/Cracks?
Sagging Or Bouncing Floors?

**ATTIC**

Number Of Attics: 0
Attic Access Location: None
Indications Of Pests, Rodents, Termites, Wildlife, Or Other Wood-Destroying Pests?
Adequate Ventilation?
Adequate Insulation R-Value?
Obvious Signs Of Leaks?
Attic Vents Screened?
Asbestos Present?

**CRAWL SPACE**

Number Of Crawl Spaces: 1
Crawl Space Access Location: Outside
Height Of Crawl Space:
High Point Of Crawl Space:
Low Point Of Crawl Space:
Distance Between Joists:
Depth Of Joists:
# of electrical connections:
Indications of pests, rodents, termites, wildlife, fungi, or other wood-destroying pests? ☒
Wood debris, stored material or structure/ground contact?
Excessive Moisture?
Visible Plumbing Leaks?
Cracked foundation walls/supports?
Sagging Or Cracked Floor Joists?
Wood-Earth Contact?
Wood Debris In Crawl Space?
Inadequate Ventilation In Crawl Space?
Wood Embedded In Concrete?
Entire Crawl Space Accessible?

| INSPECTOR'S STATEMENT OF VISIBLE DAMAGE | | |
|---|---|---|
| Screens | Date: | 04/22/2020 |

| TECHNICIAN'S STATEMENT OF VISIBLE DAMAGE | | |
|---|---|---|
| | Date: | |



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

**Scale 1:1**

This graph is a record of a visual, non-destructive inspection by Terminix of certain readily accessible areas of the identified property for visible termite infestation/damage. Terminix is not responsible for repairs to damages disclosed above. In addition, hidden damage may exist in concealed, obstructed or inaccessible areas. No attempt to remove siding, plastic or sheetrock insulation, carpeting, paneling, etc. to search for hidden damage was made. Terminix cannot guarantee that the damage disclosed by visual inspection of the premises shown above represents the entirety of the damage which may exist as of the date of the initial control application. Terminix shall not be responsible for repair of any existing damage including without limitation, any damage which existed in areas or in structural members which were not accessible for visual inspection as of the date of this graph.



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

# FLOOR PLAN LEGEND

## PROPERTY ELEMENTS

| | | | |
|---|---|---|---|
| Exterior Gas Grill | Water Shut-Off | Sprinkler Shut-Off | Gas Meter |
| Air Conditioner | Exterior New Paint | Exterior Weather Door | Foam Board Insulation |
| French Drain | Finished Garage Wall | Interior New Paint | Stall Shower |
| Stump | Sump Pump | Visible Waterway | Zero Property Line |

## KEY TO EVIDENCE

| | | | |
|---|---|---|---|
| Access Holes Allowing Pest Entry | Ant Activity | Bed Bug Activity | Bird Activity |
| Carpenter Ants Fume | Carpenter Ants Local Treatment | Carpenter Bee Local Treatment | Cellulose Debris |
| Cistern | Cracks In Foundation Wall | Cracks In Stucco | Dampwood Termites |
| Drywood Termites Local Treatment | Drywood Termites (Existing Customer) | Drywood Termites Preventative Treatment | Drywood Termites Fumigation |
| Earth Contact | Excessive Moisture | Excessive Moisture In Subarea | Exterior Slab Over Basement Area |
| Faulty Grade | Faulty Grade At Vent | Faulty Grade Flash Wall | Firewood At Foundation |
| Flaking Peeling Wall | Flies | Fungus | Gnaw Marks/Debris (Rodent) |
| Heavy Vegetation | Inaccessible Area(s) Attic: Duct Work | Inaccessible Area(s) Attic: Insulation | Inaccessible Area(s) Attic: No Clearance |
| Inaccessible Area(s) Attic: No Opening | Inaccessible Area(s) Attic: Storage | Inaccessible Area(s) Attic: Closet Storage | Inaccessible Area(s) Attic: High Temp |
| Inaccessible Area(s) Deck: No Clearance | Inaccessible Area(s) Deck: No Clearance | Inaccessible Area(s) Garage: Storage | Inaccessible Area(s) |
| Inaccessible Subarea | Inadequate Ventilation | Large Gaps | Mice |
| Mosquitoes | Missing Screens/Vent Covers | Plumbing Leak | Powder Post Beetles Fume |
| Roaches | Rodents | Rodent Droppings | Rodent Tunneling In Insulation |
| Rodent Tunneling Under Slab Or Concrete Pad | Rodent Waste (Droppings) | Rub Marks (Rodent) | Siding Less Than 6" From Grade |
| Spiders | Standing Water in Subarea | Stucco Below Grade | Styrofoam Insulation Or DRI-Vit Below Grade |
| Subterranean Termites (Existing Customer) | Subterranean Termites Preventative Treatment | Subterranean Termites Liquid Treatment | Subterranean Termites Local Treatment |
| Subterranean Termites Curative Bait | Vent Below Grade | Water Stains | Water Stains: Deck Stucco |
| Water Stains: Garage Ceiling | Water Stains: Attic | Wildlife | Wood Embedded In Concrete |



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

## FLOOR PLAN LEGEND

### GENERAL TREATMENT SPECIFICATIONS

| Code | Specification | Code | Specification |
|---|---|---|---|
| 117 | Trench or trench/rod soil adjacent to exterior foundation walls | 117A | Vertically drill exterior attached slabs and treat soil beneath along point of attachment |
| 118 | Excavate soil beneath dirt-filled porch slab at point(s) of attachment to the structure and treat soil beneath | 120 | Vertically drill the dirt-filled porch slab and treat the soil beneath the slab along the point(s) of attachment to the structure |
| 121A | Drill the exterior foundation wall of a crawl space or basement from the inside and treat the soil immediately beneath the dirt-filled porch slab by short-rodding along the point(s) of attachment to the structure | | |
| 121B | Drill through each side of the dirt-filled porch foundation wall per product label specifications and treat the soil immediately beneath the dirt-filled porch slab by short-rodding along the entire inside perimeter of the DFP | | |
| 121C | Drill foundation walls of the dirt-filled porch and treat the soil immediately beneath the slab by long-rodding adjacent to the entire inside perimeter of the DFP | | |
| 128 | Trench, remove, and treat soil by the Backfill Method (see label) | 129 | Drill and treat voids of a double brick foundation wall per product label specifications |
| 130 | Drill and treat voids of a stone foundation wall per product label specifications | 131 | Drill and treat voids of a triple brick foundation wall per product label specifications |
| 132 | Drill and treat voids of a hollow block foundation wall per product label specifications | 133 | Drill and treat voids of a brick veneer foundation wall per product label specifications |
| 134 | Drill and treat all voids of a chimney per product label specifications | 138 | Drill and treat a subterranean termite infested wooden sill or plate |
| 140 | Drill and treat a subterranean termite infested wooden joist/s | 145 | Drill into voids of termite infested wood and inject product into inaccessible voids ,termite galleries and nests |
| 146 | Make small openings into termite shelter tubes and inject product inside | 147 | Make multiple openings into carton nests in building voids or in trees and make multiple injections of products to varying depths |
| 160 | Trench, trench and rod, or rod soil of planter box adjacent to the exterior foundation wall according to state specific treatment standards or to label directions, whichever apply | | |
| 501 | Install In-ground Monitoring Station | | |

### NON-CHEMICAL TREATMENT SPECIFICATIONS

| Code | Specification | Code | Specification |
|---|---|---|---|
| 101 | Provide at least 14" clearance between wood and soil in the crawl space | 102 | Install access to ceiling of basement for inspection and/or treatment |
| 104 | Install door/s to provide access for treating soil adjacent to plumbing | 105 | Install crawl space access door |
| 106 | Install Automatic Vents | 109 | Remove cellulose debris and/or any other debris that would interfere with inspection or treatment in the crawl space |
| 109A | Remove form boards | 110 | Scrape off termite tunnels |
| 111 | Set wooden supports on concrete pads to properly insulate wood to soil contact | 135 | Cut off stucco at least 3" above grade and remove stucco below grade |
| 149 | Remove wood to ground contacts | 152 | Break ground contact on step stringers |
| 161 | Prepare floor surface for drilling | 205 | Install a vapor barrier over the soil of a crawl space |
| 206 | Install floor supports to provide additional support | | |



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

## FLOOR PLAN LEGEND

### BASEMENT TREATMENT SPECIFICATIONS

| | | | |
|---|---|---|---|
| 122 | Vertically drill basement concrete slab floor and treat the soil beneath | 144 | Drill and treat basement door frames |

### CRAWL SPACE TREATMENT SPECIFICATIONS

| | | | |
|---|---|---|---|
| 114 | Trench or trench/rod soil adjacent to the inside of the foundation walls of a crawl space | 115 | Trench or trench and rod soil adjacent to the piers of a crawl space |
| 116 | Trench or trench and rod soil adjacent to soil pipes of a crawl space | 119 | Trench or trench and rod soil adjacent to a chimney of a crawl space |

### EXCLUSION/WILDLIFE TREATMENT SPECIFICATIONS

| | | | |
|---|---|---|---|
| 900 | Trap - Wildlife | 901 | Install Mushroom/Turbine Vent Cage - Roof |
| 902 | Seal Mushroom/Termite Vent - In Attic | 903 | Install Plumbing Vent Cap - Roof |
| 904 | Screen Gable Vent | 905 | Screen Foundation Vent |
| 906 | Screen Soffit Vent | 907 | Repair Roof Return |
| 908 | Seal Pipe Penetration | 909 | Seal Hole In Wall/Foundation, Floor, Etc. |
| 910 | Install One-Way Door Exclusion Cage | 911 | Install Garage Door Seal |
| 912 | Install Dryer Vent Cover - Wall | 913 | Install Oven Vent Cover - Wall |
| 914 | Install Oven Vent Cage - Roof | 915 | Install Chimney Cap |

### PRE-CONSTRUCTION TREATMENT SPECIFICATIONS

| | | | |
|---|---|---|---|
| 171 | Vertical treatment zone - trench or trench and rod soil adjacent to pillars and other interior foundation elements such as chimneys and soil pipes | 172 | Vertical treatment zone - trench or trench/rod soil adjacent to utility pipes, plumbing lines, and conduits that will penetrate through the slab (1 gallon/sqft) |
| 173 | Horizontal treatment zone - make a horizontal treatment to the entire surface area of soil or substrate to be covered beneath the concrete slab | 174 | Vertical treatment zone - upon completion of grading along the outside of the exterior foundation wall, treat the backfill by trenching or trenching/rodding the soil adjacent to the exterior foundation wall |

### SLAB TREATMENT SPECIFICATIONS

| | | | |
|---|---|---|---|
| 122A | Drill the slab per product label specifications along the expansion joint where two slabs meet and treat soil underneath | 123 | Treat soil adjacent to plumbing penetrations |
| 123A | Drill the slab along one side of the partition wall per product label specifications and treat the soil beneath | 123AA | Drill the slab along both sides of a load-bearing wall per product label specifications and treat the soil beneath |
| 124 | Drill through the exterior foundation wall immediately below the slab per product label specifications and treat the soil beneath by short-rodding from the outside | 126 | Vertically drill the slab along the inside perimeter of the foundation walls and treat the soil beneath the slab |

**TERMINIX** Contract #: 79982-042220222002-5641

PEST CONTROL SERVICE PLAN

*Quarterly Service (4 Treatments)*

**THIS AGREEMENT PROVIDES FOR SERVICES TO CONTROL FOR AND MITIGATE AGAINST INFESTATIONS OF CERTAIN INSECTS, SPIDERS AND RODENTS. TERMINIX SHALL NOT BE RESPONSIBLE FOR ANY INJURY, DISEASE OR ILLNESS RESULTING FROM BITES, INFESTATION OR CONTAMINATION OR FOR THE REPAIR OF ANY DAMAGE TO THE STRUCTURES ON THE PREMISES CAUSED BY SUCH INSECTS, SPIDERS AND RODENTS.**

Purchaser: JOSEPHINE BORCHARDT Home Phone: 4803219994 Work Phone:

Mailing Address: . .

Property Address: 1628 N BEVERLY GLEN BLVD, LOS ANGELES,CA 90077-2708

Description of Structure(s) Covered: House Email: jborchardt@email.arizona.edu

| SERVICE / PAYMENT TERMS | | |
|---|---|---|
| **INITIAL SERVICE VISIT CHARGE *** | $ | 189.00 |
| **RECURRING SERVICE VISIT CHARGE*** | $ | 139.00 |
| **OWNERSHIP TRANSFER FEE*** | $ | |
| **BILLING FREQUENCY** | | Quarterly |

*Excludes tax (if applicable)

**PEST CONTROL SERVICES**

***Service Frequency:*** Quarterly (4 treatments)

***Standard Pests Covered:*** cockroaches, mice, rats, silverfish, "house" ants (other than Premium Pest ants listed below), clothes moths, non-poisonous spiders, scorpions, centipedes, millipedes, earwigs, house crickets and paper wasps

***Premium Pests (Subject to Additional Charges):* (select)**

☐ Fleas Ticks Carpenter Ants Fire Ants Pharaoh Ants Tawny Crazy Ants Black Widow Spiders Brown Recluse Spiders Bees (Yellow Jackets, Hornets, Wasps)

**NOTICE: YOU, THE PURCHASER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FOR AN EXPLANATION OF THIS RIGHT.**

Terminix has provided the Purchaser with a copy of the manufacturer's specimen label or other state-required documents for the pesticide(s), which will be used to treat the above-named property.

**Purchaser accepts and agrees to the Terms and Conditions of this Agreement, including the MANDATORY ARBITRATION and CLASS ACTION WAIVER provisions in Sections 16 and 17 of the Terms and Conditions of this Agreement:**

Purchaser Name: JOSEPHINE BORCHARDT Purchaser (Signature): Date:

Representative Name: RICKS, SOLOMAN Representative (Signature): Date:

Terminix Branch Phone: 5626412220 Terminix Branch Charter No.:

Terminix Branch Address: 13722 HARVARD PL, GARDENA, CA 90249-2527

In the event you have any questions or complaints, you may contact a Terminix representative by calling 1.800.TELLTMX (1.800.835.5869).

**STATE-SPECIFIC DISCLOSURES.**

**CALIFORNIA:** Supplier shall provide the "Notice to Owner/Tenant" as required by Cal. Bus. & Prof. Code section 8538.

**GEORGIA:** The Georgia Structural Pest Control Act requires all pest control companies to maintain insurance coverage. Information about this coverage is available from this pest control company.

**TEXAS:** Licensed and regulated by: Texas Department of Agriculture, Structural Pest Control Service, PO Box 12847, Austin, TX 78711-2847 Phone 1.866.918.4481 Fax 1.888.232.2567.

www.terminix.com Any #33235 Resident Pest Control Service Plan (3.5.2014) New 3/2014 Rev 3/2015

© 2015 The Terminix International Company Limited Partnership. All rights reserved

# TERMS AND CONDITIONS

1. **INITIAL TERM; RENEWAL.** The term of this Agreement shall be a period of one (1) year beginning on the date executed (the "Initial Term"). Thereafter, this Agreement shall automatically renew for additional one (1) year periods (each a "Renewal Term") unless earlier terminated in accordance with this Agreement. Notwithstanding the foregoing, either Party may terminate this Agreement by providing the other Party with at least 30 days advance written notice prior to the start of any Renewal Term.

2. **FEES.** Purchaser shall pay the fees for Initial Service Visit and subsequent quarterly Service Visits for the Initial Term and any Renewal Term in accordance with the payment terms set forth in this Agreement based upon the Payment Option selected by Purchaser.

3. **PEST CONTROL SERVICE PLAN.** Terminix shall control for and mitigate against infestations of Standard Pests located in and around the structures on the Purchaser's premises through delivery of regular pest control service. For an additional charge, Terminix shall control for and mitigate against infestations of Premium Pests designated by Purchaser on Page 1 of this Agreement located in and around the structures on the Purchaser's premises through delivery of regular pest control service. All services shall be performed in accordance with procedures recognized in the pest control industry and scientific community as effective against target pests. THIS AGREEMENT DOES NOT COVER AND TERMINIX SHALL HAVE NO OBLIGATION WHATSOEVER, WHETHER EXPRESS OR IMPLIED, TO REPAIR ANY DAMAGE TO THE STRUCTURES ON THE PREMISES OR THE CONTENTS THEREIN CAUSED BY ANY PESTS OR TO COMPENSATE PURCHASER FOR ANY SUCH DAMAGE.

   a. **INITIAL SERVICE VISIT; SUBSEQUENT SERVICE VISITS.** On the initial service visit, Terminix will apply pesticides both to the interior of the structures and the exterior perimeter of the structures on the premises (the "Initial Treatment"). Subsequent to the Initial Treatment, Terminix will apply pesticides only to the exterior perimeter of the structures on the premises once each calendar quarterly period during the Initial Term and any Renewal Term. Additionally, for control of certain Premium Pests, Terminix may utilize other pest control strategies including use of traps and glue boards.

   b. **EXCLUDED PESTS.** Terminix shall have no obligation to control for or mitigate against the following pests: Termites (subterranean, drywood, dampwood), wood-boring beetles, bed bugs (*Cimex lectularius*), mosquitoes or any other pests not specified as a Standard Pest or Premium Pest, unless otherwise agreed to in writing by Terminix.

   c. **INTERIM SERVICE VISITS.** Subject to the limitations in Section 5-Purchaser Cooperation, Terminix shall, upon the request of Purchaser and at no additional costs to Purchaser, make a service visit to reapply pesticides to the structures on the premises as is reasonably necessary to control for and mitigate against acute infestations of Standard Pests and/or Premium Pests which occur between the regularly scheduled quarterly service visits.

4. **ACCESS TO PROPERTY.** Purchaser must allow Terminix access to the structures for any purpose contemplated by this Agreement, including but not limited to reinspections, whether the inspections were requested by the Purchaser or considered necessary by Terminix. The failure to allow Terminix such access will terminate this Agreement without further notice.

5. **PURCHASER COOPERATION.** Purchaser's cooperation is important to ensure the most effective results from Services. Whenever conditions conducive to the breeding and harborage of pests covered by this contract are reported in writing by Terminix to the Purchaser, and are not corrected by Purchaser, Terminix cannot ensure effective Services. If Purchaser fails to correct the conditions noted by Terminix within a reasonable time period, all guarantees as to the effectiveness of the Services in this Agreement shall automatically terminate. Further, additional treatments in areas of such conditions that are not corrected as required shall be paid for by Purchaser as an extra charge.

6. **30-DAY MONEY-BACK GUARANTEE.** IF WITHIN THE THIRTY (30) DAY PERIOD IMMEDIATELY FOLLOWING ANY INSPECTION OR SERVICE TREATMENT PROVIDED BY TERMINIX UNDER THIS AGREEMENT, PURCHASER IS NOT SATISFIED WITH THE SERVICES RENDERED, AS PURCHASER'S SOLE AND EXCLUSIVE REMEDY AND UPON PURCHASER'S WRITTEN REQUEST, TERMINIX SHALL REFUND TO PURCHASER ANY FEES PAID BY PURCHASER FOR SUCH INSPECTION OR SERVICE TREATMENT AND THIS AGREEMENT SHALL BE TERMINATED WITHOUT ANY FURTHER LIABILITY ON THE PART OF TERMINIX.

7. **LIMITATION OF LIABILITY; LIMITED WARRANTY.** EXCEPT AS OTHERWISE PROHIBITED BY LAW, TERMINIX DISCLAIMS AND SHALL NOT BE RESPONSIBLE FOR ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE AND/OR LOSS OF ENJOYMENT DAMAGES. THE OBLIGATIONS OF TERMINIX SPECIFICALLY STATED IN THIS AGREEMENT ARE GIVEN IN LIEU OF ANY OTHER OBLIGATION OR RESPONSIBILITY, EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THIS AGREEMENT DOES NOT PROVIDE FOR THE REPAIR OF ANY DAMAGE CAUSED BY PESTS. THIS AGREEMENT DOES NOT GUARANTEE, AND TERMINIX DOES NOT REPRESENT, THAT PESTS WILL NOT RETURN SUBSEQUENT TO SERVICE TREATMENTS.

8. **WATER LEAKAGE.** Water leakage in treated areas, in interior areas or through the roof or exterior walls of the structures on the premises, may destroy the effectiveness of treatment by Terminix and is conducive to new infestation. Purchaser is responsible for making timely repairs as necessary to stop the leakage. Purchaser's failure to make timely repairs will terminate this Agreement automatically without further notice. Terminix shall have no responsibility for repairs with respect to water leakage.

9. **OWNERSHIP TRANSFER.** Upon transfer of ownership of the structures, Services may be continued upon request of the new owner and upon payment of the Ownership Transfer Fee set forth on page 1 of this Agreement. In addition, Terminix reserves the right to revise the service charges upon transfer of ownership. In the event the new owner fails to request continuation of this Agreement or does not agree to pay the transfer fee of the revised service charges, this Agreement will terminate automatically as of the date of the change of ownership

10. **FORCE MAJEURE.** Terminix shall not be liable to Purchaser for any failure to perform or delay in the performance under this Agreement attributable in whole or in part to any cause beyond its reasonable control and without its fault or negligence, including but not limited to acts of God, fires, floods, earthquakes, strikes, unavailability of necessary utilities, blackouts, government actions, war, civil disturbance, insurrection or sabotage.

11. **ADDITIONAL DISCLAIMERS.** This Agreement does not cover and Terminix will not be responsible for damage resulting from or services required for: (a) termites and/or any other wood-destroying organisms, except as specifically provided herein; (b) moisture conditions, including but not limited to fungus damage and/or water leakage caused by faulty plumbing, roofs, gutters, downspouts and/or poor drainage; (c) masonry failure or grade alterations; (d) inherent structural problems including, but not limited to, wood to ground contacts; (e) termites entering any rigid foam, wooden or cellulose containing components in contact with the earth and the Structures regardless of whether the component is a part of the Structures; and (f) the failure of Purchaser to properly cure at Purchaser's expense any condition that prevents proper treatment or inspection or is conducive to pest infestation.

12. **CHANGE IN LAW.** Terminix performs its services in accordance with the requirements of law. In the event of a change in existing law as it pertains to the services herein, Terminix reserves the right to revise the service charges or terminate this Agreement.

13. **NON-PAYMENT; DEFAULT.** In case of non-payment or default by the Purchaser, Terminix has the right to terminate this Agreement. In addition, cost of collection, including reasonable attorney's fees, shall be paid by the Purchaser, whether suit is filed or not. In addition, interest at the highest legal rate will be assessed for the period of delinquency.

14. **CHANGE IN TERMS.** At the time of any renewal of this Agreement, Terminix may change this Agreement by adding, deleting or modifying any provision. Terminix will notify the Purchaser in advance of any such change, and Purchaser may decline to accept such a change by declining to renew this Agreement. Renewal of this Agreement will constitute acceptance of any such changes.

15. **SEVERABILITY.** If any part of this Agreement is held to be invalid or unenforceable for any reason, the remaining terms and conditions of this Agreement shall remain in full force and effect.

16. **MANDATORY ARBITRATION.** Any claim, dispute or controversy, regarding any contract, tort, statute or otherwise ("Claim"), arising out of or relating to this agreement or the relationships among the parties hereto shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Commercial or Consumer, as applicable, Rules in effect at the time the Claim is filed ("AAA Rules"). Copies of the AAA Rules and forms can be located at www.adr. org, or by calling 1.800.778.7879. The arbitrator's decision shall be final, binding and non-appealable. Judgment upon the award may be entered and enforced in any court having jurisdiction. This clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act. Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award; any such suit may be brought only in Federal District Court for the District or, if any such court lacks jurisdiction, in any state court that has jurisdiction. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement including any claim that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver." Venue for arbitration hereunder shall lie in Memphis, TN.

17. **CLASS ACTION WAIVER.** Any Claim must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE THEIR CASE AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, THE PARTIES UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY, THROUGH ARBITRATION.

18. **GOVERNING LAW.** Except for the Mandatory Arbitration Clause in Section 16 of this Agreement which is governed by and construed in accordance with the Federal Arbitration Act, this Agreement shall be governed by, and construed in accordance with, the laws of the state in which the dispute arises without regard to the conflict of laws provisions.

19. **ENTIRE AGREEMENT.** This Agreement, together with all exhibits thereto, constitutes the entire agreement between the parties and supersedes all proposals, oral or written, and all other communications between the parties relating to such subject matter, and no other representations or statements will be binding upon the parties. This Agreement may not be modified or amended in any way without the written consent of both parties

© 2015 The Terminix International Company Limited Partnership. All rights reserved.



Contract #: 79982-042220222002-5641

# RODENT EXCLUSION SERVICE PLAN

**THIS AGREEMENT PROVIDES FOR INSTALLATION AND MONITORING OF A PEST EXCLUSION SYSTEM TO CONTROL FOR AND MITIGATE AGAINST INFESTATIONS OF CERTAIN RODENTS.**

Purchaser (print name): JOSEPHINE BORCHARDT  Home Phone: 4803219994  Work Phone: ______

Mailing Address: , ,

Property Address: 1628 N BEVERLY GLEN BLVD, LOS ANGELES,CA 90077-2708

Description of Structure(s) Covered: House  Email: jborchardt@email.arizona.edu

Estimated Start Date: ______  Estimated Completion Date: ______

**NOTICE: YOU, THE PURCHASER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FOR AN EXPLANATION OF THIS RIGHT.**

Purchaser acknowledges, accepts and agrees that:

Terminix has provided the Purchaser with a copy of the manufacturer's specimen label or other state-required documents for the rodenticide(s), which will be applied to the Structures.

Terminix has provided the Purchaser with an Inspection Graph as described in Section 3-Inspection Graph of the Terms and Conditions on page 2 of this Agreement.

Purchaser has reviewed and agrees to the Roof Damage Waiver provision set forth in Section 7-Roof Damage Waiver of the Terms and Conditions on page 2 of this Agreement.

**SERVICE / PAYMENT TERMS**

| | | |
|---|---|---|
| **INITIAL CHARGE* (Installation Services & Exclusion System Components)** | $ | 1300.00 |
| **ANNUAL RENEWAL CHARGE*** | $ | 200.00 |
| **BILLING FREQUENCY** | | Annual |

*Excludes tax (if applicable)

**Purchaser accepts and agrees to the Terms and Conditions on pages 1-2 of this Agreement, including the MANDATORY ARBITRATION and CLASS ACTION WAIVER provisions in Sections 19 and 20 of the Terms and Conditions on page 2 of this Agreement.**

**In the event that events occur beyond the reasonable control of Terminix, it is possible delays will occur in providing for the contracted services. Such delays do not constitute abandonment and are not included in calculating timeframes for payment or performance.**

**Terminix will comply with all local requirements for building permits, inspections and zoning. Any modification to the contract, which changes the cost, materials, work to be performed, or estimated completion date, must be in writing and signed by Purchaser and Terminix.**

Purchaser Name: JOSEPHINE BORCHARDT  Purchaser (Signature): ______  Date: ______

Representative Name: RICKS. SOLOMAN  Representative (Signature): ______  Date: ______

Terminix Branch Phone: 5626412220  Terminix Branch Charter No.: ______

Terminix Branch Address: 13722 HARVARD PL, GARDENA, CA 90249-2527

In the event you have any questions or complaints, you may contact a Terminix representative by calling 1.800.TELLTMX (1.800.835.5869).

www.terminix.com Key #37792 Residential Exclusion Services Annual Version (v 6.20.2014) Rev 10/2015
© 2015 The Terminix International Company Limited Partnership. All rights reserved.

**STATE-SPECIFIC DISCLOSURES:**

**FOR CALIFORNIA RESIDENTS:** Supplier shall provide the "Notice to Owner/Tenant" as required by Cal. Bus. & Prof. Code section 8538.

**FOR GEORGIA RESIDENTS:** The Georgia Structural Pest Control Act requires all pest control companies to maintain insurance coverage. Information about this coverage is available from this pest control company.

**FOR TEXAS RESIDENTS:** Licensed and regulated by: Texas Department of Agriculture, Structural Pest Control Service. PO Box 12847. Austin, TX 78711-2847 Phone 1.866.918.4481 Fax 1.888.232.2567.

**FOR VIRGINIA RESIDENTS: Virginia: The Virginia Contractor Transaction Recovery Act provides relief to eligible consumers who have incurred losses through the improper or dishonest conduct of a licensed residential contractor. For more information, contact: Recovery Fund Office | DPOR 9960 Mayland Drive, Suite 400 Richmond, VA 23233; (804) 367-1559**

www.terminix.com Key #37792 Residential Exclusion Services Annual Version (v 6.20.2014) Rev 10/2015
© 2015 The Terminix International Company Limited Partnership. All rights reserved.

2015 The Terminix International Company Limited Partnership. All rights reserved

# TERMS AND CONDITIONS

1. **INITIAL TERM; RENEWAL.** The term of this Agreement shall commence on the date of initial installation (the "Installation Date") of the Exclusion System Components and shall continue thereafter for one year (the "Initial Term"), unless terminated earlier as set forth herein. Purchaser may extend the Initial Term for additional one year periods (each a "Renewal Term") for so long as Purchaser owns the property described on the Inspection Graph by paying the *Annual Renewal Term Fee* set forth in this Agreement prior to the expiration of the Initial Term or any Renewal Term. Terminix reserves the right to revise the *Annual Renewal Term Fee* following the expiration of the second Renewal Term.

2. **FEES.** Purchaser shall pay the fees for Installation of the Exclusion System and purchase of the Exclusion System Components in accordance with the payment terms set forth in this Agreement based upon the Payment Option selected by Purchaser.

3. **INSPECTION GRAPH.** This Inspection Graph prepared by Terminix and provided to Purchaser is a record of a visual, non-destructive inspection by Terminix of certain readily accessible areas of the identified Structures for purposes of identifying access points utilized by Covered Pests to gain entry to the Structures and any existing infestations of Covered Pests.

4. **COVERED PESTS.** The obligations of Terminix hereunder only apply to the following pests: commensal rodents (including rats and mice), bats, tree squirrels and flying squirrels and pigeons, starlings and sparrows (collectively "Covered Pests").

5. **EXCLUDED PESTS.** The following pests are not covered by this Agreement and Terminix shall have no obligations hereunder with respect to such pests: *insects, spiders and wildlife (including, but not limited to, raccoons, opossums, skunks, armadillos and snakes (whether venomous or non-venomous), groundhogs, rabbits, ground squirrels, chipmunks, foxes, large lizards, pocket gophers, voles, moles, alligators, beavers, muskrats, marmots, porcupines and deer) or any other pests not specified as a Covered Pest in Section 4–Covered Pests* (collectively "Excluded Pests").

   THIS AGREEMENT DOES NOT COVER AND TERMINIX SHALL HAVE NO OBLIGATION WHATSOEVER, WHETHER EXPRESS OR IMPLIED, TO: (A) REPAIR ANY DAMAGE TO THE EXCLUSION SYSTEM COMPONENTS CAUSED BY EXCLUDED PESTS; OR (B) CONTROL FOR AND MITIGATE AGAINST INFESTATIONS OF ANY EXCLUDED PESTS.

6. **LIMITED EXCLUSION PLAN SERVICES; NO DAMAGE WARRANTY.** The sole obligation of Terminix during the Initial Term or any Renewal Term, as applicable, of this Agreement (hereinafter the "Services") is as follows: (a) Analyzing the Structures on Purchaser's premises to identify actual and potential entry points to the Structures that could be used by Covered Pests to gain access to the Structures;
(b) identifying any existing infestations of Covered Pests; (c) Sealing of all entry points through installation of screens, excluder fabrics and sealants (the "Exclusion System Components") in the locations identified on the Inspection Graph attached to this Agreement to prevent Covered Pests from entering the Structures; (d) Controlling for and mitigating against infestation of Covered Pests existing at time of inspection using rodenticides and/or traps; (e) On an annual basis or at any time, upon the reasonable request of Purchaser, inspecting the installed Exclusion System Components and Structures for damage to the Exclusion System Components caused by Covered Pests and/or any actual entry to the Structures by Covered Pests and resulting infestations; (f) Subject to Section 9–Purchaser Cooperation, repairing or replacing any Exclusion System Components damaged by Covered Pests and/or installing additional Exclusion System Components to seal new access points utilized by Covered Pests to gain entry to the Structures; and (g) Controlling for and mitigating against infestations of Covered Pests which actually gain entry to the Structures. EXCEPT FOR REPAIRS TO THE EXCLUSION SYSTEM COMPONENTS CAUSED BY COVERED PESTS AS EXPRESSLY PROVIDED FOR HEREIN, THIS AGREEMENT DOES NOT COVER AND TERMINIX SHALL HAVE NO OBLIGATION WHATSOEVER, WHETHER EXPRESS OR IMPLIED, TO REPAIR ANY DAMAGE CAUSED BY ANY PESTS, WHETHER COVERED PESTS OR EXCLUDED PESTS, TO THE STRUCTURES OR ITS CONTENTS. THIS AGREEMENT DOES NOT GUARANTEE, AND TERMINIX DOES NOT REPRESENT, THAT COVERED PESTS WILL NOT ATTEMPT TO, AND/OR REGAIN ENTRY TO, THE STRUCTURES SUBSEQUENT TO THE INSTALLATION OF THE EXCLUSION SYSTEM COMPONENTS.

7. **ROOF DAMAGE WAIVER.** PURCHASER ACKNOWLEDGES AND AGREES THAT, IN ORDER TO INSTALL THE EXCLUSION SYSTEM COMPONENTS, TERMINIX WILL HAVE TO GAIN ACCESS TO AND WALK ON THE ROOF OF PURCHASER'S STRUCTURES AND THAT DAMAGE TO ROOFING TILES AND OTHER ROOFING SYSTEM COMPONENTS MAY BE UNAVOIDABLE IN SUCH INSTALLATION PROCESS, NO MATTER WHAT DEGREE OF CARE IS EXERCISED BY TERMINIX. ACCORDINGLY, PURCHASER HEREBY RELEASES TERMINIX FROM ANY AND ALL CLAIMS OF DAMAGE TO THE STRUCTURES, INCLUDING ROOFING TILE, GUTTERS, PLUMBING VENTS OR ANY OTHER COMPONENT OF THE ROOFING SYSTEM, WHICH OCCURS AS A RESULT OF THE INSTALLATION OF THE EXCLUSION SYSTEM COMPONENTS.

8. **ACCESS TO PROPERTY.** Purchaser must allow Terminix access to the Structures (including the attic and roof) for any purpose contemplated by this Agreement including, but not limited to, installation and monitoring of the installed Exclusion System Components and controlling for and mitigating against Covered Pests which gain entry to the Structures. The failure to allow Terminix such access will terminate this Agreement without further notice.

9. **PURCHASER COOPERATION.** Purchaser's cooperation is important to ensure the most effective results from Services. Whenever conditions conducive to the breeding and harborage of pests covered by this contract are reported in writing by Terminix to the Purchaser, and are not corrected by Purchaser, Terminix cannot ensure effective Services. If Purchaser fails to correct the conditions noted by Terminix within a reasonable time period, all guarantees as to the effectiveness of the Services in this Agreement shall automatically terminate. Further, additional treatments in areas of such conditions that are not corrected as required shall be paid for by Purchaser as an extra charge.

10. **LIMITATION OF LIABILITY; LIMITED WARRANTY.** EXCEPT AS OTHERWISE PROHIBITED BY LAW, TERMINIX DISCLAIMS AND SHALL NOT BE RESPONSIBLE FOR ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE AND/OR LOSS OF ENJOYMENT DAMAGES. THE OBLIGATIONS OF TERMINIX SPECIFICALLY STATED IN THIS AGREEMENT ARE GIVEN IN LIEU OF ANY OTHER OBLIGATION OR RESPONSIBILITY, EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

11. **INFORMATION REGARDING EXCLUSION SYSTEM SERVICES.** Purchaser acknowledges and agrees that the installation of the Exclusion System Components requires sealing of all potential access points to the Structures through which a Covered Pest may gain entry which may require installation of roof returns, plumbing caps, mushroom cages, chimney caps, garage door seals, dryer vent caps and/or wire mesh. Purchaser further understands and agrees that the installation of the Exclusion System Components shall be determined by Terminix, in its sole discretion, based upon its review and analysis of the Structures. Purchaser hereby releases Terminix from any and all claims of damage to the Structures as a result of the installation of the Exclusion System Components. If Purchaser fails and refuses to authorize Terminix to install the Exclusion System Components, in the locations and in the manner as determined by Terminix in its sole discretion, this Agreement shall automatically terminate.

12. **ADDITIONS OR ALTERATIONS TO STRUCTURES.** This Agreement covers the Structures described on the Inspection Graph as of the date of the installation of the Exclusion System Components. If the Structures or areas on or near the installed Exclusion System Components are structurally modified, altered or otherwise changed (collectively "Alterations"), Purchaser must provide Terminix with written notice of such Alterations within ten (10) days of the occurrence of such Alterations. Purchaser's failure to provide such notice will terminate this Agreement automatically without further notice. The failure of Terminix to discover such Alterations does not release Purchaser from the obligations to provide written notice to Terminix of the same. Purchaser shall pay Terminix's then-current charges for a service call to evaluate the Alterations and install additional Exclusion System Components as a result of the Alterations. Terminix reserves the right to increase the *Annual Renewal Term Fee* as a result of the Alterations.

13. **OWNERSHIP TRANSFER.** Upon transfer of ownership of the Structures, Services may be continued upon request of the new owner and upon payment of an ownership transfer fee as determined by Terminix in its sole discretion. In addition, Terminix reserves the right to revise the *Annual Renewal Term Fee* upon transfer of ownership. In the event the new owner fails to request continuation of this Agreement or does not agree to pay the transfer fee of the revised *Annual Renewal Term Fee*, this Agreement will terminate automatically as of the date of the change of ownership.

14. **FORCE MAJEURE.** Terminix shall not be liable to Purchaser for any failure to perform or delay in the performance under this Agreement attributable in whole or in part to any cause beyond its reasonable control and without its fault or negligence including, but not limited to, acts of God, fires, floods, earthquakes, strikes, unavailability of necessary utilities, blackouts, government actions, war, civil disturbance, insurrection or sabotage.

15. **CHANGE IN LAW.** Terminix performs its services in accordance with the requirements of law. In the event of a change in existing law as it pertains to the services herein, Terminix reserves the right to revise the *Annual Renewal Term Fee* or terminate this Agreement.

16. **NON-PAYMENT; DEFAULT.** In case of non-payment or default by the Purchaser, Terminix has the right to terminate this Agreement. In addition, cost of collection, including reasonable attorney's fees, shall be paid by the Purchaser, whether suit is filed or not. In addition, interest at the highest legal rate will be assessed for the period of delinquency.

17. **CHANGE IN TERMS.** At the time of any renewal of this Agreement, Terminix may change this Agreement by adding, deleting or modifying any provision. Terminix will notify the Purchaser in advance of any such change, and Purchaser may decline to accept such a change by declining to renew this Agreement. Renewal of this Agreement will constitute acceptance of any such changes.

18. **SEVERABILITY.** If any part of this Agreement is held to be invalid or unenforceable for any reason, the remaining terms and conditions of this Agreement shall remain in full force and effect.

19. **MANDATORY ARBITRATION.** Any claim, dispute or controversy, regarding any contract, tort, statute or otherwise ("Claim"), arising out of or relating to this Agreement or the relationships among the parties hereto shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Commercial or Consumer, as applicable, Rules in effect at the time the Claim is filed ("AAA Rules"). Copies of the AAA Rules and forms can be located at www.adr.org, or by calling 1.800.778.7879. The arbitrator's decision shall be final, binding and non-appealable. Judgment upon the award may be entered and enforced in any court having jurisdiction. This clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act. Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award; any such suit may be brought only in Federal District Court for the District or, if any such court lacks jurisdiction, in any state court that has jurisdiction. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement, including any claim that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver." Venue for arbitration hereunder shall lie in Memphis, TN.

20. **CLASS ACTION WAIVER.** Any Claim must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE THEIR CASE AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, THE PARTIES UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY, THROUGH ARBITRATION.

21. **GOVERNING LAW.** Except for the Mandatory Arbitration Clause in Section 19 of this Agreement which is governed by and construed in accordance with the Federal Arbitration Act, this Agreement shall be governed by, and construed in accordance with, the laws of the state in which the dispute arises without regard to the conflict of laws provisions.

22. **ENTIRE AGREEMENT.** This Agreement, together with all exhibits thereto, constitutes the entire agreement between the parties, supersedes all proposals, oral or written, and all other communications between the parties relating to such subject matter, and no other representations or statements will be binding upon the parties. This Agreement may not be modified or amended in any way without the written consent of both parties.

2015 The Terminix International Company Limited Partnership. All rights reserved

Contract #: 79982-042220222002-5641

**DRYWOOD TERMITE DEFEND SYSTEM™**
**Annual Plan**

**THIS AGREEMENT PROVIDES FOR TREATMENT OF A STRUCTURE FOR DRYWOOD TERMITES *(KALOTERMES SPP., INCISITERMES SPP., CRYPTOTERMES SPP.)* AND FOR THE REPAIR OF DAMAGES CAUSED BY DRYWOOD TERMITES AFTER THE INITIAL TREATMENT DATE WITHIN THE LIMITS STATED IN THIS CONTRACT.**

| | | | | | |
|---|---|---|---|---|---|
| Purchaser (print name) | JOSEPHINE BORCHARDT | Home Phone | 4803219994 | Work Phone | |
| Purchaser Mailing Address | . . | | | | |
| Property Address | 1628 N BEVERLY GLEN BLVD, LOS ANGELES,CA 90077-2708 | | | | |
| Description of Structure(s) Covered | House | | | Email | jborchardt@email.arizona.edu |

**SERVICE / PAYMENT TERMS**

| | | |
|---|---|---|
| **INITIAL CHARGE* (Initial Treatment and Initial Term Fee)** | $ | 799.00 |
| **ANNUAL RENEWAL TERM FEE*** | $ | 299.00 |
| **OWNERSHIP TRANSFER FEE*** | $ | .00 |
| **BILLING FREQUENCY** | | Annual |

*Excludes tax (if applicable)

**NOTICE: YOU, THE PURCHASER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FOR AN EXPLANATION OF THIS RIGHT.**

**Purchaser acknowledges, accepts and agrees that:**

- Terminix has provided the Purchaser with a copy of the manufacturer's specimen label or other state-required disclosures for the pesticide(s), which will b e used to treat the above-named property.
- Terminix has provided the Purchaser with an *Inspection Graph* as described in Section 5 of the Terms and Conditions on page 2 of this Agreement, whic h is a part of this Agreement and is incorporated by reference herein.
- Terminix has provided to Purchaser for review and execution the *Wood Destroying Pests and Organisms Inspection Report* as required by Cal. Bus. & Prof. Code §8516, which is a part of this Agreement and is incorporated by reference herein.

Terminix has provided the Purchaser with *Notice to Owner/Tenant* as required by Cal. Bus. & Prof. Code §8538.

**PURCHASER ACCEPTS AND AGREES TO THE TERMS, CONDITIONS, RESTRICTIONS, LIMITATIONS AND EXCLUSIONS ON PAGES 1-2 OF THIS AGREEMENT, INCLUDING THE MANDATORY ARBITRATION AND CLASS ACTION WAIVER PROVISIONS IN SECTIONS 20 AND 21 OF THE TERMS AND CONDITIONS ON PAGE 2 OF THIS AGREEMENT. PURCHASER AGREES THAT THE INSPECTION GRAPH AND THE WOOD DESTROYING ORGANISM APPLICATION RECORD PROVIDED TO PURCHASER CONSTITUTES PART OF THIS AGREEMENT AND IS FULLY INCORPORATED BY REFERENCE.**

Purchaser Name: JOSEPHINE BORCHARDT   Purchaser (Signature): ____________________   Date: __________

Representative Name: RICKS, SOLOMAN   Representative (Signature): ____________________   Date: __________

Terminix Branch Phone: 5626412220   Terminix Branch Charter No.: __________

Terminix Branch Address: 13722 HARVARD PL, GARDENA, CA 90249-2527

In the event you have any questions or complaints, you may contact a Terminix representative by calling 1.800.TELLTMX (1.800.835.5869).

© 2018 The Terminix International Company Limited Partnership. All rights reserved.

## TERMS AND CONDITIONS

1. **INITIAL INSPECTION.** Terminix shall conduct a full inspection of the Structures for wood destroying pests and organisms and provide a written report to Purchaser within ten (10) business days of the date of the inspection and prior to commencing the provision of any services under this Agreement in accordance with Cal. Bus. & Prof Code §8516.

2. **INITIAL TERM; RENEWAL.** The term of this Agreement shall commence on the Effective Date, as indicated above and shall continue for one year (the "Initial Term"), unless terminated earlier as set forth herein. The Purchaser may extend the Initial Term for additional one-year periods (each a "Renewal Term") for so long as Purchaser owns the property described on the Inspection Graph by paying the Renewal Term Fee set forth in this Agreement prior to the expiration of the Initial Term or any Renewal Term. The Renewal Term Fee shall remain fixed for the first Renewal Term. However, Terminix has the right to modify the Renewal Term Fee applicable to any Renewal Term following the first Renewal Term upon thirty (30) days' prior written notice to Purchaser.

3. **NOTICE OF WORK COMPLETED AND NOT COMPLETED.** Within ten (10) business days of the date of the completion of the initial fumigation service, Terminix will file with the California Structural Pest Control Board and furnish to Purchaser a copy of the written Notice of Work Completed and Not Completed in accordance with Cal. Bus. & Prof. Code §8518 and Title 16, Article 4, §1996.2 of the California Code of Regulations respectively.

4. **FEES.** Purchaser shall pay the fees for the Initial Term and any prepaid Renewal Term based upon the Payment Option selected by Purchaser. Purchaser shall pay the fees for any subsequent Renewal Term in the form of check, credit card, money order or any other payment form acceptable to Terminix.

5. **INSPECTION GRAPH.** This Inspection Graph, prepared by Terminix and provided to Purchaser, is a record of a visual, non-destructive inspection by Terminix of certain readily accessible areas of the identified property for visible termite infestation/ damage. Terminix is not responsible for repairs to damages identified on the Inspection Graph. In addition, hidden damage or infestation may exist in concealed, obstructed or inaccessible areas. No attempt to remove siding, plastic or sheetrock insulation, carpeting, paneling, etc., to search for hidden damage or infestation was made. Terminix cannot guarantee that the damage disclosed by visual inspection of the premises depicted in the Inspection Graph represents the entirety of the damage or infestation which may exist as of the date of the initial control application. Terminix shall not be responsible for repair of any damages to the Structures including, without limitation, any damage which existed in areas or in structural members which were not accessible for visual inspection as of the date of the Inspection Graph. If X (circled or not) appears on the Inspection Graph, it is advisable that a qualified building expert inspect the property to determine what effect, if any, the infestation/damage has upon the structural integrity of the property.

6. **PLAN SERVICES.** The sole obligations of Terminix under this Agreement are to:

   (a) Apply a treatment, consisting of any chemical and/or non chemical products as deemed necessary by Terminix to provide mitigation against and/or control of Drywood termites to certain areas of the Structure(s) as identified by Terminix, in its sole discretion (hereinafter the "Services"); (b) Provide additional Services to the Structure(s) following the commencement of each Renewal Term, as deemed necessary by Terminix, to provide ongoing mitigation and/or for control of Drywood termite activity in the Structure(s), and (c) Inspect the Structure(s), as consistent with the terms of this Agreement and/or at any time upon the reasonable request of Purchaser for Drywood termite activity.

7. **DAMAGE REPAIR PLAN; COVERED DAMAGES.** If Drywood termite damage to the Structures and/or their contents occurs subsequent to the Effective Date, during the Initial Term or any Renewal Term, (hereinafter "Covered Damage"), Terminix will, following inspection of and confirmation that such damage constitutes Covered Damage, arrange for and pay the costs of labor and materials of a contractor to repair such Covered Damage. Terminix is not responsible for the repair of any damage, whether visible or hidden, occurring prior to or on the Effective Date, whether or not live termites are present. Damage discovered after the Effective Date with no verified live and active infestation present shall be deemed to have been caused before the Effective Date. Because damage may be present in areas that are inaccessible to visual inspection, Terminix does not guarantee that the damage disclosed on the Inspection Graph represents all of the existing damage as of the date of this Agreement. TERMINIX IS NOT RESPONSIBLE FOR THE REPAIR OF ANY DAMAGE TO ANY EXTERIOR FENCES OR DECKS LOCATED ON PURCHASER'S PREMISES. THIS AGREEMENT DOES NOT COVER, AND TERMINIX SHALL HAVE NO OBLIGATION TO REPAIR, DAMAGE CAUSED BY ANY WOOD-DESTROYING ORGANISM, OTHER THAN DRYWOOD TERMITES, INCLUDING SUBTERRANEAN (IN-GROUND) TERMITES, FORMOSAN TERMITES, DAMPWOOD TERMITES, CARPENTER ANTS, POWDER-POST BEETLES OR WOOD- DECAY FUNGI, REGARDLESS OF WHETHER SUCH DAMAGE OCCURS PRIOR TO OR SUBSEQUENT TO THE APPLICATION OF THE SERVICES.

8. **NOTICE OF CLAIMS; TIMING.** Any claim made by Purchaser for Terminix to repair any Covered Damage must be made in writing to Terminix during the Initial Term, any Renewal Term or within the one (1) year following the expiration or termination of this Agreement ("Claim Period"). Purchaser's failure to provide such written notice of a claim within the Claim Period shall constitute an intentional waiver of any such claim.

9. **ACCESS TO PROPERTY.** Purchaser must allow Terminix access to the Structures for any purpose contemplated by this Agreement including, but not limited to, reinspections whether the inspections were requested by the Purchaser or considered necessary by Terminix. The failure to allow Terminix such access will allow Terminix to terminate this Agreement without further notice.

10. **PURCHASER COOPERATION.** Purchaser's cooperation is important to ensure the most effective results from Services. Whenever conditions conducive to the breeding and harborage of pests covered by this contract are reported in writing by Terminix to the Purchaser, and are not corrected by Purchaser, Terminix cannot ensure effective Services. If Purchaser fails to correct the conditions noted by Terminix within a reasonable time period, all guarantees as to the effectiveness of the Services in this Agreement shall automatically terminate. Further, additional treatments in areas of such conditions that are not corrected as required shall be paid for by Purchaser as an extra charge.

11. **30-DAY MONEY-BACK GUARANTEE.** IF WITHIN THE THIRTY (30) DAY PERIOD IMMEDIATELY FOLLOWING ANY INSPECTION OR SERVICE TREATMENT PROVIDED BY TERMINIX UNDER THIS AGREEMENT PURCHASER IS NOT SATISFIED WITH THE SERVICES RENDERED, AS PURCHASER'S SOLE AND EXCLUSIVE REMEDY AND UPON PURCHASER'S WRITTEN REQUEST, TERMINIX SHALL REFUND TO PURCHASER ANY FEES PAID BY PURCHASER FOR SUCH INSPECTION OR SERVICE TREATMENT, AND THIS AGREEMENT SHALL BE TERMINATED WITHOUT ANY FURTHER LIABILITY ON THE PART OF TERMINIX.

12. **LIMITATION OF LIABILITY; LIMITED WARRANTY.** EXCEPT AS OTHERWISE PROHIBITED BY LAW, TERMINIX DISCLAIMS AND SHALL NOT BE RESPONSIBLE FOR ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE AND/OR LOSS OF ENJOYMENT DAMAGES. THE OBLIGATIONS OF TERMINIX SPECIFICALLY STATED IN THIS AGREEMENT ARE GIVEN IN LIEU OF ANY OTHER OBLIGATION OR RESPONSIBILITY, EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THIS AGREEMENT DOES NOT PROVIDE FOR THE REPAIR OF ANY DAMAGE CAUSED BY DRYWOOD TERMITES, OTHER THAN AS SPECIFICALLY STATED HEREIN. THIS AGREEMENT DOES NOT GUARANTEE, AND TERMINIX DOES NOT REPRESENT THAT TERMITES WILL NOT RETURN FOLLOWING ANY TREATMENTS.

13. **WATER LEAKAGE.** Water leakage in treated areas, in interior areas or through the roof or exterior walls of the Structures may destroy the effectiveness of treatment by Terminix and is conducive to new infestation. Purchaser is responsible for making timely repairs as necessary to stop the leakage. Purchaser's failure to make timely repairs will terminate this Agreement automatically without further notice. Terminix shall have no responsibility for repairs with respect to water leakage.

14. **ADDITIONS OR ALTERATIONS TO STRUCTURES.** This Agreement covers the Structure(s) described on the Inspection Graph as of the Effective Date. If the Structure(s) are structurally modified, altered or otherwise changed (collectively "Alterations"), Purchaser must provide Terminix with written notice of such Alterations within ten (10) days of the occurrence of such Alterations. Purchaser's failure to provide such notice will provide Terminix the option to terminate this Agreement, at its sole discretion. The failure of Terminix to discover such Alterations does not release Purchaser from the obligations to provide written notice to Terminix of the same. Purchaser shall pay Terminix's then-current charges for a service call to evaluate the Alterations and provide additional treatments as a result of the Alterations. Terminix reserves the right to increase the Renewal Term Fee as a result of the Alterations.

15. **OWNERSHIP TRANSFER.** Upon transfer of ownership of the Structure(s), Services may be continued upon request of the new owner and upon payment of the Ownership Transfer Fee set forth on page 1 of this Agreement. In addition, Terminix reserves the right to revise the Renewal Term Fee upon transfer of ownership. In the event the new owner fails to request continuation of this Agreement or does not agree to pay the transfer fee of the revised Renewal Term Fee, this Agreement will terminate automatically as of the date of the change of ownership.

16. **FORCE MAJEURE.** Terminix shall not be liable to Purchaser for any failure to perform or delay in the performance under this Agreement attributable in whole or in part to any cause beyond its reasonable control and without its fault or negligence including, but not limited to, acts of God, fires, floods, earthquakes, strikes, unavailability of necessary utilities, blackouts, government actions, war, civil disturbance, insurrection or sabotage. Additionally, Terminix shall not be liable to Purchaser and this Agreement shall be automatically terminated in the event the Structure(s) are destroyed or substantially damaged due to an event beyond Terminix's reasonable control including, but not limited to, acts of God, fires, storms, hurricanes, floods or earthquakes.

17. **ADDITIONAL DISCLAIMERS.** This Agreement does not cover, and Terminix will not be responsible for, damage resulting from or services required for: (a) termites and/ or any other wood-destroying organisms, except as specifically provided herein this Agreement; (b) moisture conditions including, but not limited to, fungus damage and/ or water leakage caused by faulty plumbing, roofs, gutters, downspouts and/or poor drainage; (c) masonry failure or grade alterations; (d) inherent structural problems including, but not limited to, wood-to-ground contacts; (e) termites entering any rigid foam, wooden or cellulose-containing components in contact with the earth and the Structures, regardless of whether the component is a part of the Structures, and (f) the failure of Purchaser to properly cure at Purchaser's expense any condition that prevents proper treatment or inspection or is conducive to termite infestation.

18. **CHANGE IN LAW.** Terminix performs its services in accordance with the requirements of law. In the event of a change in existing law as it pertains to the services herein, Terminix reserves the right to revise the Renewal Term Fee or terminate this Agreement.

19. **NON-PAYMENT; DEFAULT.** In case of non-payment or default by the Purchaser, Terminix has the right to terminate this Agreement without notice. In addition, cost of collection, including reasonable attorney's fees, shall be paid by the Purchaser, whether suit is filed or not. In addition, interest at the highest legal rate will be assessed for the period of delinquency.

20. **CHANGE IN TERMS.** At the time of any renewal of this Agreement, Terminix may change this Agreement by adding, deleting or modifying any provision. Terminix will notify the Purchaser in advance of any such change, and Purchaser may decline to accept such a change by declining to renew this Agreement. Renewal of this Agreement will constitute acceptance of any such changes.

21. **SEVERABILITY.** If any part of this Agreement is held to be invalid or unenforceable for any reason, the remaining terms and conditions of this Agreement shall remain in full force and effect.

22. **MANDATORY ARBITRATION.** Any claim, dispute or controversy, regarding any contract, tort, statute or otherwise ("Claim"), arising out of or relating to this Agreement or the relationships among the parties hereto, shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Commercial or Consumer, as applicable, Rules in effect at the time the Claim is filed ("AAA Rules"). Copies of the AAA Rules and forms can be located at www.adr.org or by calling 1 800.778.7879. The arbitrator's decision shall be final, binding and non-appealable. Judgment upon the award may be entered and enforced in any court having jurisdiction. This clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act. Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award; any such suit may be brought only in Federal District Court for the District or, if any such court lacks jurisdiction, in any state court that has jurisdiction. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement, including any claim that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver." Venue for arbitration hereunder shall be within the state where the customer's property, that is the subject of the services provided, is located.

23. **CLASS ACTION WAIVER.** Any Claim must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE THEIR CASE AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION.

© 2018 The Terminix International Company Limited Partnership. All rights reserved

HOWEVER, THE PARTIES UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY, THROUGH ARBITRATION.

24 **GOVERNING LAW.** Except for the Mandatory Arbitration Clause in Section 20 of this Agreement which is governed by and construed in accordance with the Federal Arbitration Act and Federal law, this Agreement shall be governed by, and construed in accordance with, the laws of the state in which the dispute arises without regard to the conflict of laws provisions

25 **ENTIRE AGREEMENT.** This Agreement, together with all exhibits thereto, constitutes the entire agreement between the parties, supersedes all proposals, oral or written and all other communications between the parties relating to such subject matter, and no other representations or statements will be binding upon the parties.

© 2018 The Terminix International Company Limited Partnership. All rights reserved.



Contract #: 79982-042220222002-5641

## DRYWOOD TERMITE ONE-TIME PLAN

**THIS AGREEMENT PROVIDES FOR THE ARRANGEMENT OF TREATMENT OF A STRUCTURE FOR DRYWOOD TERMITES (*KALOTERMES SPP.*, *INCISITERMES SPP.*, *CRYPTOTERMES SPP.*) BUT DOES NOT PROVIDE FOR THE REPAIR OF DAMAGES CAUSED BY SUCH DRYWOOD TERMITES.**

**PLEASE READ THIS ENTIRE DOCUMENT, INCLUDING THE "TERMS AND CONDITIONS," BEFORE SIGNING.**

| | | | | | |
|---|---|---|---|---|---|
| Purchaser: | JOSEPHINE BORCHARDT | Home Phone: | 4803219994 | Work Phone: | |
| Purchaser Mailing Address | , , | | | | |
| Property Address | 1628 N BEVERLY GLEN BLVD, LOS ANGELES,CA 90077-2708 | | | | |
| Description of Structure(s) Covered | House | | | Email: | jborchardt@email.arizona.edu |

### SERVICE / PAYMENT TERMS

| | | |
|---|---|---|
| **Drywood Termite One-Time Plan*** .................... | $ | 3100.00 |
| *Excludes tax (if applicable) | | |

**THIS TREATMENT IS ONLY FOR THE CONTROL OF THE STRUCTURE(S) AS IDENTIFIED ON THE INSPECTION GRAPH(S) FROM DRYWOOD TERMITES (*KALOTERMES SPP.*, *INCISITERMES SPP.*, *CRYPTOTERMES SPP.*) (COLLECTIVELY "DRYWOOD TERMITES") INFESTATIONS. THE TREATMENT DOES NOT CONTROL FROM SUBTERRANEAN (UNDERGROUND) TERMITES (*RETICULITERMES SPP.*, *HETEROTERMES SPP.*), ASIAN TERMITES (*COPTOTERMES GESTROI SPP.*) AND FORMOSAN TERMITES (*COPTOTERMES SPP.*) INFESTATIONS OR OTHER WOOD-DESTROYING ORGANISMS INCLUDING, BUT NOT LIMITED TO, DAMPWOOD TERMITES, CARPENTER ANTS, POWDER-POST BEETLES OR WOOD-DECAY FUNGI.**

**TERMINIX MAY ARRANGE FOR THE PERFORMANCE OF THE WORK TO ANOTHER LICENSED COMPANY. TERMINIX SHALL NOTIFY YOU, THE PURCHASER, IF THE WORK SHALL BE PERFORMED BY AN ENTITY OTHER THAN TERMINIX. IN THE EVENT THAT THE WORK IS TO BE PERFORMED BY A SEPARATE ENTITY, YOU, THE PURCHASER, CONSENT AND AGREE TO THE WORK BEING PERFORMED BY SUCH ENTITY.**

**PURCHASER SIGNATURE** ____________________

**NOTICE: YOU, THE PURCHASER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FOR AN EXPLANATION OF THIS RIGHT.**

**For All Residents:**

- As required, Terminix has provided the Purchaser with a copy of any federal, state or locally required documents regarding the treatment for the above-n amed property.

**For California Residents:**

- Terminix has provided to Purchaser for review and execution the *Wood Destroying Pests and Organisms Inspection Report* as required by Cal. Bus. & Pr of. Code §8516, which, along with the Inspection Graph referenced on Page 2 and any service records provided to Purchaser, is a part of this Agreement and is incorporated by reference herein.
- Purchaser will be or has been provided with the *Notice to Owner/Tenant* as required by Cal. Bus. & Prof. Code §8538.
- Purchaser will be or has been provided with the *Occupants Fumigation Notice and Pesticide Disclosure Statement* as required by Cal. Code of Regulations , Title 16, Article 4, §1970.4.
- Purchaser will be or has been provided with the following Notices: (a) *Preparation by Owner or Occupant Prior to Fumigation Notice* and (b) *Fumigation S ervices Notice*.

**For Florida Residents:**

- A treatment sticker will be placed on the electrical box by the service provider upon job completion.

**PURCHASER ACCEPTS AND AGREES TO THE TERMS, CONDITIONS, RESTRICTIONS, LIMITATIONS AND EXCLUSIONS ON PAGES 1-2 OF THIS AGREEMENT, INCLUDING THE MANDATORY ARBITRATION AND CLASS ACTION WAIVER PROVISIONS IN SECTIONS 16 AND 17 OF THE TERMS AND CONDITIONS ON PAGE 2 OF THIS AGREEMENT. PURCHASER AGREES THAT THE INSPECTION GRAPH AND THE WOOD DESTROYING ORGANISM APPLICATION RECORD PROVIDED TO PURCHASER CONSTITUTES PART OF THIS AGREEMENT AND IS FULLY INCORPORATED BY REFERENCE.**

| | | | | | |
|---|---|---|---|---|---|
| Purchaser Name: | JOSEPHINE BORCHARDT | Purchaser (Signature): | | Date: | |
| Representative Name: | RICKS, SOLOMAN | Representative (Signature): | | Date: | |
| Terminix Branch Phone: | 5626412220 | Terminix Branch Charter No.: | | | |

In the event you have any questions or complaints, you may contact a Terminix representative by calling 1.800.TELLTMX (1.800.835.5869).

New 2/2019 © 2019 The Terminix International Company Limited Partnership. All rights reserved.

Terminix Branch Address: 13722 HARVARD PL, GARDENA, CA 90249-2527

www.terminix.com Key #40070 RESIDENTIAL DRYWOOD ONE-TIME PLAN (v 2.21.2019)
New 2/2019 © 2019 The Terminix International Company Limited Partnership. All rights reserved.

## TERMS AND CONDITIONS

1. **CALIFORNIA-ONLY CONSUMER INFORMATION:**

   (a) **CAL. BUS. & PROF. CODE §8516 REQUIREMENT.** Terminix shall conduct a full inspection of the Structures for wood destroying pests and organisms and provide a written report to Purchaser within ten (10) business days of the date of the inspection and prior to commencing the provision of any services under this Agreement in accordance with Cal. Bus. & Prof. Code §8 516.

   (b) **NOTICE OF WORK COMPLETED AND NOT COMPLETED.** Within ten (10) busi ness days of the date of the completion of the initial fumigation service, Terminix will file with the California Structural Pest Control Board and furnish to Purchaser a copy of the written Notice of Work Completed and Not Completed in accordance with Cal. Bus. & Prof. Code §8518 and Title 16, Article 4, §1996.2 of the California Code of Regulations respectively.

2. **GENERAL DESCRIPTION.** By executing this Drywood Termite Plan (hereinafter t he "Agreement"), Purchaser and Terminix agree that: a) Terminix shall procure on Purchaser's behalf the Services (as defined below) at the Structures identified on page 1 of this Agreement and b) Purchaser shall pay Terminix the Fees stated on the face of this Agreement in exchange for the procurement of such Services.

3. **FEES.** Purchaser shall pay the fees based upon the Payment Option selected by Pu rchaser.

4. **INSPECTION GRAPH.** This Inspection Graph, prepared by Terminix and provided to Purchaser, is a record of a visual, non-destructive inspection by Terminix of certain readily accessible areas of the identified property for visible termite infestation/ damage. Terminix is not responsible for repairs to damages identified on the Inspection Graph. In addition, hidden damage or infestation may exist in concealed, obstructed or inaccessible areas. No attempt to remove siding, plastic or sheetrock insulation, carpeting, paneling, etc., to search for hidden damage or infestation was made. Terminix cannot guarantee that the damage disclosed by visual inspection of the premises depicted in the Inspection Graph represents the entirety of the damage or infestation which may exist as of the date of the initial control application. Terminix shall not be responsible for repair of any damages to the Structures including, without limitation, any damage which existed in areas or in structural members which were not accessible for visual inspection as of the date of the Inspection Graph. If X (circled or not) appears on the Inspection Graph, it is advisable that a qualified building expert inspect the property to determine what effect, if any, the infestation/damage has upon the structural integrity of the property.

5. **LIMITED PLAN SERVICES.** Purchaser and Terminix agree that the Services shall co nsist exclusively of the following (hereinafter collectively the "Services"): Purchaser authorizes Terminix on Purchaser's behalf to (a) Arrange for the Services to be performed by a third party (the "Provider"), as applicable; (b) When necessary, issue a work order to the Provider to perform Services at Purchaser's Structures to control for and/or mitigate against infestation of Drywood termites; (c) Pay the Provider upon completion of the Services and after acknowledgment by the Purchaser that the Services have been satisfactorily completed.

6. **LICENSES, PERMITS, SAFETY RULES AND OTHER LAWS.** Each Provider shall be pr operly licensed, permitted and credentialed, as required by applicable laws and regulations. The Provider shall be solely responsible to Purchaser for obtaining any and all licenses which are legally required to perform the Services. The Provider shall also be solely responsible to Purchaser for the Services being performed in compliance with all applicable safety rules, pest control regulations and other laws and regulations.

7. **LIMITED PLAN SERVICES; NO COVERAGE FOR DAMAGES.** The sole obligation of T erminix is as follows: (a) Perform the Services at the Structures identified on page 1 of this Agreement and (b) During the ninety (90) day period immediately following the Effective Date, if requested by Purchaser, conduct a full inspection of the Structures for Drywood termite activity and, if activity is found, retreat the area(s) of activity with liquid spot treatments, if necessary, to control for infestations of Drywood termites, as determined by Terminix in its sole discretion. Subsequent to the ninety (90) day period, Terminix has no obligation to re-inspect the Structures. This Agreement expires ninety (90) days following the Effective Date and may not be renewed or extended by Purchaser. THIS AGREEMENT DOES NOT COVER AND TERMINIX SHALL HAVE NO OBLIGATION WHATSOEVER, WHETHER EXPRESS OR IMPLIED, TO REPAIR ANY DAMAGE CAUSED BY DRYWOOD TERMITES, REGARDLESS OF WHETHER SUCH DAMAGE OCCURS PRIOR TO OR SUBSEQUENT TO THE DATE OF ANY TREATMENT. All corrections of infestations covered by this Agreement shall be completed within 6 months of discovery, unless otherwise agreed to in writing by the parties.

8. **NOTICE OF CLAIMS; TIMING.** Any claim made by Purchaser for Terminix to repair a ny Covered Damage must be made in writing to Terminix during the Initial Term, any Renewal Term or within the one (1) year following the expiration or termination of this Agreement ("Claim Period"). Purchaser's failure to provide such written notice of a claim within the Claim Period shall constitute an intentional waiver of any such claim.

9. **PURCHASER RESPONSIBILITIES.** Purchaser agrees to pay Terminix according to th ese Terms and Conditions. Purchaser agrees to provide Provider with access to work areas of the Structures during working hours. The failure to allow Terminix and/ or Provider such access will allow Terminix to terminate this Agreement without further notice. Purchaser agrees that if Purchaser or anyone Purchaser controls interferes with or delays performance of the Services, Purchaser may be subject to additional fees.

10. **LIMITATION OF LIABILITY; LIMITED WARRANTY.** EXCEPT AS OTHERWISE PROHIBITED BY LAW, TERMINIX DISCLAIMS AND SHALL NOT BE RESPONSIBLE FOR ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE AND/OR LOSS OF ENJOYMENT DAMAGES. THIS AGREEMENT DOES NOT PROVIDE FOR THE REPAIR OF ANY DAMAGE CAUSED BY DRYWOOD TERMITES, OTHER THAN AS SPECIFICALLY STATED HEREIN. THIS AGREEMENT DOES NOT GUARANTEE, AND TERMINIX DOES NOT REPRESENT, THAT TERMITES WILL NOT RETURN FOLLOWING THE SERVICES DELIVERED BY PROVIDER. TERMINIX DOES WARRANT THAT THE SERVICES DELIVERED BY PROVIDER WILL BE PERFORMED BY PROVIDER IN A GOOD AND WORKMANLIKE MANNER. TERMINIX'S WARRANTY THAT THE SERVICES WILL BE PERFORMED BY THE PROVIDER IN A GOOD AND WORKMANLIKE MANNER DOES NOT COVER, AND TERMINIX WILL NOT BE RESPONSIBLE FOR, ANY DEFECT IN SUCH SERVICES DUE TO ANY DEFECT, WEAKNESS OR DANGEROUS CONDITION IN THE STRUCTURES, OR OTHER PRE-EXISTING PHYSICAL OR ENVIRONMENTAL HAZARD. TERMINIX'S WARRANTY FOR PROVIDER'S SERVICES SHALL BE IN LIEU OF ANY OTHER WARRANTY, EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION WARRANTY OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE.

New 2/2019 © 2019 The Terminix International Company Limited Partnership. All rights reserved.

TERMINIX'S PROCUREMENT OF THE SERVICES ARE PROVIDED "AS IS." EXCEPT TO THE EXTENT PROHIBITED BY LAW, OR TO THE EXTENT ANY STATUTORY RIGHTS APPLY THAT CANNOT BE EXCLUDED, LIMITED OR WAIVED, TERMINIX AND ITS AFFILIATES (A) MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE SERVICE DELIVERED BY PROVIDER OR ANY OTHER THIRD PARTY AND (B) DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED OR EXPRESSED WARRANTIES (I) OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OR QUIET ENJOYMENT, (II) ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE, (III) THAT THE SERVICES WILL BE ERROR FREE OR FREE OF HARMFUL COMPONENTS.

11. **FORCE MAJEURE.** Terminix shall not be liable to Purchaser for any failure to perform or delay in the performance under this Agreement attributable in whole or in part to any cause beyond its reasonable control and without its fault or negligence including, but not limited to, acts of God, fires, floods, earthquakes, strikes, unavailability of necessary utilities, blackouts, government actions, war, civil disturbance, insurrection or sabotage. Additionally, Terminix shall not be liable to Purchaser and this Agreement shall be automatically terminated in the event the Structure(s) are destroyed or substantially damaged due to an event beyond Terminix's reasonable control including, but not limited to, acts of God, fires, storms, hurricanes, floods or earthquakes.

12. **ADDITIONAL DISCLAIMERS.** This Agreement does not cover, and Terminix will not be responsible for, damage resulting from or services required for: (a) termites and/ or any other wood-destroying organisms, except as specifically provided herein this Agreement; (b) moisture conditions including, but not limited to, fungus damage and/ or water leakage caused by faulty plumbing, roofs, gutters, downspouts and/or poor drainage; (c) masonry failure or grade alterations; (d) inherent structural problems including, but not limited to, wood-to-ground contacts; (e) termites entering any rigid foam, wooden or cellulose-containing components in contact with the earth and the Structures, regardless of whether the component is a part of the Structures; and (f) the failure of Purchaser to properly cure at Purchaser's expense any condition that prevents proper treatment or inspection or is conducive to termite infestation.

13. **CHANGE IN LAW.** In the event of a change in existing law as it pertains to the Service s herein, Terminix reserves the right to terminate this Agreement.

14. **NON-PAYMENT; DEFAULT.** In case of non-payment or default by the Purchaser, Termi nix has the right to terminate this Agreement without notice. In addition, cost of collection, including reasonable attorney's fees, shall be paid by the Purchaser, whether suit is filed or not. In addition, interest at the highest legal rate will be assessed for the period of delinquency.

15. **SEVERABILITY.** If any part of this Agreement is held to be invalid or unenforceable fo r any reason, the remaining terms and conditions of this Agreement shall remain in full force and effect.

16. **MANDATORY ARBITRATION.** Any claim, dispute or controversy, regarding any contra ct, tort, statute or otherwise ("Claim"), arising out of or relating to this Agreement or the relationships among the parties hereto, shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("A AA"), under the AAA Commercial or Consumer, as applicable, Rules in effect at the time the Claim is filed ("AAA Rules"). Copies of the AAA Rules and forms can be located at www.adr.org or by calling 1.800.778.7879. The arbitrator's decision shall be final, binding and non-appealable. Judgment upon the award may be entered and enforced in any court having jurisdiction. This clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act. Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award; any such suit may be brought only in Federal District Court for the District or, if any such court lacks jurisdiction, in any state court that has jurisdiction. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement, including any claim that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver." Venue for arbitration hereunder shall be within the state where the customer's property, that is the subject of the services provided, is located.

17. **CLASS ACTION WAIVER.** Any Claim must be brought in the parties' individual capacit y, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE THEIR CASE AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, THE PARTIES UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY, THROUGH ARBITRATION.

18. **GOVERNING LAW.** Except for the Mandatory Arbitration Clause in Section 16 of this Agreement which is governed by and construed in accordance with the Federal Arbitration Act and Federal law, this Agreement shall be governed by, and construed in accordance with, the laws of the state in which the dispute arises without regard to the conflict of laws provisions.

New 2/2019 © 2019 The Terminix International Company Limited Partnership. All rights reserved.

19. **ENTIRE AGREEMENT.** This Agreement, together with all exhibits thereto, constitut es the entire agreement between the parties, supersedes all proposals, oral or written, and all other communications between the parties relating to such subject matter, and no other representations or statements will be binding upon the parties.

**TERMINIX** Contract #: 79982-042220222002-5641

## ONE-TIME HEAT TREATMENT FOR DRYWOOD TERMITES

**THIS AGREEMENT PROVIDES FOR A ONE-TIME HEAT TREATMENT OF A STRUCTURE TO CONTROL FOR INFESTATIONS OF DRYWOOD TERMITES (KALOTERMES SPP., INCISITERMES SPP., CRYPTOTERMES SPP.) BUT DOES NOT PROVIDE FOR THE REPAIR OF DAMAGE CAUSED BY SUCH DRYWOOD TERMITES.**

Purchaser JOSEPHINE BORCHARDT Home Phone 4803219994 Work Phone

Purchaser Mailing Address , ,

Property Address 1628 N BEVERLY GLEN BLVD, LOS ANGELES,CA 90077-2708

Description of Structure(s) Covered House Email jborchardt@email.arizona.edu

| SERVICE / PAYMENT TERMS | |
|---|---|
| HEAT TREATMENT CHARGES* | $ 4650.00 |
| *Excludes tax (if applicable) | |

**NOTICE: YOU, THE PURCHASER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FOR AN EXPLANATION OF THIS RIGHT.**

**Purchaser acknowledges, accepts and agrees that:**

- Terminix has provided the Purchaser with a copy of the manufacturer's specimen label or other state-required disclosures for the fumigant(s ), which will be used to treat the above-named property.
- Terminix has provided the Purchaser with an *Inspection Graph* as described in Section 4 of the Terms and Conditions on page 2 of this Agreement, which is a part of this Agreement and is incorporated by reference herein.
- Terminix has provided to Purchaser for review and execution the *Wood Destroying Pests and Organisms Inspection Report* as required by Cal. Bus. & Prof. Code §8516, which is a part of this Agreement and is incorporated by reference herein.
- Terminix has provided the Purchaser with *Notice to Owner/Tenant* as required by Cal. Bus. & Prof. Code §8538.

**Purchaser accepts and agrees to the Terms and Conditions of this Agreement, including the MANDATORY ARBITRATION and CLASS ACTION WAIVER provisions in Sections 18 and 19 of the Terms and Conditions of this Agreement:**

Purchaser Name: JOSEPHINE BORCHARDT Purchaser (Signature): ____________ Date: ________

Representative Name: RICKS, SOLOMAN Representative (Signature): ____________ Date: ________

Terminix Branch Phone: 5626412220 Terminix Branch Charter No.: ____________

Terminix Branch Address: 13722 HARVARD PL, GARDENA, CA 90249-2527

In the event you have any questions or complaints, you may contact a Terminix representative by calling 1.800.TELLTMX (1.800.835.5869).

www.terminix.com Key F40014CA CA One Time Heat Treatment Service (v 4.5.2016) New 4/2016 © 2016 The Terminix International Company Limited Partnership. All rights reserved

# TERMS AND CONDITIONS

1. **INITIAL INSPECTION.** Terminix shall conduct a full inspection of the Structures for wood-destroying pests and organisms and provide a written report to Purchaser within ten (10) business days of the date of the inspection and prior to commencing the provision of any services under this Agreement in accordance with Cal. Bus. & Prof. Code §8516.

2. **NOTICE OF WORK COMPLETED AND NOT COMPLETED.** Within ten (10) business days of the date of the completion of the initial heat treatment service, Terminix will file with the California Structural Pest Control Board and furnish to Purchaser a copy of the written Notice of Work Completed and Not Completed in accordance with Cal. Bus. & Prof. Code §8518 and Title 16, Article 4, §1996.2 of the California Code of Regulations respectively.

3. **FEES.** Purchaser shall pay the fees for the initial treatment with the Heat Treatment System based upon the Payment Option selected by Purchaser.

4. **INSPECTION GRAPH.** This Inspection Graph, prepared by Terminix and provided to Purchaser, is a record of a visual, non-destructive inspection by Terminix of certain readily accessible areas of the identified property for visible termite infestation/ damage. Terminix is not responsible for repairs to damages identified on the Inspection Graph. In addition, hidden damage may exist in concealed, obstructed or inaccessible areas. No attempt to remove siding, plastic or sheetrock insulation, carpeting, paneling, etc., to search for hidden damage was made. Terminix cannot guarantee that the damage disclosed by visual inspection of the premises depicted in the Inspection Graph represents the entirety of the damage which may exist as of the date of the initial control application. Terminix shall not be responsible for repair of any existing damage including, without limitation, any damage which existed in areas or in structural members which were not accessible for visual inspection as of the date of the Inspection Graph. If X (circled or not) appears on the Inspection Graph, it is advisable that a qualified building expert inspect the property to determine what effect, if any, the infestation/damage has upon the structural integrity of the property.

5. **LIMITED PLAN SERVICES; NO COVERAGE FOR DAMAGES.** THIS AGREEMENT DOES NOT COVER AND TERMINIX SHALL HAVE NO OBLIGATION WHATSOEVER, WHETHER EXPRESS OR IMPLIED, TO REPAIR ANY DAMAGE CAUSED BY DRYWOOD TERMITES, REGARDLESS OF WHETHER SUCH DAMAGE OCCURS PRIOR TO OR SUBSEQUENT TO THE DATE OF INITIAL TREATMENT WITH THE HEAT TREATMENT SYSTEM. The sole obligation of Terminix under this Agreement (hereinafter the "Services") is as follows: (a) Treat the Structures as described on the Inspection Graph attached to this Agreement with the Terminix Heat Treatment System (the "Heat Treatment System"); and (b) During the ninety (90) day period immediately following the date of initial treatment, if requested by Purchaser, conduct a full inspection of the Structures for termite activity and retreat with the Heat Treatment System, if necessary, to control for infestations of Drywood Termites, as determined by Terminix in its sole discretion. Subsequent to the ninety (90) day period, Terminix has no obligation to re-inspect the Structures. This Agreement expires ninety (90) days following the date of initial treatment and may not be renewed or extended by Purchaser. All corrections of infestations or infections covered by this control services agreement shall be completed within 6 months of discovery, unless otherwise agreed to in writing by the parties.

6. **PROTECTION AGAINST DRYWOOD TERMITES.** PURCHASER ACKNOWLEDGES THAT THE FOLLOWING WOOD-DESTROYING ORGANISMS COULD INFEST OR INFECT PURCHASER'S STRUCTURES: (A) SUBTERRANEAN (IN-GROUND) TERMITES (*RETICULITERMES SSP., HETEROTERMES SPP.*) AND FORMOSAN TERMITES (*COPTOTERMES SPP.*); (B) DRYWOOD TERMITES (*KALOTERMES SPP., INCISITERMES SPP., CRYPTOTERMES SPP.*); (C) DAMPWOOD TERMITES (*ZOOTERMOPSIS SPP., NEOTERMES SPP.*); (D) CARPENTER ANTS AND CARPENTER BEES; (E) WOOD-BORING AND/OR POWDER-POST BEETLES; AND (F) WOOD- DECAY FUNGI. THE TERMINIX HEAT TREATMENT SYSTEM ONLY CONTROLS FOR AND PROTECTS THE STRUCTURES FROM DRYWOOD TERMITES (*KALOTERMES SPP., INCISITERMES SPP., CRYPTOTERMES SPP.*) (COLLECTIVELY "DRYWOOD TERMITES") INFESTATIONS. THE HEAT TREATMENT SYSTEM DOES NOT CONTROL OR PROTECT THE STRUCTURES FROM SUBTERRANEAN (IN-GROUND) TERMITES (*RETICULITERMES SSP., HETEROTERMES SPP.*) AND FORMOSAN TERMITES (*COPTOTERMES SPP.*) INFESTATIONS OR OTHER WOOD-DESTROYING ORGANISMS INCLUDING, BUT NOT LIMITED TO, DAMPWOOD TERMITES, CARPENTER ANTS, POWDER-POST BEETLES OR WOOD-DECAY FUNGI.

7. **ACCESS TO PROPERTY.** Purchaser must allow Terminix access to the Structures for any purpose contemplated by this Agreement including, but not limited to, reinspections, whether the inspections were requested by the Purchaser or considered necessary by Terminix. The failure to allow Terminix such access will terminate this Agreement without further notice.

8. **PURCHASER COOPERATION.** Purchaser's cooperation is important to ensure the most effective results from Services. Whenever conditions conducive to the breeding and harborage of pests covered by this contract are reported in writing by Terminix to the Purchaser and are not corrected by Purchaser, Terminix cannot ensure effective Services. If Purchaser fails to correct the conditions noted by Terminix within a reasonable time period, all guarantees as to the effectiveness of the Services in this Agreement shall automatically terminate. Further, additional treatments in areas of such conditions that are not corrected as required shall be paid for by Purchaser as an extra charge.

9. **30-DAY MONEY-BACK GUARANTEE.** IF WITHIN THE THIRTY (30) DAY PERIOD IMMEDIATELY FOLLOWING ANY INSPECTION OR SERVICE TREATMENT PROVIDED BY TERMINIX UNDER THIS AGREEMENT PURCHASER IS NOT SATISFIED WITH THE SERVICES RENDERED, AS PURCHASER'S SOLE AND EXCLUSIVE REMEDY AND UPON PURCHASER'S WRITTEN REQUEST, TERMINIX SHALL REFUND TO PURCHASER ANY FEES PAID BY PURCHASER FOR SUCH INSPECTION OR SERVICE TREATMENT, AND THIS AGREEMENT SHALL BE TERMINATED WITHOUT ANY FURTHER LIABILITY ON THE PART OF TERMINIX.

10. **LIMITATION OF LIABILITY; LIMITED WARRANTY.** EXCEPT AS OTHERWISE PROHIBITED BY LAW, TERMINIX DISCLAIMS AND SHALL NOT BE RESPONSIBLE FOR ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE AND/OR LOSS OF ENJOYMENT DAMAGES. THE OBLIGATIONS OF TERMINIX SPECIFICALLY STATED IN THIS AGREEMENT ARE GIVEN IN LIEU OF ANY OTHER OBLIGATION OR RESPONSIBILITY, EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THIS AGREEMENT DOES NOT PROVIDE FOR THE REPAIR OF ANY DAMAGE CAUSED BY SUBTERRANEAN TERMITES. THIS AGREEMENT DOES NOT GUARANTEE, AND TERMINIX DOES NOT REPRESENT, THAT TERMITES WILL NOT RETURN FOLLOWING ANY TREATMENTS.

11. **WATER LEAKAGE.** Water leakage in treated areas, in interior areas or through the roof or exterior walls of the Structures, may destroy the effectiveness of treatment by Terminix and is conducive to new infestation. Purchaser is responsible for making timely repairs as necessary to stop the leakage. Purchaser's failure to make timely repairs will terminate this Agreement automatically without further notice. Terminix shall have no responsibility for repairs with respect to water leakage.

12. **IMPLEMENTATION OF HEAT TREATMENT SYSTEM.** Purchaser understands and agrees that the installation of the Heat Treatment System shall be determined by Terminix in its sole discretion, based upon its review and analysis of the Structures and surrounding areas. Purchaser hereby releases Terminix from any and all claims of damage to the Structure and surrounding areas as a result of the installation of the Heat Treatment System. If Purchaser fails and refuses to allow Terminix to properly install the Heat Treatment System as determined by Terminix in its sole discretion, this Agreement shall automatically terminate.

13. **ADDITIONS OR ALTERATIONS TO STRUCTURES.** This Agreement covers the Structures described on the Inspection Graph as of the date of the initial treatment of the Heat Treatment System. If the Structures is modified, altered or otherwise changed, (collectively "Alterations"), Purchaser must provide Terminix with written notice of such Alterations within ten (10) days of the occurrence of such Alteration. Purchaser's failure to provide such notice will terminate this Agreement automatically without further notice. The failure of Terminix to discover such Alterations does not release Purchaser from the obligations to provide written notice to Terminix of the same. Purchaser shall pay Terminix's then-current charges for a service call to evaluate the Alterations and provide additional Heat Treatment System treatment as a result of the Alterations.

14. **FORCE MAJEURE.** Terminix shall not be liable to Purchaser for any failure to perform or delay in the performance under this Agreement, attributable in whole or in part to any cause beyond its reasonable control and without its fault or negligence including, but not limited to, acts of God, fires, floods, earthquakes, strikes, unavailability of necessary utilities, blackouts, government actions, war, civil disturbance, insurrection, or sabotage.

    (b) **ADDITIONAL DISCLAIMERS.** This Agreement does not cover and Terminix will not be responsible for damage resulting from or services required for: (a) termites and/ or any other wood-destroying organisms, except as specifically provided herein; moisture conditions including, but not limited to, fungus damage and/or water leakage caused by faulty plumbing, roofs, gutters, downspouts and/or poor drainage; masonry failure or grade alterations; (d) inherent structural problems including, but not limited to, wood-to-ground contacts; (e) termites entering any rigid foam, wooden or cellulose-containing components in contact with the earth and the Structures, regardless of whether the component is a part of the Structures; and (f) the failure of Purchaser to properly cure at Purchaser's expense any condition that prevents proper treatment or inspection or is conducive to termite infestation.

15. **CHANGE IN LAW.** Terminix performs its services in accordance with the requirements of law. In the event of a change in existing law as it pertains to the services herein, Terminix reserves the right to terminate this Agreement.

16. **NON-PAYMENT; DEFAULT.** In case of non-payment or default by the Purchaser, Terminix has the right to terminate this Agreement. In addition, cost of collection, including reasonable attorney's fees, shall be paid by the Purchaser, whether suit is filed or not. In addition, interest at the highest legal rate will be assessed for the period of delinquency.

17. **SEVERABILITY.** If any part of this Agreement is held to be invalid or unenforceable for any reason, the remaining terms and conditions of this Agreement shall remain in full force and effect.

18. **MANDATORY ARBITRATION.** Any claim, dispute or controversy, regarding any contract, tort, statute or otherwise ("Claim"), arising out of or relating to this agreement or the relationships among the parties hereto, shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Commercial or Consumer, as applicable, Rules in effect at the time the Claim is filed ("AAA Rules"). Copies of the AAA Rules and forms can be located at www. adr.org, or by calling 1.800.778.7879. The arbitrator's decision shall be final, binding and non-appealable. Judgment upon the award may be entered and enforced in any court having jurisdiction. This clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act. Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award; any such suit may be brought only in Federal District Court for the District or, if any such court lacks jurisdiction, in any state court that has jurisdiction. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement including any claim that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver." Venue for arbitration hereunder shall lie in Memphis, TN.

19. **CLASS ACTION WAIVER.** Any Claim must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE THEIR CASE AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, THE PARTIES UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY, THROUGH ARBITRATION.

20. **GOVERNING LAW.** Except for the Mandatory Arbitration Clause in Section 18 of this Agreement which is governed by and construed in accordance with the Federal Arbitration Act, this Agreement shall be governed by, and construed in accordance with, the laws of the state in which the dispute arises without regard to the conflict of laws provisions.

21. **ENTIRE AGREEMENT.** This Agreement, together with all exhibits thereto, constitutes the entire agreement between the parties, supersedes all proposals, oral or written, and all other communications between the parties relating to such subject matter, and no other representations or statements will be binding upon the parties. This Agreement may not be modified or amended in any way without the written consent of both parties.

 © 2016 The Terminix International Company Limited Partnership. All rights reserved.



## Summary of Charges

| | Product | Renewals | Amount | Tax | Discount | Total Amount |
|---|---|---|---|---|---|---|
| Initial Term | Drywood Defend Plan | | $799.00 | $0.00 | $0.00 | $799.00 |
| Initial Term | Residential Exclusion | | $1300.00 | $0.00 | $0.00 | $1300.00 |
| Initial Term | Residential Inside/Outside Pest Control | | $189.00 | $0.00 | $0.00 | $189.00 |
| Special Charges | Heat Treatment | | $4650.00 | $0.00 | $0.00 | $4650.00 |
| Special Charges | Tent Defend System | | $3100.00 | $0.00 | $0.00 | $3100.00 |
| | | | | | **Grand Total:** | $10038 |

| Product | Merchandise | Quantity |
|---|---|---|

## Purchaser Payments

By signing below, I, the cardholder, have authorized Terminix to process this one-time payment without further signature or authorization from me.

$

## Authorization

**Purchaser Name:** JOSEPHINE BORCHARDT **Purchaser (Signature):** ______________________ Date: ____________

**AUTOPAY:** Purchaser authorizes Terminix and affiliates including SMAC to automatically debit Purchaser's checking account or credit card, as indicated below, in an amount equal to any recurring service charges due to Terminix under this Agreement within five (5) days of the date such charge becomes due. This authorization will remain in effect until the fifth business day following Terminix's receipt from Purchaser of a written notice to cancel such authorization. Purchaser understands that cancellation of this authorization does not cancel Purchaser's obligations under this Agreement.

## Terminix Authorization

**Purchaser Name:** JOSEPHINE BORCHARDT **Purchaser (Signature):** ______________________ Date: ____________

## SMAC Authorization

TERMINIX®

| Purchaser Name: | JOSEPHINE BORCHARDT | Purchaser (Signature): | ______________ | Date: | ______________ |
|---|---|---|---|---|---|

Providing Exterminating Solutions Today, Inc. (P.E.S.T.)

**CALIFORNIA CUSTOMER AGREEMENT FOR**
**STRUCTURAL FUMIGATION**
**-RESIDENTIAL-**

**THIS AGREEMENT IS FOR P.E.S.T. OR A CONTRACTOR SELECTED BY P.E.S.T. TO PROVIDE FUMIGATION TREATMENT OF A STRUCTURE CURRENTLY UNDER CONTRACT WITH THE TERMINIX INTERNATIONAL COMPANY, L.P. (TERMINIX) TO CONTROL DRYWOOD TERMITES (KALOTERMES SPP., INCISITERMES SPP., CRYPTOTERMES SPP.) OR OTHER TARGET PESTS AS PER THE APPLICABLE PRODUCT LABEL. THE SERVICES BEING PERFORMED BY P.E.S.T. ARE BEING PROVIDED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF YOUR CONTRACT WITH TERMINIX.**

Purchaser JOSEPHINE BORCHARDT Home Phone 4803219994 Work Phone ____________

Purchaser Mailing Address . .

Property Address 1628 N BEVERLY GLEN BLVD. LOS ANGELES,CA 90077-2708

Description of Structure(s) Covered ____________ Email jborchardt@email.arizona.edu

THE FUMIGATION SERVICES IDENTIFIED HEREIN MAY BE PERFORMED BY P.E.S.T., OR MAY BE PERFORMED BY ANOTHER CONTRACTOR SELECTED BY P.E.S.T.

P.E.S.T. IS NOT RESPONSIBLE FOR WOOD DESTROYING ORGANISM DAMAGE OR DAMAGE RESULTING FROM FUMIGATION TREATMENT. CUSTOMER UNDERSTANDS THAT FUMIGATION OF THE STRUCTURE DOES NOT GUARANTEE THAT ALL TARGET PESTS WILL BE EXTERMINATED OR THAT ALL TARGET PESTS WILL NOT RETURN. CUSTOMER ACKNOWLEDGES THAT WOOD DESTROYING ORGANISM INFESTATION AND DAMAGE MAY BE PRESENT OR MAY OCCUR IN THE FUTURE AND IN EXCHANGE FOR THE SERVICES PROVIDED BY PEST WAIVES ANY CLAIM OR LIABILITY AS TO PEST FOR THE SAME. CUSTOMER ACKNOWLEDGES THAT THE PROCESS OF FUMIGATION MAY RESULT IN DAMAGE TO THE STRUCTURE AND/OR ITS CONTENTS, INCLUDING LANDSCAPING NEAR THE STRUCTURE AND HEREBY ASSUMES ALL RISK THEREOF AND WAIVES ANY CLAIM FOR THE SAME AS TO PEST. CUSTOMER ACKNOWLEDGES THAT IT IS POSSIBLE THAT ILLEGAL ENTRY BY THIRD PARTIES MAY OCCUR DURING THE PROCESS OF FUMIGATION AND THAT CUSTOMER ASSUMES THE RISK THEREOF AND ASSUMES RESPONSIBILITY FOR THE REMOVAL OR SAFEGUARDING OF THE STRUCTURE AND VALUABLES THEREIN. CUSTOMER ACKNOWLEDGES THAT PEST DOES NOT PROVIDE SECURITY AGAINST ILLEGAL ENTRY BY THIRD PARTIES AND WAIVES ANY CLAIM AGAINST PEST AS A RESULT THEREOF.

CONSIDERATION FOR SERVICES PERFORMED BY P.ES.T. AS DEFINED BY THIS AGREEMENT HAS BEEN SATISFIED BY TERMINIX AND CUSTOMER'S ACCEPTANCE OF SERVICES FROM P.E.S.T. THERE IS NO SEPARATE AMOUNT OWED BY CUSTOMER TO P.E.S.T. FOR THE SERVICES DEFINED BY THIS AGREEMENT. P.E.S.T. IS NOT RESPONSIBLE FOR COLLECTION OF ANY AMOUNT OWED TO TERMINIX BY CUSTOMER.

CUSTOMER WILL COOPERATE WITH P.E.S.T. WITH RESPECT TO THE EXECUTION OF ANY ADDITIONAL NOTICES AND ALL PREPARATION AND SAFETY DIRECTIVES REASONABLY NECESSARY FOR P.E.S.T. TO SAFELY PERFORM THE SERVICES OUTLINED IN THIS AGREEMENT IN ACCORDANCE WITH ALL APPLICABLE LAWS AND REGULATIONS.

A TREATMENT TAG WILL BE PLACED IN THE ATTIC, SUB-AREA, OR A CONSPICUOUS PLACE IF THE PROPERTY DOES NOT HAVE EITHER UPON JOB COMPLETION.

**CUSTOMER ACCEPTS AND AGREES TO THE TERMS, CONDITIONS, RESTRICTIONS, LIMITATIONS AND EXCLUSIONS ON PAGES 1-2 OF THIS AGREEMENT, INCLUDING THE MANDATORY ARBITRATION AND CLASS ACTION WAIVER PROVISIONS OF THE TERMS AND CONDITIONS ON PAGE 2 OF THIS AGREEMENT. Any claim, dispute or controversy, regarding any contract, tort, statute or otherwise ("Claim"), arising out of or relating to this agreement or the relationships among the parties hereto, shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Commercial or Consumer Rules, as applicable.**

Customer or Representative (signature) ____________________ Date ____________

Customer or Representative (Name and/or title) JOSEPHINE BORCHARDT

Authorized Agent (signature)

Authorized Agent (Name and Title) RICKS, SOLOMAN Terminix Sales Professional

Company License No. 8150

In the event you have any questions or complaints, you may contact a Terminix representative by calling 1-800-TELLTMX (1-800-835-5869).

**TERMS AND CONDITIONS**

1. **LIMITED SERVICES; NO COVERAGE FOR DAMA GES.** The sole obligation of PEST under this agreement is to provide the following Services: Treat the Structures as described on the Inspection Graph that has been prepared by Terminix and attached to your Terminix contract, and to re-fumigate the Structures for one year thereafter, at Terminix's sole discretion. THIS AGREEMENT DOES NOT COVER AND PEST SHALL HAVE NO OBLIGATION WHATSOEVER, WHETHER EXPRESS OR IMPLIED, FOR ANY OTHER OBLIGATION.

2. **ACCESS TO PROPERTY.** Customer must allow PEST access to the Structures for any purpose contemplated by this Agreement including, but not limited to, re-inspections, whether the inspections were requested by the customer or considered necessary by Terminix or the PEST Failure to allow PEST such access will terminate this Agreement without further notice.

3. **LIMITATION OF LIABILITY.** EXCEPT AS OTHERWISE PROHIBITED BY LAW, SUBCONMTRACTOR DISCLAIMS AND SHALL NOT BE RESPONSIBLE FOR ANY LIABILITY FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE AND/OR LOSS OF ENJOYMENT DAMAGES. THE OBLIGATIONS OF PEST SPECIFICALLY STATED IN THIS AGREEMENT ARE GIVEN IN LIEU OF ANY OTHER OBLIGATION OR RESPONSIBILITY, EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THIS AGREEMENT DOES NOT PROVIDE FOR THE REPAIR OF ANY DAMAGE CAUSED BY DRYWOOD TERMITES. THIS AGREEMENT DOES NOT GUARANTEE, AND PEST DOES NOT REPRESENT, THAT TERMITES WILL NOT RETURN FOLLOWING ANY TREATMENTS.

4. **FORCE MAJEURE.** PEST shall not be liable to custo mer for any failure to perform or delay in the performance under this Agreement attributable in whole or in part to any cause beyond its reasonable control and without its fault or negligence including, but not limited to, acts of God, fires, floods, earthquakes, strikes, unavailability of necessary materials or utilities, blackouts, government actions, war, civil disturbance, insurrection or sabotage.

5. **CHANGE IN LAW.** PEST performs its services in acc ordance with the requirements of law. In the event of a change in existing law as it pertains to the services herein, PEST reserves the right to revise or terminate this Agreement.

6. **SEVERABILITY.** If any part of this Agreement is hel d to be invalid or unenforceable for any reason, the remaining terms and conditions of this Agreement shall remain in full force and effect.

7. **MANDATORY ARBITRATION.** Any claim, dispute or controversy, regarding any contract, tort, statute or otherwise ("Claim"), arising out of or relating to this agreement or the relationships among the parties hereto, shall be resolved by one arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Commercial or Consumer, as applicable, Rules in effect at the time the Claim is filed ("AAA Rules"). Copies of the AAA Rules and forms can be located at www.adr.org, or by calling 1.800.778.7879. The arbitrator's decision shall be final, binding and non-appealable. Judgment upon the award may be entered and enforced in any court having jurisdiction. This clause is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act. Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award, any such suit may be brought only in Federal District Court for the District or, if any such court lacks jurisdiction, in any state court that has jurisdiction. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement, including any claim that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver." Venue for arbitration hereunder shall lie in or near the location of the Structure identified in this Agreement.

8. **CLASS ACTION WAIVER.** Any Claim must be br ought in the parties' individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). The parties expressly waive any ability to maintain any Class Action in any forum. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE THEIR CASE AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, THE PARTIES UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY, THROUGH ARBITRATION.

9. **GOVERNING LAW.** Except for the Mandatory Arb itration Clause of this Agreement which is governed by and construed in accordance with the Federal Arbitration Act, this Agreement shall be governed by, and construed in accordance with, the laws of the state in which the dispute arises without regard to the conflict of laws provisions.

10. **ENTIRE AGREEMENT.** This Agreement, together with all exhibits thereto, constitutes the entire agreement between the parties, supersedes all proposals, oral or written, and all other communications between the parties relating to such subject matter, and no other representations or statements will be binding upon the parties. This Agreement may not be modified or amended in any way without the written consent of both parties.



GARDENA
13722 HARVARD PL
GARDENA,CA 90249-2527
5626412220

Contract #: 79982-042220222002-5641
Inspection Date: 04/22/2020
Inspector: RICKS, SOLOMAN

# BEING A TERMINIX CUSTOMER HAS ITS BENEFITS.

## MANAGE YOUR ACCOUNT 24/7.

Manage your Terminix account around the clock on your computer, tablet or smartphone. Just sign up and **Terminix.com/my-account.**

- **MOBILE-FRIENDLY ACCESS:** Access your account from anywhere
- **MANAGE UPCOMING APPOINTMENTS:** View and schedule service visits
- **UPDATE YOUR PROFILE:** Update your payment and contact info
- **SIMPLE PROTECTION PLAN RENEWALS:** Maintain your plan without the hassle

## MAKE PAYMENTS WORRY-FREE.

Save time and money with **AutoPay.** Payments are automatically charged to your preferred payment method when they're due so there's no need to worry about another bill.

## HAPPY WITH YOUR SERVICE? PASS THE WORD ALONG.

Want to earn a credit on your next service? Recommend Terminix to your friends and family. Ask your technician for more details.

## FIND OUT WHAT PEOPLE ARE SAYING.

Find reviews and ratings by other customers. **consumeraffairs.com/homeowners/terminix**





Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com

Client Name: Josephine Borchardt
Inspector: Los Angeles - Sean Dare
Location Address: 1628 N Beverly Glen Blvd Los Angeles California 90077
Inspection Date: 04/24/2020
Time of Inspection: 9:00 AM

Outside Temperature: 77
Outside Humidity: 32
Outside Conditions: clear

Indoor Temperature: 75.7
Indoor Humidity: 53.5

***Basic Mold Inspection Details:***
A basic mold inspection by an MI&T inspector includes a full visual assessment of a property's readily accessible areas with use of specific tools of our trade in order to identify any possible "red flags" that could be causing a mold growth problem. It also includes the collection of 2 air samples. The first must be taken from outside and serves as a "control," every home or business has "normal" levels of mold and this will determine what is acceptable for a property in your area. It also shows that all the equipment/supplies used were working properly and makes our results legally binding. The other air sample is taken from the area inside the home or business that the inspector and client agree is the area of greatest concern. These 2 air samples will determine whether or not elevated conditions exist at the property in question.

***Advanced Mold Testing:***
For those that wish to confirm the source of a mold problem and receive specific instructions for remediation, additional mold testing is necessary. We offer surface samples via tape lift/swabs and in-wall cavity air samples to accomplish this task. When an inspector finds something specific that they believe is compromising the indoor air quality of a property, he will suggest one of the above samples mentioned. If the problem shown by the general air sample is the same seen at the localized testing location, we can not only confirm that is the source of a problem, but also offer exactly what you need to do in order to fix it. If the problem area is large enough, multiple samples may be suggested to establish precisely what has been contaminated. Additional general air samples are also beneficial to determine how far an air quality problem has spread.





Mold Remediation Overview

Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com

To whom it may concern,

Based on the findings of the visual inspection and lab results of samples collected during the inspection, it is our professional opinion that elevated mold conditions do exist at the property.

Elevated Mold Conditions Exist: YES
Professional Mold Remediation Recommended: YES

CHOOSING A MOLD REMEDIATION COMPANY:

It is important to understand there is a difference between a general remodel and a mold remediation. Later in this document we will lay out recommended remediation steps. This protocol should be carried out by a restoration company/technician with both education and experience dealing with mold. While some general contractors are prepared to complete a mold remediation properly, the majority are not equipped to carry out all the recommend steps unless restoration is a focus of the business. Failure to complete all of the steps may result in lingering indoor air quality problems or even worse, the mold problem returning entirely.

Many of our clients turn to us for a recommendation on what company to use for the mold removal. In an effort to stay separate from the restoration process and help our clients with this process, we have compiled a list of reputable companies in your area. MI&T is not affiliated with these companies. If you have a negative experience with one of them please inform us and we will re-evaluate their placement.

Requirements to be listed: IICRC Certified, Properly Licensed, Insured,
No Unclosed BBB Complaints, Positive Online Reputation.

**Water Mold Fire Restoration**
**(323) 999-2063**
**http://watermoldfire.net/los-angeles-ca/**
**help@watermoldfire.net**

**Drymaster**
**(323) 741-2083**
**http://drymaster.us**
**info@drymaster.us**

Email

**Click Here to Forward Mold Inspection Report and Request Quote**





***# of air samples taken:*** 2
***# of surface samples taken:*** 1

***Recommended Samples NOT Submitted:*** None

***Areas of Concern:*** Downstairs bedroom closet has an elevated mold problem due to the moisture penetration in the closet wall

***General Observations***

| **Observation** | **Yes** | **No** |
|---|---|---|
| Musty Smell or Odor | ✔ | |
| Water Damage | ✔ | |
| Excess Humidity | | ✔ |
| Excess Moisture | | ✔ |
| Visual Growth | ✔ | |
| Roof Leak | | ✔ |
| HVAC Problem | | ✔ |
| Plumbing Issue | ✔ | |
| Health Complications | ✔ | |
| Localized Problem | ✔ | |
| Widespread Problem | | ✔ |
| Control Sample Taken | ✔ | |

***Additional Notes:*** Bedroom closet wall has some water damage and the wall was still wet at the time of the inspection

***Mold Sample Details***

Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com

***Sample ID:*** ***Type of Sample:*** Surface Sample ***Area Tested:*** bedroom closet wall

***Picture of Sample Medium:***

***Picture of Sample Collection:***

| *Sample Details* | *YES* | *NO* |
|---|---|---|
| **Air Sample** | | ✔ |
| **Surface Sample** | ✔ | |
| **Control Sample** | | ✔ |
| **General Air Sample** | | ✔ |
| **In-Wall Cavity Sample** | | ✔ |
| **Swab** | | ✔ |
| **Tape Lift** | | ✔ |



*Mold Sample Details*

Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com

***Sample ID:*** 2533444 ***Type of Sample:*** Air Sample ***Area Tested:*** bedroom

***Picture of Sample Medium:***

***Picture of Sample Collection:***

| *Sample Details* | *YES* | *NO* |
|---|---|---|
| **Air Sample** | ✔ | |
| **Surface Sample** | | ✔ |
| **Control Sample** | | ✔ |
| **General Air Sample** | | ✔ |
| **In-Wall Cavity Sample** | | ✔ |
| **Swab** | | ✔ |
| **Tape Lift** | | ✔ |



***Mold Remediation Recommendations***

Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com

*If your advanced mold testing report came back showing elevated levels of mold, it should have a supplementary test(s) confirming the source of a problem. This report should have detailed findings for each additional sample taken. When a test indicates a problem, we identify which remediation steps must be performed at that area. Below you will find a more detailed explanation of each of those steps. If professional mold remediation is recommended, this work should be carried out by a mold removal professional that is trained and has the equipment necessary to complete each task as instructed. Please do not attempt to handle this work on your own. Doing so puts your health and the health of other occupants of the property at risk.*

***Professional Mold Remediation Recommended:*** YES

***Source of Mold Growth:*** water damage

| *REMEDIATION STEPS* | *YES* | *NO* | *N/A* |
|---|---|---|---|
| **Vacate Premises (Problem Spread Throughout)** | | ✔ | |
| **Area Containment (Problem Localized)** | ✔ | | |
| **Personal Protective Equipment** | ✔ | | |
| **Negative Pressure Used** | ✔ | | |
| **HEPA Vacuum** | ✔ | | |
| **Apply Biocide/Wipe-down** | ✔ | | |
| **Removing Contaminated Material** | ✔ | | |
| **Salvaged/Restored (If applicable to item tested)** | | | ✔ |
| **Final Cleaning** | ✔ | | |
| **Air Scrubber** | ✔ | | |
| **HVAC System Cleaning** | ✔ | | |
| **Post Remediation Inspection** | ✔ | | |
| **Containment During Reconstruction** | | | ✔ |

***Description of Work Area If Necessary:*** Based on mold test results it appears that area in question does in fact have a mold problem that requires contracting a restoration company for professional remediation. The following work should be carried out:

Create containment, use negative pressure, remove all contaminated drywall/insulation 12" past any visible mold. Clean and treat structural components and wipe down all vertical/horizontal surfaces with anti-microbial, HEPA vac and run air scrubbers for 48-72 hours throughout work. MI&T recommends clearance testing before rebuild process begins to ensure work has been completed properly.

It is imperative that any source of water intrusion be addressed to ensure mold growth does not return.





Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com

**#1: Vacating the Premises**

- Vacating people from the adjacent spaces is usually only necessary for a large/widespread problem but is also recommended for individuals with reduced immune systems, elderly, infants, recent surgery patients, people with chronic inflammatory lung disease or individuals with respiratory health concerns.

**#2: Personal Protective Equipment (PPE)**

- Full-face respirators are to be worn.
- Gloves are to be worn to remove all infected building materials.
- Disposable Tyvek coveralls covering both the head and shoes shall be worn.

**#3: Containment of Each of the Contaminated Area**

- Complete isolation of the work area using plastic (6 mil poly) sheeting sealed with tape.
- If a containment area blocks the only entrance, vacating the property is usually recommended during remediation.
- If the problem is widespread and the entire property needs remediation, no containment is necessary.
- This area should be large enough to house any contaminated materials
- Sealing with plastic sheeting (6 mil poly) all ventilation, ducts/grills, fixtures and other openings.

**#4: Negative Pressure Used**

- Use an exhaust fan with a HEPA filter to generate negative pressurization (ventilating to the outdoors). Use the appropriate sized unit for the space. The air exchange rate must be six times per hour.

**#5: HEPA Vacuum**

- Any area that is in the same area of contaminated materials should be HEPA vacuumed, starting at highest point and working down to the floor.
- Any area that is contained should be completely HEPA-Vaced.
- This should be done before AND after removing contaminated materials.
- If the entire property is contaminated, the entire property needs to be HEPA-Vaced.

**#6: Applying Biocide**

- Apply biocide to visible fungal growth prior to removal of material. Wait thirty minutes before removing the material. This provides sufficient time for the biocide to disinfect the material and reduces the dust generated because the material is wetted.
- This should be done before AND after removing contaminated materials

**#7: Removal and Discarding of Contaminated Materials**

- Remove infected drywall, insulation and building material least twelve inches past any visual mold.
- All debris should be double bagged in 3 mil contractor bags twisted, goose necked and sealed with duct tape.
- The sealed bags are to be wiped clean with the appropriate disinfectant in the containment before transport to the disposal area.



- There are no special requirements for the disposal of moldy material. Moldy materials that are bagged can be disposed of with other general waste.
- All contaminated materials should be wrapped in plastic and sealed with tape before being taken out of the containment area through the unaffected areas for disposal.
- Sometimes building material. furniture. flooring, etc can not be evaluated until it has been jarred from its location. For cases like this, the mold remediation company hired should be trusted to give an honest evaluation.

**#8: Restoring a Damaged Item**

- If an item such as kitchen cabinets. clothing, furniture, etc were damaged you should have a yes/no answer to whether or not your item can be restored
- How this needs to be done is dependent upon the item in question. Wood may require sanding, clothes a simple rinse in the wash, etc.
- Some items like cabinets may appear to be salvaged. but after they are removed the damage is worse than our inspector anticipated. Trust the mold professional you hire for advice on whether or not something can be restored.

**#9: Final Cleaning**

- After the contaminated material has been removed, the contained area is to be HEPA vacuumed again.
- If any visual mold is seen on studs HEPA sand affected area.
- In the event that an item cannot be restored it must be replaced. even if it is building material.
- The contained area is to be wiped down with a biocide and/or detergent solution.
- The contained area is to be HEPA vacuumed again.

**#10: Air Scrubber(s)**

- Multiple air scrubbers should be used for properties with a widespread problem and no containment area. How many should be a decision trusted in the hands of the mold remediation company hired.
- An Air Scrubber should be placed in each containment area for 48-72 hours.

**#11 Air Duct Cleaning**

- Every mold remediation should be completed with a thorough cleaning of the HVAC system and air ducts.
- Sanitize/Disinfect air handler coils.
- Sanitize/Disinfect all duct work

**#12: Final Inspections**

- Prior to containment removal and re-occupancy of the space a certified mold inspector should do a visual inspection and air sampling. Air sample should be taken both within the containment and in an adjacent area to insure spores have not spread to other areas.
- After passing post remediation testing you may choose to apply a sealant around studs.
- Containment removal and re-occupancy shall occur when space passes appropriate verification testing.

**#13: Containment Used During Reconstruction**

- After the work area has passed clearance testing. the enclosure can be used to contain the dusts generated by sheetrock sanding and taping activities. This is done to reduce the clean up when reconstruction is complete.





Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com

Attached are the lab results from independent AIHA accredited microbiology laboratory. If you have any questions about this report, the lab results, or anything else, please feel free to give us a call at the number listed below.

Los Angeles - Sean Dare
MI&T-Mold Inspection & Testing
www.MitMold.com
855-600-6653

*Additional Mold Inspection Pictures*



Mold Inspection & Testing | MI&T
Nationwide Unbiased Mold Testing
Website: http://mitmold.com
855-600-6653 | Office@mitmold.com























# Exhibit X

Jo Ardalan <jo.ardalan@gmail.com>

## Reports, Labs, and Inspection

**Jo Ardalan** <jo.ardalan@gmail.com> Thu, Apr 30, 2020 at 9:07 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>, David Quinto <davidwquinto@gmail.com>, "Stewart L. Fournier" <stewart@fournierandfournierhomes.com>

Dear Josephine:

David Quinto and Stewart Fournier have contacted you numerous times attempting to set up inspections and repairs, but you haven't responded. They are trying to help you and me, because to the extent there are issues with a home I love, I want them taken care of.

Thank you for sharing the lab report. As you know, I was trying to get them done but you refused to communicate with us. It is impossible to investigate problems unless you cooperate with us, and I ask that you communicate with Mr. Quinto directly. He repeatedly asked you for convenient times to inspect the property and for photographs of the mold and termites but heard nothing. Mr. Fournier also asked for times to conduct inspections and likewise received no response. I am legally entitled to have agents to respond on my behalf. A response from them is like a response from me. Just as you are entitled to have a lawyer act on your behalf, I am too.

I wish you had cooperated with us because, as you know, Orkin was at the property to conduct a full investigation and to report its recommendations. I had already told Orkin that I would most likely accept its recommendations because I wanted any problems fixed. But despite having confirmed their appointment with them, you refused to admit them when they arrived. Because you denied them entry, there is now a delay in undertaking corrective measures.

The bottom line is, of course, I want to get any repairs done, but doing so depends on your willingness to let the repair people into the house. Also, I ask you to treat the vendors with respect. If they do not consent to being filmed, please do not do so. They are just trying to investigate or fix the issues you reported.

Please communicate with Mr. Quinto directly. He will make sure, on my behalf, to take care of any problem provided that you allow access to the property.

Orkin said they won't come to the property unless you agree to not film or otherwise harass them. Please allow them to treat the termites and please allow another vendor to remediate the mold or any other issue that may arise. We try to schedule them at a time convenient for you once you confirm that you will cooperate in permitting repairs. Please send us times that work for you. We will try to accommodate them.

I understand that Mr. Quinto has asked you for your renter's insurance policy several times. Please provide that to him promptly.

Thank you,
Jo Ardalan

[Quoted text hidden]

# Exhibit Y

 Jo Ardalan <jo.ardalan@gmail.com>

## Scheduling Repairs/Inspections

**Jo Ardalan** <jo.ardalan@gmail.com> Fri, May 1, 2020 at 12:20 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>, David Quinto <davidwquinto@gmail.com>, "Stewart L. Fournier" <stewart@fournierandfournierhomes.com>

Josephine:

We would like to have a mold specialist inspect and recommend repairs on Monday morning. The specialist needs a two-hour arrival window, 9-11, 10-12, etc., and will be happy to accommodate your schedule.

We also want o have Orkin return to treat the termites and to follow-up on rodents. They can come either Monday 10-12 or Tuesday 10-12. They will come, however, only if you will allow them to work without obstructing their efforts by photographing them or otherwise harassing them. Please confirm that you will allow them to do their jobs without interference.

Please let Mr. Quinto know whether and when the problems you have called to our attention may be corrected. I very much want to prevent further damage to the house.

Many thanks,

Jo

# Exhibit Z

 Jo Ardalan <jo.ardalan@gmail.com>

## Reports, Labs, and Inspection

**Josephine Borchardt** <jborchardt@email.arizona.edu> Fri, May 1, 2020 at 12:22 PM
To: Jo Ardalan <jo.ardalan@gmail.com>
Cc: David Quinto <davidwquinto@gmail.com>, Stewart Fournier <stewart.fournier@compass.com>

Good morning Jo,

Thank you for obliging with the California Civil Code 1962.

We are confirming that you have added David Quinto as your representative and hired Stewart Fournier from Compass to manage the rental property:
1628 N Beverly Glen Blvd. Los Angeles, CA 90077

We are available the following:
Saturday, May 2, 2020, 2-4 pm
Sunday, May 3, 2020, 12-2 pm
Thursday, May 7, 2020, 12-4 pm
Friday, May 8, 2020, 12-4 pm

Please advise Mr. Quinto and Mr. Fouriner to abide by the parameters of the California Civil Code 1954.

Very respectfully,

Josephine Borchardt

On Thu, Apr 30, 2020 at 9:07 PM Jo Ardalan <jo.ardalan@gmail.com> wrote:

**External Email**

[Quoted text hidden]

# Exhibit AA

 Jo Ardalan <jo.ardalan@gmail.com>

## Reports, Labs, and Inspection

**Jo Ardalan** <jo.ardalan@gmail.com> Fri, May 1, 2020 at 12:42 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: David Quinto <davidwquinto@gmail.com>, Stewart Fournier <stewart.fournier@compass.com>

Josephine:

It looks like our email messages crossed paths. We will be pleased to confirm whether our vendors can come at these times.

I just reached out to Orkin about a followup appointment, and unfortunately, they are unwilling to come to the property if you are present due to the circumstances of their last visit. Would you be willing to vacate the property during their visit? I'll make sure either Dave, Stewart, or I are present while they do their work.

We'll inquire about the other appointment and circle back.

For what it is worth, we have a very different understanding of 1962. We just want to get the problem fixed, Josephine, so let's work together to make that happen.

Jo

[Quoted text hidden]

# Exhibit AB

 Jo Ardalan <jo.ardalan@gmail.com>

## Reports, Labs, and Inspection

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Fri, May 1, 2020 at 12:55 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>, Jo Ardalan <jo.ardalan@gmail.com>
Cc: Stewart Fournier <stewart.fournier@compass.com>

Josephine:

Thank you for providing convenient times for me and Mr. Fournier to "manage" the property. Now may I ask you to address the questions Ms. Ardalan posed earlier today? Namely, will you permit a mold remediation specialist to enter the property to assess the problem and determine what corrective measures are needed? Will you also permit a pair of people from Orkin Pest Control to enter the property to treat the areas affected by dry wood termites and complete the rodent treatment? And, if so, will you also agree to vacate the property when they arrive and not photograph or otherwise harass them? They have refused to return to the property absent such assurance. As the report you provided recommended, one room might need to be heated treated. If so, that would require that all residents leave the building for the duration of that treatment anyway.

Please note that Orkin's last visit was scheduled in conformity with California Civil Code Section 1954(a)(2) but you nevertheless denied them entry.

Thanks much,

David Quinto

[Quoted text hidden]

# Exhibit AC

 Jo Ardalan <jo.ardalan@gmail.com>

## Reports, Labs, and Inspection

**Josephine Borchardt** <jborchardt@email.arizona.edu> Fri, May 1, 2020 at 2:00 PM
To: David Quinto <davidwquinto@gmail.com>, Jo Ardalan <jo.ardalan@gmail.com>
Cc: Stewart Fournier <stewart.fournier@compass.com>

Good afternoon,

We are on quarantine due to COVID-19.
Our immune systems are compromised and we are not going to leave our premises except for doctor visits.
Please refer to the LA County Department of Public Health for more information.

The allegations of harassment Orkin relayed to you are unfounded.
We have proof that no such harassment occurred.

Orkin has expressed three times in person and twice over the phone that the exclusion service for the rodents is to be performed on the exterior of the home.
The rat traps are not placed indoors.
The holes created by the rats larger than 1 dime or 1 quarter in size are not sealed indoors.
There is no need for Orkin to come into the home.

Orkin called on Thursday, April 23, 2020, and canceled the April 24th, 2020 visit.
We have proof the visit was canceled.
California Civil Code 1954 was not abided by.

Please let us know when licensed, bonded, and insured contractors will come for the repairs and remediation of the damages caused by rats and mold.

Very respectfully,

Josephine Borchardt

On Fri, May 1, 2020 at 12:55 PM <davidwquinto@gmail.com> wrote:

**External Email**

[Quoted text hidden]

# Exhibit AD

 Jo Ardalan <jo.ardalan@gmail.com>

## Reports, Labs, and Inspection

**Josephine Borchardt** <jborchardt@email.arizona.edu> Fri, May 1, 2020 at 3:55 PM
To: Jo Ardalan <jo.ardalan@gmail.com>
Cc: David Quinto <davidwquinto@gmail.com>

Good afternoon Jo,

Is Stewart Fournier no longer the property manager?
Is Compass is no longer the property management company?
Please confirm both of the inquiries above.

Additionally, please provide the name of the company that will be performing the mold inspection on Thursday, May 7th between 12-3 pm as well as their contact information.

We will collect their business card upon arrival.

Very respectfully,

Josephine Borchardt

On Fri, May 1, 2020 at 2:04 PM Jo Ardalan <jo.ardalan@gmail.com> wrote:

**External Email**

Subject to Mr. Quinto's email, the mold specialist can come on Thursday, May 7 between 12 and 3 pm. Please confirm receipt and consent.

Also, now that the communication has opened up, please direct everything to Mr. Quinto. Mr. Fournier does not need to be involved.

On Fri, May 1, 2020 at 12:55 PM <davidwquinto@gmail.com> wrote:

Josephine:

Thank you for providing convenient times for me and Mr. Fournier to "manage" the property. Now may I ask you to address the questions Ms. Ardalan posed earlier today? Namely, will you permit a mold remediation specialist to enter the property to assess the problem and determine what corrective measures are needed? Will you also permit a pair of people from Orkin Pest Control to enter the property to treat the areas affected by dry wood termites and complete the rodent treatment? And, if so, will you also agree to vacate the property when they arrive and not photograph or otherwise harass them? They have refused to return to the property absent such assurance. As the report you provided recommended, one room might need to be heated treated. If so, that would require that all residents leave the building for the duration of that treatment anyway.

Please note that Orkin's last visit was scheduled in conformity with California Civil Code Section 1954(a)(2) but you nevertheless denied them entry.

Thanks much,

David Quinto

**From:** Josephine Borchardt <jborchardt@email.arizona.edu>
**Sent:** Friday, May 1, 2020 12:22 PM
**To:** Jo Ardalan <jo.ardalan@gmail.com>
**Cc:** David Quinto <davidwquinto@gmail.com>; Stewart Fournier <stewart.fournier@compass.com>
**Subject:** Re: [EXT]Re: Reports, Labs, and Inspection

Good morning Jo,

Thank you for obliging with the California Civil Code 1962.

We are confirming that you have added David Quinto as your representative and hired Stewart Fournier from Compass to manage the rental property:

1628 N Beverly Glen Blvd. Los Angeles, CA 90077

We are available the following:

Saturday, May 2, 2020, 2-4 pm

Sunday, May 3, 2020, 12-2 pm

Thursday, May 7, 2020, 12-4 pm

Friday, May 8, 2020, 12-4 pm

Please advise Mr. Quinto and Mr. Fouriner to abide by the parameters of the California Civil Code 1954.

Very respectfully,

Josephine Borchardt

On Thu, Apr 30, 2020 at 9:07 PM Jo Ardalan <jo.ardalan@gmail.com> wrote:

External Email

Dear Josephine:

David Quinto and Stewart Fournier have contacted you numerous times attempting to set up inspections and repairs, but you haven't responded. They are trying to help you and me, because to the extent there are issues with a home I love, I want them taken care of.

Thank you for sharing the lab report. As you know, I was trying to get them done but you refused to communicate with us. It is impossible to investigate problems unless you cooperate with us, and I ask that you communicate with Mr. Quinto directly. He repeatedly asked you for convenient times to inspect the property and for photographs of the mold and

termites but heard nothing. Mr. Fournier also asked for times to conduct inspections and likewise received no response. I am legally entitled to have agents to respond on my behalf. A response from them is like a response from me. Just as you are entitled to have a lawyer act on your behalf, I am too.

I wish you had cooperated with us because, as you know, Orkin was at the property to conduct a full investigation and to report its recommendations. I had already told Orkin that I would most likely accept its recommendations because I wanted any problems fixed. But despite having confirmed their appointment with them, you refused to admit them when they arrived. Because you denied them entry, there is now a delay in undertaking corrective measures.

The bottom line is, of course, I want to get any repairs done, but doing so depends on your willingness to let the repair people into the house. Also, I ask you to treat the vendors with respect. If they do not consent to being filmed, please do not do so. They are just trying to investigate or fix the issues you reported.

Please communicate with Mr. Quinto directly. He will make sure, on my behalf, to take care of any problem provided that you allow access to the property.

Orkin said they won't come to the property unless you agree to not film or otherwise harass them. Please allow them to treat the termites and please allow another vendor to remediate the mold or any other issue that may arise. We try to schedule them at a time convenient for you once you confirm that you will cooperate in permitting repairs. Please send us times that work for you. We will try to accommodate them.

I understand that Mr. Quinto has asked you for your renter's insurance policy several times. Please provide that to him promptly.

Thank you,

Jo Ardalan

On Thu, Apr 30, 2020 at 5:32 PM Josephine Borchardt <jborchardt@email.arizona.edu> wrote:

Good evening Jo,

Since April 20th, you have not communicated.

You have abandoned your duties as our landlord.

You are in breach of our contract.

You have not complied with California Civil Codes.

Our health has been adversely affected because of your neglect.

We are suffering.

We have obtained additional professional evaluations pertaining to the complaints we made to you. These evaluations confirm and support the uninhabitable conditions that both we (your tenants) and Orkin revealed to you.

Below you will find an in-depth inspection from Terminix.

You will also find a conclusive report of the lab findings for the samples collected and tested from the home, performed by Mold Inspection and Testing Los Angeles.

Respectfully,

Josephine Borchardt

1628 N. Beverly Glen Blvd.

Los Angeles, CA 90077

# Exhibit AE

Gmail

Jo Ardalan <jo.ardalan@gmail.com>

# Followup on repairs

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Sat, May 2, 2020 at 8:10 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: Jo Ardalan <jo.ardalan@gmail.com>

Ms. Borchardt,

Please review the attached letter and respond to me promptly.

Best,

David Quinto

**Letter to Josephine Borchardt 5 2 20.pdf**
109K

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

May 2, 2020

Dear Ms. Borchardt:

I am writing in furtherance of the owner's effort to secure your cooperation in getting the problems you have complained of fixed. As you know, the owner has a maintenance contract with Orkin. Pursuant to that contract, Orkin would have conducted the dry wood termite inspection and completed the rodent remediation at no additional cost to the owner. When I last checked, Orkin was available to come Tuesday, May 5, between 10:00 a.m. and noon to complete the rodent work. At the same time, they will prepare their own termite report because they are not permitted to accept another company's report. I will ask Orkin to perform the termite work recommended in its report, if you will permit it to do so. Any termite and rodent work performed by Orkin will be at the owner's expense.

As your Terminix reported noted, the termite remediation and repair work will require entry into the property. That raises another issue should you choose to have that work (or the completion of the rodent abatement) performed at the owner's expense: you will need to allow Orkin to perform the work in peace.

After you complained of rodents and refused to use the rat traps the owner ordered for you, the owner scheduled Orkin to eliminate the rodents. Because you failed to point out a rodent hole to Orkin during its first visit, the owner asked it to return to treat and repair that hole, as well. You expressed no complaint whatever concerning Orkin after either visit.

As Orkin advised you during those visits, it typically requires one or more follow-up visits to complete a rodent treatment. Two weeks ago, Orkin called you directly to schedule a follow-up rodent treatment and arrived during the time slot you scheduled. You and your sister, however, chased Orkin away.

Owing to the histrionics you and your sister engaged in while refusing to allow them to enter the property, Orkin has advised the owner in writing that it will not return unless (i) you are both out of the house while its workers are inside, and (ii) you both agree not to photograph or otherwise harass them at any time while they are present. Inasmuch as the Terminix report you paid for noted that all occupants would have to vacate the property while the termites are being extinguished, I assume that you will have no objection to Orkin's requirement. I will await your written confirmation, though, before confirming any appointment with Orkin to avoid wasting their time again.

In the alternative, you may continue using Terminix at your cost to perform the termite work it recommended and, if you would like, to complete the rodent remediation as well. Either way, you must keep me advised concerning what you have arranged and provide evidence of the work's completion when it is done. We require an expeditious response from you.

The owner is also eager to get the mold problem fixed. She will do so at her expense upon your written confirmation that you will cooperate with the mold service and afford it all required access. 911 Restoration is available to arrive on Thursday, May 7, between noon and 3:00. Please confirm that you will allow 911 Restoration to do so then.

Regardless of what you decide, please provide the lockbox code, as required by your lease. As you know, the owner is entitled to enter the property without your

permission in the event of emergency and in other situations as provided by statute. *See* California Civil Code § 1954(a)(1), (2), (4).

Please be advised if you default on any portion of your rent or fail to cure your breaches of your rental agreement, the owner will not hesitate to bring an eviction proceeding and seek a judgment against you for all unpaid rent, interest thereon, damages you cause, and attorney's fees when the courts again permit such actions. Please note that to the extent any property damage is exacerbated by your refusal to permit the immediate treatment and repair of any problem causing damage, the owner will seek a judgment against you for such additional damage. You are advised to consider what effect the entry of a judgment against you might have on your credit worthiness and ability to persuade future landlords to rent to you. You might also think about how having an additional blemish on your record will affect your ability to win elective office.

Finally, given the unhappy situation, the owner is willing to release you from the balance of your lease term without penalty if you would like to leave. She does not want you to feel that you have any reason to remain in a property that causes you angst and concern.

Very truly yours,

David W. Quinto

Cc: Joanna Ardalan, Esq.

P.S. For your edification, your refusal to communicate with me has been meritless. Pursuant to my letter to you dated April 21, 2020, the owner

authorized you—and, indeed, directed you—to communicate directly with me. The letter identified me as the owner's attorney and made clear that I was writing in that capacity.  An "attorney" is "a person appointed to act for another in business or legal matters." Thus, in sending the letter, I was acting in the owner's stead.  I will therefore treat your May 1, 2020 acknowledgement that the owner complied with the California Civil Code § 1962 requirement to identify me as authorized to speak for her as retroactive to April 21.

# Exhibit AF

 Jo Ardalan <jo.ardalan@gmail.com>

## Followup on repairs

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Sat, May 2, 2020 at 10:20 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: Jo Ardalan <jo.ardalan@gmail.com>

We have decided that under the circumstances, it is best that I assume principal responsibility for managing the property. I await your response to my letter of today's date.

**From:** Josephine Borchardt <jborchardt@email.arizona.edu>
**Sent:** Saturday, May 2, 2020 8:52 PM
**To:** David Quinto <davidwquinto@gmail.com>
**Cc:** Jo Ardalan <jo.ardalan@gmail.com>
**Subject:** Re: [EXT]Followup on repairs

Good evening David,

I received your email and I will review it.

I am waiting for an answer from Jo but maybe you can answer me since I have yet to hear from her.

Is Stewart Fournier from Compass the property manager? And is Compass still managing the property?

Very Respectfully,

Josephine Borchardt

On Sat, May 2, 2020 at 8:10 PM <davidwquinto@gmail.com> wrote:

External Email

Ms. Borchardt,

Please review the attached letter and respond to me promptly.

Best,

David Quinto

Case 2:21-cv-02540-FMO-RAO   Document 1   Filed 03/23/21   Page 222 of 289   Page ID #:222

# Exhibit AG

 Jo Ardalan <jo.ardalan@gmail.com>

## Notice to Terminate Lease

**Josephine Borchardt** <jborchardt@email.arizona.edu> Sun, May 3, 2020 at 10:20 AM
To: Jo Ardalan <jo.ardalan@gmail.com>, David Quinto <davidwquinto@gmail.com>

Good morning,

Attached is our Notice to Terminate Lease.

Very Respectfully,

Josephine Borchardt

**Notice to Terminate Lease.pdf**
24K

May 3, 2020

**Notice to Terminate Lease**

Re:     1628 N. Beverly Glen Blvd.
        Los Angeles, CA 90077

It gives us great comfort that Jo Ardalan will release us from the lease and forgive any balance remaining of the lease term without penalty.

**Therefore, we are exercising our right stipulated under Section 28 of the lease agreement and under California Civil Code 1942, to terminate the lease.**

We must comply with LA County and the State of California Stay at Home orders.
The property will be vacated and keys will be returned to Jo Ardalan on June 30th, 2020.


This letter has been sent via email to jo.ardalan@gmail.com and davidwquinto@gmail.com
This letter will be sent via certified mail on Monday, May 4th, 2020 to:
3007 Franklin Canyon Dr. Beverly Hills, CA 90210


Very Respectfully,

//Signed//

Josephine Borchardt
Genevieve Borchardt

1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

# Exhibit AH

 Jo Ardalan <jo.ardalan@gmail.com>

**Response to Your Notice to Terminate**

**davidwquinto@gmail.com** <davidwquinto@gmail.com>
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: Jo Ardalan <jo.ardalan@gmail.com>

Sun, May 3, 2020 at 11:06 PM

Ms. Borchardt,

See the attached letter.

David Quinto

**Letter to Josephine Borchardt 05 03 20 (1).pdf**
103K

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
Genevieve Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

May 3, 2020

Dear Josephine and Genevieve:

I am writing to set the record straight. What my May 2 letter actually conveyed is that the owner finds you intolerable, not that the property is uninhabitable. The owner rejects your attempt to characterize her rental property as uninhabitable. Further, she has not offered to release you from your legal obligation to pay rent until you vacate the property.

Were the property actually uninhabitable, the mold report you paid for would have said so and you would certainly permit the owner's professional treatment and remediation services to fix any problems rather than demand to live there another two months. The California Civil Code does not give you the right to squat in a house without paying rent while it is purportedly uninhabitable; it allows you to ***move out*** and not pay rent.

Your promise to vacate the property by June 30 also does not relieve you of liability for any further damage the property may suffer as a result of your refusal to give maintenance personnel access to the property. Further, you remain obligated to provide the lockbox code to permit the owner access to the property as provided by law.

The mold specialist is scheduled to arrive on Thursday, May 7 between 12 and 3 pm. Steve Henry, a handyman, is scheduled to come on Friday, May 8 between 8 and 10 a.m. He will review the workmanship of the toilet, examine the cabinets in the kitchen, and will inspect the home for any other necessary repairs, as needed. I trust you will permit both appointments and cooperate fully. I regret that I am unable to schedule Orkin owing to your refusal to leave the home for the brief period its personnel would be present.

The owner is formally requesting a mediation to be conducted by a qualified mediator to attempt to resolve the outstanding differences. If you agree to mediate, the parties will split the costs of the mediation. Many mediators are currently offering Zoom mediation services.

Very truly yours,

David W. Quinto

Cc: Joanna Ardalan, Esq.

# Exhibit AI

 Jo Ardalan <jo.ardalan@gmail.com>

## Response to Your Notice to Terminate

**Josephine Borchardt** <jborchardt@email.arizona.edu> Mon, May 4, 2020 at 8:06 AM
To: David Quinto <davidwquinto@gmail.com>
Cc: Jo Ardalan <jo.ardalan@gmail.com>

Good morning,

Your letters and emails are inaccurate and not based on facts.

Please review the lease agreement and the California Civil Codes that pertain to our contract.

We welcome maintenance and repair of the home to be made per California Civil Code 1954.

Both owners are liable for the uninhabitable conditions of the home we leased.
Jo Ardalan and Bach Ardalan are not released of liability.

We decline the formal request for mediation at this juncture from Jo Ardalan as she is in full breach of the contract and has yet to cure and remedy.

Our Notice to Terminate the Lease Agreement stands.

Very Respectfully,

//Signed//

Josephine Borchardt
Genevieve Borchardt

On Sun, May 3, 2020 at 11:07 PM <davidwquinto@gmail.com> wrote:

External Email

[Quoted text hidden]

# Exhibit AJ

 Jo Ardalan <jo.ardalan@gmail.com>

## May 5, 2020

**Josephine Borchardt** <jborchardt@email.arizona.edu> Tue, May 5, 2020 at 4:42 PM
To: David Quinto <davidwquinto@gmail.com>, Jo Ardalan <jo.ardalan@gmail.com>

Good evening,

Genevieve informed me David Quinto sent her a text message stating he left her a voicemail and to call him. No voicemail was left.

Please do not change the course of communication.
It is best that we continue to communicate via email as we have done so.

We also request that you respect our right to quiet enjoyment.
Please do not come to our home looking into our vehicle and our lower bedroom window as Jo did today.

Very respectfully,

Josephine Borchardt

# Exhibit AK

**24 HOUR NOTICE OF INSPECTION, REPAIRS, AND MAINTENANCE – MAY 5, 2020**

TO JOSEPHINE BORCHARDT, GENEVIEVE BORCHARDT, AND FRANCESCA BORCHARDT

1628 N. Beverly Glen Blvd. Los Angeles, CA 90077

**This is formal notice confirming that the technicians described below will enter your rental home to make repairs you have requested and to determine whether further maintenance is needed (beyond the work to be done by Orkin if and when you confirm that you will temporarily vacate the building while its personnel are present). The technician visits have been scheduled in an effort to accommodate your schedules. Neither the property owner nor her attorney plan to be present. If that poses a problem, please tell David Quinto immediately.**

On Thursday, May 7, between noon and 3 pm, 911 Restoration Los Angeles will enter the home to inspect for mold and/or begin repair and remediation of the same. We understand that you will cooperate fully and allow the technician entry to the home.

On Friday, May 8, between 8 a.m. and 10 a.m., Steve Henry, a handyman, needs to enter to the home to diagnose and correct any problem with the toilet, examine and repair the kitchen cabinets, inspect the home generally, and advise as to any additional required maintenance. We understand that you will cooperate fully and allow the Mr. Henry entry to the home.

If you have any questions or concerns, you may contact David Quinto using the contact information you already have.

# Exhibit AL

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
Genevieve Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

May 5, 2020

Dear Josephine:

I have been trying to decipher your cryptic messages that ignore most of the questions I have asked and respond to others only elliptically. You have stated as a general proposition that you will permit repairs but you have time and again refused to say whether you will vacate the premises to allow Orkin to dispatch the termites. I gather that you would likely need to be outside the house for the entirety of Orkin's work. I will not schedule Orkin unless and until I get your commitment that you will allow its technicians to perform their work in peace, with all occupants of the house outside.

I also trust that you will allow the termite company and the handyman in even if neither the owner nor I are present.

This will also serve as notice that the rental payments you and your sister made this month were both delinquent and insufficient. Unless the owner receives the $1,150 balance owing tomorrow, you will incur a late fee. Your sister's credit rating when you applied to lease the property was relatively good but your actions are putting it at risk.

And as regards your latest allegations concerning the property owner, all I can say is that you inhabit your own reality.


Very truly yours,


David W. Quinto

Cc: Joanna Ardalan, Esq.

# Exhibit AM

 Jo Ardalan <jo.ardalan@gmail.com>

## Re: [EXT]Repair work today

**Josephine Borchardt** <jborchardt@email.arizona.edu> Fri, May 8, 2020 at 9:17 AM
To: David Quinto <davidwquinto@gmail.com>, Jo Ardalan <jo.ardalan@gmail.com>

Good morning David,

Steve Henry was to enter today between 8-10 am to correct Hamo's previous defective repairs.
Steve was additionally going to inspect the rat holes that remain unrepaired.

You must provide a proper 24-hour notice for Hamo to enter.

We addressed the importance of the cabinet holes being repaired and replaced in our previous communication.
On April 17th, I texted Jo to immediately repair the holes the rats caused in the kitchen cabinets.
Please refer to the Letter to Cure and Remedy dated and sent to Jo Ardalan on April 20th, 2020.

Very Respectfully,

Josephine Borchardt

On Fri, May 8, 2020 at 8:46 AM <davidwquinto@gmail.com> wrote:

**External Email**

Josephine:

Steve Henry is unable to make it today. As such, we coordinated with Hamo to do the same work.

Dave

# Exhibit AN

 **Jo Ardalan <jo.ardalan@gmail.com>**

---

## Fwd: 1628 Beverly Glen - New Property Management

**Daniel Glaser** <daniel.glaser23@gmail.com>
To: Jo Ardalan <jo.ardalan@gmail.com>

Tue, May 12, 2020 at 11:20 AM

---------- Forwarded message ---------
From: **Daniel Glaser** <daniel.glaser23@gmail.com>
Date: Mon, May 11, 2020 at 8:29 PM
Subject: 1628 Beverly Glen - New Property Management
To: <jborchardt@email.arizona.edu>, <geniborchardt@gmail.com>

Hi Josephine and Genevieve,

I hope this email finds you well and staying safe. My name is Daniel Glaser and my company Glaser Property Management has just signed on with Jo to manage the property where you reside.

Moving forward, please contact me by cell phone at 310-367-9946 or email address at daniel.glaser23@gmail.com`

Additionally, please write your rent checks as payment due to Glaser Property Management Inc. at the following address:

16559 Akron St.
Pacific Palisades, CA 90272

Thank you and I am always here to assist. Have a great rest of your night

--
Daniel Glaser
Managing Principal at Glaser Property Management and Glaser Family Properties
10940 Wilshire Blvd, Suite 1600 PMB #450
Los Angeles, CA 90024

Phone: (310) 367-9946
Email: daniel.glaser23@gmail.com
Website: https://glaserpropertymanagementinc.com/
LinkedIn: https://www.linkedin.com/in/daniel-glaser-599a9237/

--
Daniel Glaser
Managing Principal at Glaser Property Management and Glaser Family Properties
10940 Wilshire Blvd, Suite 1600 PMB #450
Los Angeles, CA 90024

Phone: (310) 367-9946
Email: daniel.glaser23@gmail.com
Website: https://glaserpropertymanagementinc.com/
LinkedIn: https://www.linkedin.com/in/daniel-glaser-599a9237/

# Exhibit AO

 Jo Ardalan <jo.ardalan@gmail.com>

**May 15, 2020**

**Josephine Borchardt** <jborchardt@email.arizona.edu> Fri, May 15, 2020 at 7:56 PM
To: Jo Ardalan <jo.ardalan@gmail.com>, David Quinto <davidwquinto@gmail.com>

Good evening,

There is someone posing as the property manager for the home.

You and David Quinto both confirmed you hired Stewart Fournier and Compass as the property management for 1628 N. Beverly Glen Blvd.

We terminated the lease and we are going to move out.
The termination of the lease does not absolve you and Bach Ardalan of your obligations and responsibilities to us as tenants in the home.

You are furthering your breach of contract.

The damages and injuries we have sustained are severe and have impacted our lives on so many levels.

You have absolutely disrespected us as human beings and disregarded the value of our lives by committing gross negligence.

Very respectfully,

Josephine Borchardt

# Exhibit AP

Gmail

Jo Ardalan <jo.ardalan@gmail.com>

## New Property Manager

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Sat, May 16, 2020 at 2:34 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: Jo Ardalan <jo.ardalan@gmail.com>

Josephine:

Please see attached letter.

For your information, you are currently $1,207.50 in arrears on your rent, are in default of your obligation to provide proof of renter's insurance, and are in default of your obligation to advise the owner of your lockbox code.

Thank you,

David Quinto

**Letter to Josephine Borchardt 05 16 2020.pdf**
91K

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
Genevieve Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

May 16, 2020

Dear Josephine:

Thank you for your May 15 e-mail message re-confirming that you will vacate 1628 N. Beverly Glen Drive by no later than June 30.

Given the repeated difficulties you have caused for no reason other than to be as unpleasant and costly as possible, the owner has asked Daniel Glaser, who deals with difficult tenants for a living, to serve as the property manager.

After you scheduled Orkin for a follow-up appointment and then refused to allow the Orkin team into your house when they arrived as per your schedule, I went to the property for the scheduled visit by 911 Restoration to evaluate the mold issue and recommend corrective measures. I did so to prevent a false claim that you did not know that 911 Restoration was authorized to perform that work. As I stood in the street, you and your mother stood a few feet away taking picture after picture of my worn shoes and laughing that I must be a very unsuccessful lawyer if I had nothing better to do with my time and couldn't afford better shoes.

While that was occurring, your 17-year-old sister came to the door. Your mother directed her to call the police, ostensibly to protect her from me, as she called me a possible "rapist." You and your mother then resumed your running commentary concerning my shoes, standing three or four feet away while I stood in the street.

When the LAPD eventually arrived, I was talking with the property owner next door. The LAPD asked for me by name, before explaining that your sister had called them because you and your mother "did not know" who I was. Apart from wasting the time of two LAPD officers, what did that stunt accomplish?

The following day, you had agreed to allow a handyman in between 8:00 and 10:30 a.m. to make minor repairs that you had requested. The handyman notified the owner that morning of his inability to visit the property. The owner then arranged with a different handyman—whom you personally knew and whose work you had twice previously complimented—to make the requested repairs *at the scheduled time*. Although the owner had, out of an excess of caution, provided you with written 24-hour notice of the scheduled repairs, the written notice had identified the first handyman as the person who would make them. On the basis that you had not been given a 24-hour notice in writing that the second handyman would, instead, perform the work, you refused to admit the back-up handyman. You did so notwithstanding that you knew the handyman, liked his work, and had been given 24-hour written notice that the repairs would be made then. It appears that you were either trying to manufacture some sort of claim or were concerned that the handyman would see that the repairs were necessitated by something other than ordinary wear and tear.

Since then, you have refused to respond to requests to schedule 911 Restoration to begin the actual mold remediation and prevention work. As you know, if the cost of that work increases as the result of your refusal to allow 911 Restoration to perform the work, the owner will hold you accountable.

Very truly yours,

David W. Quinto

Cc: Joanna Ardalan, Esq.

# Exhibit AQ

**Jo Ardalan <jo.ardalan@gmail.com>**

## New Property Manager

**Josephine Borchardt** <jborchardt@email.arizona.edu> Mon, May 18, 2020 at 8:09 PM
To: David Quinto <davidwquinto@gmail.com>
Cc: Jo Ardalan <jo.ardalan@gmail.com>

Good evening,

David's emails and letters are dishonest and not factual.

On May 1st, we confirmed the 911 Mold Restoration appointment for that following Thursday.

On May 5th, after Jo Ardalan was caught peering into my minor sister's bedroom, we requested that our right to quiet enjoyment is not disturbed.

On May 7th, David Quinto arrived at our residence, without notice, and took pictures of the exterior and interior of our vehicle.
As David stood on our driveway, he refused to confirm his identity and refused to leave our home.

On May 7th, Brent from 911- Mold Restoration confirmed the mold needed immediate remediation. He was surprised we were still living in the home given the extent of the mold, the slugs, and other vermin due to the mold, and the overall consequences to our health.

David and Brent did not communicate during this visit which further rose suspicion as to why David was at the property, especially after we were notified that Jo and David would not be present.

As of today, May 18th, 2020, there is not a follow-up appointment scheduled for the mold remediation or the removal of rats.

We continue to live in a home infested with rats, vermin, and toxic mold.

Very respectfully,

Josephine Borchardt

On Sat, May 16, 2020 at 2:35 PM <davidwquinto@gmail.com> wrote:

**External Email**

[Quoted text hidden]

# Exhibit AQ2

Gmail

Jo Ardalan <jo.ardalan@gmail.com>

## Your e-mail barrage

**davidwquinto@gmail.com** <davidwquinto@gmail.com> Wed, May 20, 2020 at 11:26 PM
To: Josephine Borchardt <jborchardt@email.arizona.edu>
Cc: Jo Ardalan <jo.ardalan@gmail.com>, Daniel Glaser <daniel.glaser23@gmail.com>

Josephine:

Please find attached my response to the five e-mail messages you have sent during the past three days.

Thank you,

David Quinto

**Letter to Josephine Borchardt 05 20 20.pdf**
64K

David W. Quinto, Esq.
3007 Franklin Canyon Dr.
Beverly Hills, California 90210-1633

DavidWQuinto@gmail.com
(213) 604-1777

Josephine Borchardt
1628 N. Beverly Glen Blvd.
Los Angeles, CA 90077

May 20, 2020

Dear Josephine:

As I advised you by letter dated May 16, the owner has asked Daniel Glaser, who deals with difficult tenants for a living, to serve as the property manager. By e-mail message to Mr. Glaser on May 20, you acknowledged that he is "the property manager" with "the responsibility to answer our questions" and your "direct contact person." You may communicate directly with him or with me; there is no other "point of contact" as you seemed to believe.

You asked who is coming to your house tomorrow between 10:00 and 3:00. As Mr. Glaser advised you 911 Remediation is coming. You know from the mold report you paid for what mold is present and where. If you are concerned that remediating the mold might cause health problems when living with it evidently does not, please discuss your concern with your medical advisers.

The owner is disappointed that you refused to allow a handyman to enter the house at the scheduled time and that you continue to refuse to allow Orkin to exterminate the dry wood termites present in the structure or to complete the rodent remediation work. She will hold you accountable for the additional costs and damage you are causing

Finally, I note that although one of your many e-mail messages sent May 18 asserted that my "emails and letters are dishonest and not factual," you have failed to identify anything in any of them that is either purportedly dishonest or purportedly not factual.  You were correct, though, that there was no "follow-up appointment scheduled for the mold remediation or the removal of rats," but that was only because you had refused to permit them.

Very truly yours,

David W. Quinto

Cc: Joanna Ardalan, Esq.
    Daniel Glaser

# Exhibit AQ3

 Jo Ardalan <jo.ardalan@gmail.com>

**Fwd: [EXT]1628 N Beverly Glen - Mold Remediation and Communications**

**Daniel Glaser** <daniel.glaser23@gmail.com> Wed, May 20, 2020 at 11:49 AM
To: Jo Ardalan <jo.ardalan@gmail.com>, David Quinto <davidwquinto@gmail.com>

Sent from my iPhone

Begin forwarded message:

**From:** Josephine Borchardt <jborchardt@email.arizona.edu>
**Date:** May 20, 2020 at 11:45:01 AM PDT
**To:** Daniel Glaser <Daniel.glaser23@gmail.com>
**Cc:** genevieve borchardt <geniborchardt@gmail.com>
**Subject: Re: [EXT]1628 N Beverly Glen - Mold Remediation and Communications**

Good morning Daniel,

We received the 24-Hour Notice to Enter as you said you would provide.

We welcome access to the property so long as it does not negatively further impact our health.

Please specify the course of action of the remediation work.
We need to speak with our doctors to see how the remediation work with us in the home will impact our health conditions.

Please also specify who will be the party entering tomorrow, May 21, 2020, from 10-3 pm.

Furthermore, you taped over the Form's Provider information. We removed the tape to unveil The Law Office of Dennis P. Block and Associates.
Is this another party that has joined in regards to 1628 N. Beverly Glen Blvd?

Very respectfully,

Josephine Borchardt

On Tue, May 19, 2020 at 12:39 PM Daniel Glaser <daniel.glaser23@gmail.com> wrote:

**External Email**

Hi,

The remediation can come to begin the work on Thursday and will arrive between 10am-noon. I will post notice on your door at least 24 hours ahead of time.

Thank you.

On Mon, May 18, 2020 at 8:40 PM Josephine Borchardt <jborchardt@email.arizona.edu> wrote:
Good evening,

The mold is throughout the home.
We paid for the mold to be tested and chose the room with the most abundant of visible mold, which happens to be the downstairs bedroom/closet. The closet is open and adjacently adjoined to the bedroom. Further evaluation found mold and moisture throughout the entire downstairs.

Attached:
Mold Lab
Mold Report
Terminix Report
Notice to Terminate Lease

On Mon, May 18, 2020 at 8:28 PM Daniel Glaser <daniel.glaser23@gmail.com> wrote:

**External Email**

Good Evening,

Thank you for sharing the details. Please do send me all documents so that I am not missing anything. I will call the mold remediation company tomorrow morning and find out when they can begin. I was only provided documents regarding mold in the closet. Was there a test of the bedrooms as well?

On Mon, May 18, 2020 at 8:22 PM Josephine Borchardt <jborchardt@email.arizona.edu> wrote:
Good evening,

We needed confirmation from the Owner, Jo Ardalan, or her representative, David Quinto, that you were the new Property Manager. We now have that confirmation.

A remediation company came out on Thursday, May 5th, 2020, to evaluate the severe mold in the bedrooms. As of today, May 18th, 2020, there is no follow up to remediate the mold or cure the issue.

We welcome work to be performed, but we also require proper notice, as any other tenant would require before anyone enters our home.

Due to the toxic mold in the bedrooms, we want to ensure that the remediation and physical disturbance and removal of the mold will not affect health any further.

We have given our notice to move out due to rodent infestation and the toxic mold.

Jo and David were provided the lease termination notice, the rodent infestation report, the mold labs, and the mold report.

Please let me know if you need me to provide a copy of the above documents.

Very respectfully,

Josephine Borchardt

On Mon, May 18, 2020 at 5:59 PM Daniel Glaser <daniel.glaser23@gmail.com> wrote:

**External Email**

Hi Josephine and Genevieve,

I hope you are doing well and staying safe. I emailed you of the transition in property management for your rental home by email on March 13th and posted a notice of the change on your door on May 13th. I again emailed you on May 14th about the repairs you had requested of Jo and I have not yet heard any response from you to either email.

I have now learned that there is a significant mold problem in the rental home that we will need access to the property to rectify. Can you please let me know when is convenient for you to have the mold remediation work completed at the owner's expense?

I have also come to learn that you told ownership that you will be ending your tenancy. Can you please provide me with an update on that front?

Thank you.

--
Daniel Glaser
Managing Principal at Glaser Property Management and Glaser Family Properties
10940 Wilshire Blvd, Suite 1600 PMB #450
Los Angeles, CA 90024

Phone: (310) 367-9946
Email: daniel.glaser23@gmail.com
Website: https://glaserpropertymanagementinc.com/
LinkedIn: https://www.linkedin.com/in/daniel-glaser-599a9237/

--
Daniel Glaser
Managing Principal at Glaser Property Management and Glaser Family Properties
10940 Wilshire Blvd, Suite 1600 PMB #450
Los Angeles, CA 90024

Phone: (310) 367-9946
Email: daniel.glaser23@gmail.com
Website: https://glaserpropertymanagementinc.com/
LinkedIn: https://www.linkedin.com/in/daniel-glaser-599a9237/

--
Daniel Glaser
Managing Principal at Glaser Property Management and Glaser Family Properties
10940 Wilshire Blvd, Suite 1600 PMB #450
Los Angeles, CA 90024

Phone: (310) 367-9946
Email: daniel.glaser23@gmail.com
Website: https://glaserpropertymanagementinc.com/
LinkedIn: https://www.linkedin.com/in/daniel-glaser-599a9237/

# Exhibit AS

 Jo Ardalan <jo.ardalan@gmail.com>

## Fwd: [EXT]1628 N Beverly Glen - Repairs

**Daniel Glaser** <daniel.glaser23@gmail.com> Fri, May 22, 2020 at 12:13 PM
To: Jo Ardalan <jo.ardalan@gmail.com>, David Quinto <davidwquinto@gmail.com>

Sent from my iPhone

Begin forwarded message:

**From:** Josephine Borchardt <jborchardt@email.arizona.edu>
**Date:** May 22, 2020 at 10:08:19 AM PDT
**To:** Daniel Glaser <Daniel.glaser23@gmail.com>
**Cc:** genevieve borchardt <geniborchardt@gmail.com>
**Subject: Re: [EXT]1628 N Beverly Glen - Repairs**

Good morning Daniel,

We want the repairs to be made. We have expressed the importance of the repairs to be made for months and welcome them to occur so long as they do not further negatively impact our health, safety, and lives.

To this day, May 22, 2020, rats and toxic mold infest and dwell in the home.

Due to the short notice, our offer to move by the end of the day on May 31st, 2020, is for $60,000, via cashier's check payment received on the morning of May 31st, 2020.

This would remedy Jo Ardalan's Breach of Contract.

Very respectfully,

Josephine Borchardt

On Thu, May 21, 2020 at 1:09 PM Daniel Glaser <daniel.glaser23@gmail.com> wrote:

**External Email**

Hi Josephine,

The owner wants to make the repairs and it seems like it would be a lot easier for everyone if you and your family weren't in the house when those happened and based off of your emails it seems like that would be preferable to you too.

As you are leaving on June 30 anyway, the owner is willing to pay you one month's rent, $3850, if you and your family leave by no later than May 31, 2020, end of the business day. We will give you payment at the end of the day on May 31 as long as you give us the keys, the lockbox code for both doors, you and your family are totally vacated, and there are no obvious signs of intentional damage in the house.

If that is agreeable to you, I will have the paperwork drawn up as we will require a formal agreement. We will return the security deposit as per the lease agreement.

Please let us know by Monday, May 25. Thank you.

--
Daniel Glaser
Managing Principal at Glaser Property Management and Glaser Family Properties

5/23/2020 Gmail - Fwd: [EXT]1628 N Beverly Glen - Repairs

10940 Wilshire Blvd, Suite 1600 PMB #450
Los Angeles, CA 90024

Phone: (310) 367-9946
Email: daniel.glaser23@gmail.com
Website: https://glaserpropertymanagementinc.com/
LinkedIn: https://www.linkedin.com/in/daniel-glaser-599a9237/

https://mail.google.com/mail/u/0?ik=518988e27e&view=pt&search=all&permmsgid=msg-f%3A1667419153319286012&simpl=msg-f%3A16674191533... 2/2

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
David W. Quinto SBN 106232

3007 Franklin Canyon Drive
Beverly Hills, CA 90210
TELEPHONE NO.: (213) 604-1777 FAX NO.:
ATTORNEY FOR (Name): Joanna Ardalan

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS:
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: Ardalan v. Borchardt

**CIVIL CASE COVER SHEET**

☒ **Unlimited** (Amount demanded exceeds $25,000) ☐ **Limited** (Amount demanded is $25,000 or less)

**Complex Case Designation**

☐ **Counter** ☐ **Joinder**

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 20STCV20169

JUDGE:

DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☒ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action *(specify)*: 4
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: May 28, 2020

David W. Quinto
(TYPE OR PRINT NAME)

▶ /s/ David W. Quinto
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36) Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

American LegalNet, Inc.
www.FormsWorkflow.com

| SHORT TITLE: Ardalan v. Borchardt | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

**Applicable Reasons for Choosing Court Filing Location (Column C)**

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | [illegible] | [illegible] | [illegible] |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death - Uninsured Motorist | 1, 4, 11 |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

American LegalNet, Inc.
www.FormsWorkFlow.com

| SHORT TITLE: Ardalan v. Borchardt | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/ Property Damage/ Wrongful Death Tort | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice<br>☐ A6050 Other Professional Malpractice (not medical or legal) | 1, 2, 3<br>1, 2, 3 |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case<br>☐ A6109 Labor Commissioner Appeals | 1, 2, 3<br>10 |
| Contract | Breach of Contract/ Warranty (06) (not insurance) | ☒ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019 Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | (2), 5<br>2, 5<br>1, 2, 5<br>1, 2, 5 |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff<br>☐ A6012 Other Promissory Note/Collections Case<br>☐ A6034 Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11<br>5, 11<br>5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009 Contractual Fraud<br>☐ A6031 Tortious Interference<br>☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 5<br>1, 2, 3, 5<br>1, 2, 3, 8, 9 |
| Real Property | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation Number of parcels ______ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure<br>☐ A6032 Quiet Title<br>☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6<br>2, 6<br>2, 6 |
| Unlawful Detainer | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2, 6, 11 |

American LegalNet, Inc.
www.FormsWorkFlow.com

| SHORT TITLE: Ardalan v. Borchardt | CASE NUMBER |
|---|---|

| | | | |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160 Abstract of Judgment | 2, 6 |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123 Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190 Election Contest | 2 |
| | | ☐ A6110 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100 Other Civil Petition | 2, 9 |

American LegalNet, Inc.
www.FormsWorkFlow.com

| SHORT TITLE: Ardalan v. Borchardt | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address**: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: ☐ 1. ☒ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | | | ADDRESS: 1628 Beverly Glen Blvd. |
|---|---|---|---|
| CITY: Los Angeles | STATE: CA | ZIP CODE: 90077 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: May 28, 2020

/s/ David W. Quinto
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet, Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).
5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.
6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:
Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

Reserved for Clerk's File Stamp

FILED
Superior Court of California
County of Los Angeles
05/28/2020
Sherri R. Carter, Executive Officer / Clerk of Court
By: R. Perez Deputy

# NOTICE OF CASE ASSIGNMENT

# UNLIMITED CIVIL CASE

**Your case is assigned for all purposes to the judicial officer indicated below.**

CASE NUMBER:
20STCV20169

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✓ | Ruth Ann Kwan | 72 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on 05/28/2020 (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By R. Perez, Deputy Clerk

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

2019-GEN-014-00

FILED
Superior Court of California
County of Los Angeles

MAY 03 2019

Sherri R. Carter, Executive Officer/Clerk
By ________, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT – MANDATORY ELECTRONIC FILING FOR CIVIL

FIRST AMENDED GENERAL ORDER

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

a) **"Bookmark"** A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

b) **"Efiling Portal"** The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

c) **"Electronic Envelope"** A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

d) **"Electronic Filing"** Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"** An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court. (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"** For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"** An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"** A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format. Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs. Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii) Bonds/Undertaking documents;

iii) Trial and Evidentiary Hearing Exhibits

iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format when technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

i) Depositions;

ii) Declarations;

iii) Exhibits (including exhibits to declarations);

iv) Transcripts (including excerpts within transcripts);

v) Points and Authorities;

vi) Citations; and

vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

i) Any printed document required pursuant to a Standing or General Order;

ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

iii) Pleadings and motions that include points and authorities;

iv) Demurrers;

v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

vi) Motions for Summary Judgment/Adjudication; and

vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019

KEVIN C. BRAZILE
Presiding Judge

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



Superior Court of California
County of Los Angeles




Los Angeles County
Bar Association
Litigation Section

Los Angeles County
Bar Association Labor and
Employment Law Section



Consumer Attorneys
Association of Los Angeles



Southern California
Defense Counsel




Association of
Business Trial Lawyers




California Employment
Lawyers Association

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| STIPULATION – DISCOVERY RESOLUTION | | CASE NUMBER: |

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

iii. Be filed within two (2) court days of receipt of the Request; and

iv. Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d. If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e. If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER |
|---|---|
| | |

The following parties stipulate:

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR PLAINTIFF)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR ________)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR ________)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR ________)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** <br> COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | | CASE NUMBER: |

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

The parties agree that:

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at www.lacourt.org under "Civil" and then under "General Information").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to ________________ (INSERT DATE) for the complaint, and ________________ (INSERT DATE) for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at www.lacourt.org under "Civil", click on "General Information", then click on "Voluntary Efficient Litigation Stipulations".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

________________________ (TYPE OR PRINT NAME) ➤ ________________________ (ATTORNEY FOR PLAINTIFF)

Date:

________________________ (TYPE OR PRINT NAME) ➤ ________________________ (ATTORNEY FOR DEFENDANT)

Date:

________________________ (TYPE OR PRINT NAME) ➤ ________________________ (ATTORNEY FOR DEFENDANT)

Date:

________________________ (TYPE OR PRINT NAME) ➤ ________________________ (ATTORNEY FOR DEFENDANT)

Date:

________________________ (TYPE OR PRINT NAME) ➤ ________________________ (ATTORNEY FOR ________________)

Date:

________________________ (TYPE OR PRINT NAME) ➤ ________________________ (ATTORNEY FOR ________________)

Date:

________________________ (TYPE OR PRINT NAME) ➤ ________________________ (ATTORNEY FOR ________________)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **INFORMAL DISCOVERY CONFERENCE** (pursuant to the Discovery Resolution Stipulation of the parties) | | CASE NUMBER: |

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: ________________ (insert date 10 calendar days following filing of the Request)

3. Deadline for Court to hold Informal Discovery Conference: ________________ (insert date 20 calendar days following filing of the Request).

4. For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | | CASE NUMBER |

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

The parties agree that:

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

____________________________ ➤ ____________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR PLAINTIFF)

Date:

____________________________ ➤ ____________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

____________________________ ➤ ____________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

____________________________ ➤ ____________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

____________________________ ➤ ____________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR ________________)

Date:

____________________________ ➤ ____________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR ________________)

Date:

____________________________ ➤ ____________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR ________________)

THE COURT SO ORDERS.

Date: ________________________

____________________________
JUDICIAL OFFICER

 Superior Court of California, County of Los Angeles

# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

**What is ADR?**

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

**Advantages of ADR**

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

**Disadvantages of ADR**

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

**Main Types of ADR:**

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may <u>not</u> be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

**How to arrange mediation in Los Angeles County**

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
If all parties agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases):

- **ADR Services, Inc.** Case Manager **patricia@adrservices.com** (310) 201-0010 (Ext. 261)
- **JAMS, Inc.** Senior Case Manager **mbinder@jamsadr.com** (310) 309-6204
- **Mediation Center of Los Angeles (MCLA)** Program Manager **info@mediationLA.org** (833) 476-9145
  - Only MCLA provides mediation in person, by phone and by videoconference.

**These organizations cannot accept every case and they may decline cases at their discretion.**
Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.
NOTE: This program does not accept family law, probate, or small claims cases.

b. **Los Angeles County Dispute Resolution Programs**
https://wdacs.lacounty.gov/programs/drp/

- Small claims, unlawful detainers (evictions) and, at the Spring Street Courthouse, limited civil:
  - Free, day- of- trial mediations at the courthouse. No appointment needed.
  - Free or low-cost mediations before the day of trial.
  - For free or low-cost Online Dispute Resolution (ODR) by phone or computer before the day of trial visit http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c. **Mediators and ADR and Bar organizations** that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit **http://www.courts.ca.gov/programs-adr.htm**

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit **http://www.lacourt.org/division/civil/CI0047.aspx**

**Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/CI0109.aspx**
**For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm**

 Superior Court of California, County of Los Angeles

# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

## What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

## Main Types of ADR:

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

**How to arrange mediation in Los Angeles County**

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
If all parties agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases):

- **ADR Services, Inc.** Case Manager patricia@adrservices.com (310) 201-0010 (Ext. 261)
- **JAMS, Inc.** Senior Case Manager mbinder@jamsadr.com (310) 309-6204
- **Mediation Center of Los Angeles (MCLA)** Program Manager info@mediationLA.org (833) 476-9145
  - Only MCLA provides mediation in person, by phone and by videoconference.

**These organizations cannot accept every case and they may decline cases at their discretion.**
Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.
NOTE: This program does not accept family law, probate, or small claims cases.

b. **Los Angeles County Dispute Resolution Programs**
https://wdacs.lacounty.gov/programs/drp/

- Small claims, unlawful detainers (evictions) and, at the Spring Street Courthouse, limited civil:
  - Free, day- of- trial mediations at the courthouse. No appointment needed.
  - Free or low-cost mediations before the day of trial.
  - For free or low-cost Online Dispute Resolution (ODR) by phone or computer before the day of trial visit http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c. **Mediators and ADR and Bar organizations** that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/CI0047.aspx

**Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/CI0109.aspx**
**For general information and videos about ADR, visit** http://www.courts.ca.gov/programs-adr.htm